ACCEPTED
15-25-00013-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
5/7/2025 4:14 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00013

# In the Fifteenth Court of Appeals
# Austin, Texas

FILED IN
15TH COURT OF APPEALS
AUSTIN, TEXAS
5/7/2025 4:14:15 PM
CHRISTOPHER A. PRINE
Clerk

State of Texas, the Texas Facilities Commission,
the Texas Health and Human Services Commission,
Mike Novak, in his Official Capacity as Executive Director of the TFC, and
Roland Niles, in his Official Capacity as Deputy Executive Commissioner
for the System Support Services Division of the Texas Health
and Human Services Commission,

*Appellants*,

*v.*

Broadmoor Austin Associates, a Texas Joint Venture,

*Appellee*.

On Appeal from the 455th Judicial District of Travis County,
No. D-1-GN-23-007899

## Brief of Appellee

**Scott Douglass &
McConnico LLP**

Jason R. LaFond
State Bar No. 24103136
Casey Dobson
Sara Clark

303 Colorado Street, Suite 2400
Austin, TX 78701
(512) 495-6300
jlafond@scottdoug.com

*Counsel for Appellee*

# Table of Contents

**Page**

Table of Authorities ......................................................................................... iv

Introduction ...................................................................................................... 1

Statement of Facts ........................................................................................... 2

    A.  Legal background ...................................................................................... 2

        1.  State appropriations ........................................................................... 2

            a.  The budget process ...................................................................... 2

            b.  Legislative control ....................................................................... 4

        2.  Leasing private office space for state tenants ......................................... 6

    B.  Factual background ................................................................................... 7

        1.  The Broadmoor Lease ......................................................................... 7

        2.  The breach ........................................................................................ 8

        3.  The pretext ....................................................................................... 8

    C.  Procedural history .................................................................................. 16

Standard of Review .......................................................................................... 17

Summary of the Argument ............................................................................... 18

Argument ......................................................................................................... 19

I.  Chapter 114's Waiver of Sovereign Immunity Encompasses Broadmoor's Breach Claim. .............................................................................................. 19

    A.  A state agency entered into the Broadmoor Lease as authorized by law. ...................................................................................................... 20

        1.  The Commission entered into the Broadmoor Lease as authorized. ......................................................................................... 20

        2.  The Government misreads the law and the lease. ................................. 22

            a.  Government Code § 2167.055 confirms the Commission entered into the Broadmoor Lease. ............................................. 22

            b.  The "State" as lessee includes the Commission and HHSC. ........................................................................................ 25

                i.  Chapter 2167 shows the Commission and HHSC may and did enter into the lease relationship. ............................... 26

  ii. Landlord-tenant law and the Broadmoor Lease's terms show the same. ...................................................... 28

  c. In any event, the State as lessee is a "state agency" as defined. .......................................................... 30

B. The Broadmoor Lease is "a contract subject to this chapter." ................. 33

C. Broadmoor alleges the breach of an express provision of the Broadmoor Lease. ................................................................. 35

 1. Broadmoor doesn't need to prove a breach to come within Chapter 114's waiver of sovereign immunity. ..................................... 35

 2. The State Entities breached in any event. ............................................. 37

  a. The Government failed to plead any condition subsequent. .......... 37

  b. Refusing to pay isn't a lack of funding. ......................................... 38

D. None of Chapter 114's terms and conditions take Broadmoor's breach claim outside the waiver. .................................................. 43

II. Broadmoor Adequately Pleaded *Ultra Vires* Claims. ...................................... 46

A. Broadmoor pleaded *ultra vires* acts by Novak and Niles. ........................... 47

 1. Novak had no authority to terminate the Broadmoor Lease. ............... 49

  a. Novak had no authority to terminate the Broadmoor Lease when money was available to pay rent. ....................................... 50

  b. Novak had no authority to violate the Commission's own regulations. ................................................................. 56

 2. Niles failed to perform his ministerial duty to certify that money was available for the Broadmoor Lease. .............................................. 58

B. Broadmoor seeks prospective relief bringing Novak's and Niles's conduct back in line with state law. ............................................ 61

III. Broadmoor's UDJA Claim Is Proper. ............................................................... 63

Conclusion and Prayer ........................................................................................... 63

Certificate of Compliance ....................................................................................... 65

## Appendix

**Tab**

**1**     Broadmoor Lease

**2**     Texas Government Code Chapter 2167

**3**     Texas Civil Practice & Remedies Code Chapter 114

**4**     Excerpts from Act of May 27, 2023, 88th Leg., R.S., ch. 1170 § 1

**5**     1 Texas Administrative Code Chapter 115 Subchapter B

**6**     2 HHSC Legislative Appropriation Request 4.A (2022)

# Table of Authorities

## Cases

*Ballantyne v. Champion Builders,*
144 S.W.3d 417 (Tex. 2004) ....................................................... 48

*Beaumont, Sour Lake & W. Ry. v. State,*
173 S.W. 641 (Tex. App.—Galveston 1914, no writ) ........................... 26

*Bracey v. City of Killeen,*
417 S.W.3d 94 (Tex. App.—Austin 2013, no pet.) .............................. 62

*Bradston Assocs. v. Cnty. Sheriff's Dep't,*
892 N.E.2d 732 (Mass. 2008) ..................................................... 59

*Bullock v. Tex. Skating Ass'n,*
583 S.W.2d 888 (Tex. App.—Austin 1979, writ ref'd n.r.e.) .................. 26

*Byrdson Servs. v. S. E. Tex. Reg'l Plan. Comm'n,*
516 S.W.3d 483 (Tex. 2016) ....................................................... 34

*Charles Scribner's Sons v. Marrs,*
262 S.W. 722 (Tex. 1924) .......................................................... 49

*City of El Paso v. Heinrich,*
284 S.W.3d 366 (Tex. 2009) ....................................................... 47

*City of Hous. v. Hous. Mun. Emps. Pension Sys.,*
549 S.W.3d 566 (Tex. 2018) ................................................... 17, 46

*City of Hous. v. Williams,*
353 S.W.3d 128 (2011) .............................................................. 21

*City of Irving v. Seppy,*
301 S.W.3d 435 (Tex. App.—Dallas 2009, no pet.) ............................ 28

*City of Lancaster v. White Rock Com.,*
2018 WL 6716932 (Tex. App.—Dallas 2018, pet. denied) .................... 38

*Cmty. Health Choice v. Hawkins,*
328 S.W.3d 10 (Tex. App.—Austin 2010, pet. denied) ........................ 52

*Cmty. Health Sys. Prof'l Servs. v. Hansen,*
525 S.W.3d 671 (Tex. 2017) ....................................................... 38

*Coinmach Corp. v. Aspenwood Apartment Corp.*,
417 S.W.3d 909 (Tex. 2013) ................................................ 45

*Ferguson v. Johnson*,
57 S.W.2d 372 (Tex. App.—Austin 1933, writ dism'd) ....................... 52

*Flora Crane Serv. v. Ross*,
390 P.2d 193 (Cal. 1964) .................................................. 59

*Fort Worth Cavalry Club v. Sheppard*,
83 S.W.2d 660 (Tex. 1935) ................................................ 49

*Fulmore v. Lane*,
140 S.W. 405 (Tex. 1911) ............................................... 5, 49

*Hartzell v. S.O.*,
672 S.W.3d 304 (Tex. 2023) ............................................ 49, 62

*Herring v. Hous. Nat. Exch. Bank*,
269 S.W. 1031 (Tex. 1925) ................................................ 25

*Hoppenstein Props. v. McLennan Cnty. Appraisal Dist.*,
341 S.W.3d 16 (Tex. App.—Waco 2010, pet. denied) ....................... 33, 45

*Hous. Belt & Terminal Ry. v. City of Hous.*,
487 S.W.3d 154 (Tex. 2016) ............................................ 48, 51

*In re City of Galveston*,
622 S.W.3d 851 (Tex. 2021) ............................................... 58

*In re Dallas Cnty.*,
697 S.W.3d 142 (Tex. 2024) ............................................... 41

*In re Durnin*,
619 S.W.3d 250 (Tex. 2021) ............................................... 58

*In re Panchakarla*,
602 S.W.3d 536 (Tex. 2020) ............................................... 59

*In re Phillips*,
496 S.W.3d 769 (Tex. 2016) ............................................ 48, 60

*In re Sanofi-Aventis U.S.*,
2025 WL 920111 (Tex. App.—15th Dist. 2025, no pet. h.) ................... 26

*Indian Towing v. United States*,
350 U.S. 61 (1955) ....................................................... 19

*Jessen Assocs. v. Bullock*,
531 S.W.2d 593 (Tex. 1975) ...................................................................2, 5, 49, 62

*Kirby Lake Dev. v. Clear Lake City Water Auth.*,
320 S.W.3d 829 (Tex. 2010) ................................................................................ 32

*Lake v. Premier Transp.*,
246 S.W.3d 167 (Tex. App.—Tyler 2007, no pet.) ............................................. 24

*Luther Transfer & Storage v. Walton*,
296 S.W.2d 750 (Tex. 1956) ............................................................................... 37

*Monsanto Co. v. Cornerstones Mun. Util. Dist.*,
865 S.W.2d 937 (Tex. 1993) ............................................................................... 25

*Nat'l Biscuit Co. v. State*,
135 S.W.2d 687 (Tex. 1940) .................................................................................. 4

*NP Anderson Cotton Exch. v. Potter*,
230 S.W.3d 457 (Tex. App.—Forth Worth 2007, no pet.) .................................. 30

*Oncor Elec. Delivery v. Wilbarger Cnty. Appraisal Dist.*,
691 S.W.3d 890 (Tex. 2024) ............................................................................... 36

*Patel v. Tex. Dep't of Licensing & Regul.*,
469 S.W.3d 69 (Tex. 2015) ................................................................................. 62

*Pepper Lawson Horizon Int'l Grp. v. Tex. S. Univ.*,
669 S.W.3d 205 (Tex. 2023)........................................................... 19, 20, 36, 38

*Port Arthur Cmty. Action Network v. Tex. Comm'n on Env't Quality*,
707 S.W.3d 102 (Tex. 2025) ............................................................................... 56

*Pub. Util. Comm'n v. Luminant Energy*,
691 S.W.3d 448 (Tex. 2024) ............................................................................... 30

*Rogers v. Bagley*,
623 S.W.3d 343 (Tex. 2021) ................................................................................31

*Schroeder v. Escalera Ranch Owners' Ass'n*,
646 S.W.3d 329 (Tex. 2022) ......................................................................... 48, 61

*State v. City of San Marcos*,
2025 WL 1142065 (Tex. App.—15th Dist. 2025, no pet. h.) ..............................17

*Sw. Bell Tel. v. Emmett*,
459 S.W.3d 578 (Tex. 2015) .......................................................................... 62, 63

*Tex. Dep't of Transp. v. Sefzik*,
   355 S.W.3d 618 (Tex. 2011) ................................................................ 62

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
   908 F.3d 127 (5th Cir. 2018) ............................................................... 52

*Tex. Nat. Res. Conservation Comm'n v. IT-Davy*,
   74 S.W.3d 849 (Tex. 2002) ................................................................. 63

*Texas v. White*,
   74 U.S. 700 (1868), *overruled on other grounds by*
   *Morgan v. United States*, 113 U.S. 476 (1885) ........................................ 32

*TotalEnergies E&P USA v. MP Gulf of Mex.*,
   667 S.W.3d 694 (Tex. 2023) ................................................................ 58

*Van Boven v. Freshour*,
   659 S.W.3d 396 (Tex. 2022) .......................................................... 60, 61

*Youngkin v. Hines*,
   546 S.W.3d 675 (Tex. 2018) ............................................................... 25

**CONSTITUTIONAL PROVISIONS**

Tex. Const. art. I
   § 1 ...................................................................................................... 32
   § 2 ...................................................................................................... 32

Tex. Const. art. II, § 1 ..................................................................... 4, 32

Tex. Const. art. III
   § 49(a) .................................................................................................. 4
   §§ 1, 35(a) ............................................................................................ 4

Tex. Const. art. IV, § 14 ........................................................................ 5

Tex. Const. art. VIII
   § 3 ...................................................................................................... 40
   § 6 ........................................................................................................ 4

**STATUTES**

Act of May 27, 2023, 88th Leg., R.S., ch. 1170 § 1, art. II sec. 1 ............................. 13

Tex. Civ. Prac. & Rem. Code
   § 101.001(3)(A) .................................................................................. 25
   § 101.025(a) ........................................................................................ 36
   § 114.001(3) ............................................................................. 21, 31, 33

§ 114.002 .................................................................................. 43, 44, 45

§ 114.003 .................................................................................. *passim*

§ 114.004 ....................................................................................... 43

§ 114.008 ....................................................................................... 43

§ 114.009 ....................................................................................... 43

§ 16.061(a) .................................................................................... 25

Tex. Gov't Code

§ 2151.002(2) ............................................................................... 41

§ 2151.004(c) ............................................................................ 21, 28

§ 2152.001 ..................................................................................... 21

§ 2152.103 ................................................................................ 50, 56

§ 2165.104(a) .................................................................................. 6

§ 2165.105(a) .................................................................................. 6

§ 2165.105(b) .................................................................................. 6

§ 2167.002 ....................................................................................... 6

§§ 2167.002, 2167.053, 2617.055(a)–(b) ....................................... 7

§ 2167.002(a) ............................................................................ 27, 40

§ 2167.0021 .................................................................................. 35

§ 2167.0021(a) ............................................................................. 56

§ 2167.005(a) ............................................................................... 22

§ 2167.006(a) ............................................................................... 22

§ 2167.053 ................................................................................... 28

§ 2167.054(a) ............................................................................... 22

§ 2167.055(a) ...................................................................... 22, 23, 26

§ 2167.055(e) ............................................................................. 7, 51

§ 2167.055(f) ............................................................................. 27, 56

§ 2167.101 ............................................................................. *passim*

§ 2167.102(a)–(b) ........................................................................ 50

§ 2167.104 ............................................................................... 22, 28

§ 2167.104(f) ............................................................................... 22

§ 2167.105 ............................................................................... 7, 50

§ 311.034 ....................................................................................... 19

§ 317.002(a) .................................................................................... 5

§ 317.002(b) .................................................................................... 5

## Legislative Materials

Tex. H.B. 1, 88th Leg., R.S.
(as introduced Jan. 18, 2023) ...................................................... 12

(as passed in the House Apr. 6, 2023) ................................................................. 12

(as passed in the Senate Apr. 17, 2023) .................................................................13

## Regulations

1 Tex. Admin. Code

§ 115.20 ................................................................................................................ 42

§ 115.20(6).............................................................................................................11

§ 115.21.............................................................................................................54, 57

§§ 115.21–.22 ....................................................................................................... 57

§ 115.21(a)........................................................................................................ 11, 57

§ 115.21(b) ............................................................................................................ 54

§ 115.22(a)–(b).................................................................................................... 57

§ 115.22(b) .........................................................................................................54, 58

## Texas Attorney General Opinions

Tex. Att'y Gen. LA-2 (1974) ................................................................................ 61

Tex. Att'y Gen. Op. No. H-207 (1974)...............................................................60

Tex. Att'y Gen. Op. No. JM-256 (1984) ............................................................. 4

Tex. Att'y Gen. Op. No. M-1171 (1972) ............................................................. 4

Tex. Att'y Gen. Op. No. M-1191 (1972) ...........................................................60

Tex. Att'y Gen. Op. No. MW-52 (1979)............................................................ 26

Tex. Att'y Gen. Op. No. O-5545 (1943) .......................................................... 4, 61

Tex. Att'y Gen. Op. No. V-1147 (1957) ............................................................ 26

## Agency Materials

2 HHSC Legislative Appropriation Request (2022) ............... 12, 21, 53

HHSC, *Monthly Financial Report for Appropriation Year 2024* (Oct. 3, 2024), https://tinyurl.com/53j57bt2 .........................................................................15

Legis. Budget Bd., *ABEST Object of Expense Codes* (Oct. 10, 2023), https://tinyurl.com/y8wytmsp ........................................................................11

Tex. Facilities Comm'n, *Master Facilities Plan Report* (2020), https://tinyurl.com/2n636aaw ..................................................................... 10

Tex. Facilities Comm'n, *Self-Evaluation Report to Sunset Advisory Commission* (Sept. 2011), https://tinyurl.com/33dr3sps ..................................... 10

Tex. Facilities Comm'n, *State Lease Contract Template*,
    https://tinyurl.com/yfyxsk94.................................................................. 7

**Rules**

Tex. R. Civ. P. 54 .................................................................................. 38

**Other Authorities**

Black's Law Dictionary (10th ed. 2014).................................. 31, 33

Garner's Modern English Usage (4th ed. 2017) ................................... 32

Internet Archive Wayback Machine, Results of Search for
    "https://oig.hhs.texas.gov/," https://tinyurl.com/mwmdme2s
    (last visited Apr. 8, 2025) .............................................................11

Internet Archive Wayback Machine, Results of Search for
    "https://oig.hhs.texas.gov/," https://tinyurl.com/mw3kev6j
    (last visited Apr. 8, 2025) .............................................................11

15 McQuillin Mun. Corp. § 39:45 (3d ed.) ................................... 58

O'Connor's Texas Causes of Action Ch. 24-A § 3 (2025 ed.) ............. 28

O'Connor's Texas Forms * Real Estate Ch. 2 § 4.8 (2025
    ed.) ......................................................................................... 44

Restatement (Second) of Agency § 154 (1958) ................................... 23

S. Rsrch. Ctr., Budget 101: A Guide to the Budget
    Process in Texas ( Jan. 2023), https://tinyurl.com/ared9bpy .... 2, 3, 4, 5, 12

49 Tex. Jur. 3d Landlord and Tenant § 237.......................................... 29

Webster's Third New International Dictionary
    (1993 ed.)....................................................................................51

Webster's Third New International Dictionary
    (2002 ed.)........................................................... 23, 39, 44, 56

5 Williston on Contracts § 9:1 (4th ed.)......................................31

12 Williston on Contracts § 35:39 (4th ed.) ........................................... 23

## To the Honorable Fifteenth Court of Appeals:

Broadmoor constructed and leased substantial office space to the Texas government. The Broadmoor Lease's term has not yet expired, yet rent has gone unpaid for nearly two years. The cause—misconduct by state officials. The result—breach of contract. The Court should affirm because sovereign immunity does not bar Broadmoor's claims addressing that cause and result.

By law, the Broadmoor Lease is contingent on ongoing rent appropriations to the tenant state agency—HHSC. In 2023, for the upcoming biennium, the Legislature appropriated HHSC more rent money than HHSC planned on spending, and plenty for the Broadmoor Lease. But at the same time, officials from the Texas Facilities Commission and HHSC were facing down an embarrassing office-space blunder and looking for a face-saving fix. So they contrived to escape the lease by implausibly claiming inadequate funding. That conduct breached the lease; it was also beyond the officials' authority and contrary to their ministerial duties.

Sovereign immunity is no obstacle to Broadmoor's claims against the lessee (comprising the State; the Commission, who controlled the leased premises; and HHSC, who occupied those premises (the "State Entities")) and the responsible officials (collectively the "Government"). An express waiver plainly encompasses Broadmoor's breach of contract claim. And sovereign immunity doesn't apply to Broadmoor's *ultra vires* claims, which merely seek prospective equitable and declaratory relief to bring the responsible officials back in line with state law.

Broadmoor begins with the legal background of state appropriations and the lease of office space for state agencies before discussing the lease, its breach, and the *ultra vires* conduct challenged here.

## A. Legal background

### 1. State appropriations

An "appropriation" is "the setting aside or dedicating of funds for a specified purpose."[1] A multi-year budget process culminates in each biennial General Appropriations Act (GAA), by which the Legislature makes funding decisions that control agency expenditures over the ensuing two years.

#### a. The budget process

The state government's biennial budget is a four-year process: In year one, agencies develop appropriation requests and the Comptroller develops revenue estimates; in year two, the Legislature appropriates through the GAA; and in years three and four, agencies expend the Legislature's appropriations according to the GAA.[2]

An agency's appropriation request details the funding the agency's administrators feel the agency needs to pursue the tasks assigned it by law. Based on these requests, the Legislative Budget Board prepares the first draft of the GAA.[3] Two

---

[1] *Jessen Assocs. v. Bullock*, 531 S.W.2d 593, 599 (Tex. 1975).
[2] S. Rsrch. Ctr., Budget 101: A Guide to the Budget Process in Texas 3–4 (Jan. 2023) ("Budget 101"), https://tinyurl.com/ared9bpy.
[3] *Id.* at 4.

identical bills are introduced, one in each house of the Legislature; then each is marked up and amended by the houses' respective committees, and then passed and sent to a conference committee, which reports a single bill for final passage.[4] When passed, the Comptroller must certify whether enough revenue will exist to cover the appropriations.[5] When certified, the bill goes to the Governor for his signature or veto.[6] Any part of the bill not vetoed takes effect on September 1, the start of the State's fiscal year.[7] "Although the budget does not appear in Texas' statutes or codes, it is law and agencies are bound by it."[8]

The GAA directs spending by "line item," which is "[a]n element of spending authority granted to an agency or institution in an appropriations bill. Literally, a line in the General Appropriations Act specifying an agency's appropriations for a specific designated use."[9] Line items appear in two forms, "strategy" and "object of expense."[10] A "strategy" is an output; it details "actions to be taken by the agency to achieve" its various goals.[11] An "object of expense" (salary, rent, travel, etc.) is an input necessary to fulfill the strategies; "[a]n expense category . . . covering

---

[4] *Id.* at 4–5.
[5] *Id.* at 5.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.* at 69.
[10] *Id.* at 18–19.
[11] *Id.* at 18.

payments for a period of time or class of items."[12] The sum of "strategy" appropriations is equal to the sum of appropriations for each "object of expense."[13]

### b. Legislative control

Appropriations are a precondition to spending because the Constitution says (with exceptions not relevant here), "No debt shall be created by or on behalf of the State,"[14] and "No money shall be drawn from the Treasury but in pursuance of specific appropriations made by law."[15] And each new Legislature needs to adopt a new appropriation law because (1) the Legislature makes the law,[16] and (2) no "appropriation of money" may "be made for a longer term than two years."[17]

The Constitution's assignment of control to the Legislature necessarily limits the other branches' role in appropriations.[18] For instance, other branches may not determine their own appropriations or second-guess the Legislature's choices about what items to spend money on.[19] And just as other branches must respect the Legislature's role, the Legislature must not delegate its role away.[20]

Two exceptions illuminate these limits.

---

[12] *Id.* at 70.

[13] *Id.* at 19.

[14] Tex. Const. art. III, § 49(a).

[15] *Id.* art. VIII, § 6.

[16] *See id.* art. III, §§ 1, 35(a).

[17] *Id.* art. VIII, § 6.

[18] *See id.* art. II, § 1.

[19] *See, e.g.*, Tex. Att'y Gen. Op. No. JM-256 (1984); Tex. Att'y Op. No. O-5545 (1943).

[20] *See Nat'l Biscuit Co. v. State*, 135 S.W.2d 687, 693–94 (Tex. 1940); Tex. Att'y Gen. Op. No. M-1171 (1972).

First, before 1985, the Executive Branch's only control over appropriations was the Governor's power to strike particular items of appropriations while allowing others to become law.[21] "The veto power . . . is a legislative and not an executive function," but the Constitution expressly endorses this crossover power.[22] That crossover, however, "exists only to the extent granted by the Constitution."[23]

Second, recognizing that the Executive Branch otherwise lacked the power to redirect or impound appropriations made by law, the Legislature proposed and Texans ratified Article XVI, § 69, which says, "The legislature may require, by rider in the General Appropriations Act or by separate statute, the prior approval of the expenditure or the emergency transfer of any funds appropriated to the agencies of state government." Implementing this amendment, the Government Code provides for "budget execution": The Governor or Legislative Budget Board may propose and the other may approve "that a state agency be prohibited from spending . . . part or all of an appropriation" absent prior approval.[24] Either may also propose or approve the other's proposal that an appropriation be "used for a purpose different from or additional to the purpose for which the appropriation was made," or "transferred to another state agency to be used for a specified purpose."[25]

---

[21] *See* Tex. Const. art. IV, § 14.

[22] *Fulmore v. Lane*, 140 S.W. 405, 411 (Tex. 1911).

[23] *Jessen Assocs.*, 531 S.W.2d at 598; *accord Fulmore*, 140 S.W. at 412.

[24] Tex. Gov't Code § 317.002(a).

[25] *Id.* § 317.002(b); *see also* Budget 101 at 43 ("this is known as budget execution").

5

### 2. Leasing private office space for state tenants

As the "objects of expense" in the GAA suggest, state government—like most endeavors—entails overhead. The State's arms require physical space from which to pursue their governmental aims. Some office space is owned; some is leased, including from private landlords like Broadmoor. Broadly, the Commission enters into a lease on behalf of a state agency that needs space, and the agency occupies the leased space and is responsible for paying rent due.

Government Code Chapters 2165 and 2167 govern this process. It's the Commission's responsibility to "study the space requirements of state agencies that occupy space under the commission's charge and control, including state-owned space and space leased from other sources."[26] And when a state agency desires more or different space, it "send[s] to the commission a written request for space the agency needs to perform its functions."[27] The Commission then determines "whether a need for the space exists" and, if so, the "specifications for needed space."[28]

If there's no suitable space available in government-owned buildings, the Commission looks for private office space to lease.[29] While the "State" is listed as the nominal "lessee" in these leases, the law makes clear that the Commission is

---

[26] Tex. Gov't Code § 2165.104(a).
[27] *Id.* § 2165.105(a).
[28] *Id.* § 2165.105(b).
[29] *See id.* § 2167.002.

6

entering into the lease, and is doing so on behalf the state agency tenant.[30] And the Commission supervises the tenant agency's compliance with the lease and the law.[31]

To comply with the Constitution's prohibition on debt, any "lease contract is contingent on the availability of money appropriated by the legislature to pay for the lease."[32] And because the leasing agency is financially responsible for space leased on its behalf, it must "certify to the commission, at least 60 days before the beginning of each fiscal biennium during the lease term, that money is available to pay for the lease until the end of the next fiscal biennium."[33]

## B. Factual background

### 1. The Broadmoor Lease

In August 2014, the Commission entered into the Broadmoor Lease on behalf of HHSC for 122,213 square feet of office space at 11501 Burnet Road in Austin, to be occupied by HHSC's Office of Inspector General.[34] The lease is on the Commission's standard form.[35] The nominal "lessee" is the "State of Texas," but, like the associated statutes, the lease makes clear that the Commission and HHSC are parties to the landlord-tenant relationship.[36]

---

[30] *See, e.g., id.* §§ 2167.002, 2167.053, 2617.055(a)–(b) (discussed more in Part I.A, *infra*).
[31] *See id.* § 2167.105.
[32] *Id.* § 2167.055(e).
[33] *Id.* § 2167.101.
[34] CR.282, 290.
[35] *See* Tex. Facilities Comm'n, *State Lease Contract Template*, https://tinyurl.com/yfyxsk94.
[36] *See, e.g.*, CR.282–83; CR.312–14 (discussed more in Part I.A, *infra*).

In addition to standard lease terms, the lease imposes on Broadmoor various construction obligations.[37]

As amended, the Broadmoor Lease's term runs through October 31, 2026.[38] That term is subject to various conditions subsequent, including loss of funding.[39] But if the lessee fails to "pay rentals" without excuse, Broadmoor "will have the remedies now or hereafter provided by law for recovery of rent . . . and damages occasioned by Lessee's default."[40]

### 2. The breach

HHSC abandoned the Broadmoor Lease in 2024 and Broadmoor hasn't been paid rent under the lease since August 2024.[41] Broadmoor has been unable to re-lease the property and has suffered millions in damages in lost rent.

### 3. The pretext

The Government maintains there's no breach because the Lease "is made contingent upon the continuation of the availability of money appropriated by the legislature to pay for the lease."[42] To be sure, on May 31, 2023, an HHSC staffer "directed the . . . Commission to terminate the . . . Lease due to the non-availability of money, either appropriated by the legislature or funded by grants, to pay for the

---

[37] *E.g.*, CR.285; CR.307 (discussed more in Part I.D, *infra*).
[38] CR.314.
[39] CR.283.
[40] CR.286.
[41] CR.274; CR.448.
[42] Br.31.

leased premises."[43] And the next day, on June 1, the Commission's Executive Director purported to terminate the Lease because HHSC "has directed that rent will not be certified for the biennium beginning September 1, 2023, as required by Section 2167.101, Texas Government Code."[44]

But HHSC's supposed lack of appropriation has always been pretext—and patently false.

### *North Austin Complex*

The events ending in the breach of the Broadmoor Lease are best understood in the context of the "North Austin Complex." HHSC's instruction to the Commission to terminate the Broadmoor Lease reveals the true reason for the request—not poverty, but a desire to move its staff to new digs at "NAC at 4601 W. Guadalupe"[45]:

Moving all staff out of Broadmoor 902 to the NAC and Winters Bldg. The plan is to relocate OIG/HHSC staff to NAC at 4601 W. Guadalupe (3405), and Winters Bldg. at 701 W. 51st St. (1001). HHSC = 122,123 sq. ft., 475 FTEs.

**D.** Current FTE's: 475

**E.** Current Location: Lease Space

Lease # / Bldg. Name: 20392
City: Austin
SF: 122123

**2. Requested Action:**

Terminate Existing Lease

---

[43] CR.317.
[44] CR.320.
[45] CR.317.

9

"NAC" is "North Austin Complex," a project HHSC and the Commission have been working together on for more than a decade, and which now includes a new state office building at 4601 W. Guadalupe.[46]

Years before entering the Broadmoor Lease on HHSC's behalf, the Commission identified the "North Austin Complex"—a large swath of State-owned land that has long included HHSC's headquarters—as "underutilized" and a "significant redevelopment opportunit[y]."[47] "The Commission, working on behalf of and in collaboration with HHSC, prepared a North Austin Complex Master Plan to consolidate [HHSC's] leased office space into state-owned buildings."[48] The Commission and HHSC have long planned to "retire $7.4 million of annual lease expenses" by "[c]onsolidating the leases into state-owned facilities" upon the completion of "phase one" in 2021.[49]

Impatient to relocate, HHSC began moving out of the Broadmoor Lease property and moving its staff to the North Austin Complex in *January 2023*—just as that cycle's legislative appropriation process was starting.[50] In fact, by early March 2023, HHSC's Office of the Inspector General had already changed its address from the

[46] *See* TEX. FACILITIES COMM'N, *Master Facilities Plan Report* 8 (2020), https://tinyurl.com/2n636aaw.
[47] TEX. FACILITIES COMM'N, *Self-Evaluation Report to Sunset Advisory Commission* 12 (Sept. 2011), https://tinyurl.com/33dr3sps.
[48] *2020 Master Facilities Plan Report* 8.
[49] *Id.*
[50] CR.317.

Broadmoor Lease location to the North Austin Complex.[51] These moves were all on the Commission's watch, as it controlled both properties.

Why did HHSC begin vacating the leased premises before it even knew its funding? Because "[p]rior to requesting that the Commission cancel a lease due to lack of funding, the governmental agency shall determine that it occupies idle facilities."[52] And "'[i]dle facilities' means *completely unused* facilities that are excess to the governmental agency's current needs."[53] HHSC anticipated deficient funding would allow it to terminate the Broadmoor Lease. But that deficiency never happened.

### *HHSC's Biennial Appropriation*

HHSC submitted its appropriation request for fiscal years 2024–25 at the beginning of fiscal year 2023.[54] For that year, HHSC expected to spend $110 million for the "Rent – Building" line-item—*i.e.*, "Rental of Office Buildings or Office Space."[55] Yet HHSC's baseline request for the two following fiscal years included only $105 million in annual appropriations for that line-item.[56] HHSC included its

---

[51] *Compare* Internet Archive Wayback Machine, Results of Search for "https://oig.hhs.texas.gov/," https://tinyurl.com/mwmdme2s (last visited Apr. 8, 2025) (website as of **Feb. 10, 2023** listing address for "Austin headquarters" as "11501 Burnet Road"), *with id.*, https://tinyurl.com/mw3kev6j (last visited Apr. 8, 2025) (website as of **Mar. 5, 2023** listing address for "Austin headquarters" as "North Austin Complex 4601 Guadalupe").

[52] 1 Tex. Admin. Code § 115.21(a).

[53] *Id.* § 115.20(6) (emphasis added).

[54] CR.270.

[55] Legis. Budget Bd., *ABEST Object of Expense Codes* 6 (Oct. 10, 2023), https://tinyurl.com/y8wytmsp; *see also* CR.434 (Government acknowledging that this item of appropriation is for HHSC's lease payments).

[56] CR.270.

remaining (and growing) lease obligations as a request for "exceptional items,"[57] which is like a wish list: "items that are not part of the agency's baseline budget request, but are exceptional in nature and warrant further discussion."[58] In justifying its request for additional funding, HHSC explained that it cannot just walk away from its lease obligations and thus "has limited flexibility to manage cost increases . . . for leases."[59]

But as originally introduced in January 2023, the GAA devoted little to that exceptional item, increasing the "Rent – Building" line-item less than $3 million above HHSC's baseline biennial request.[60]

| Object-of-Expense Informational Listing: | | |
| --- | --- | --- |
| Salaries and Wages | $    2,173,465,500 | $    2,291,785,403 |
| Other Personnel Costs | 66,448,066 | 66,453,482 |
| Professional Fees and Services | 1,573,974,720 | 1,673,640,682 |
| Fuels and Lubricants | 1,400,052 | 1,400,052 |
| Consumable Supplies | 11,060,379 | 11,060,379 |
| Utilities | 44,599,400 | 44,601,800 |
| Travel | 28,554,198 | 27,964,416 |
| Rent - Building | 106,123,383 | 107,016,015 |
| Rent - Machine and Other | 24,579,765 | 24,579,765 |
| Other Operating Expense | 511,708,305 | 414,101,807 |
| Client Services | 38,837,614,208 | 39,050,595,928 |
| Food for Persons - Wards of State | 21,450,451 | 21,450,451 |
| Grants | 2,370,385,267 | 2,335,278,494 |
| Capital Expenditures | 152,926,639 | 81,325,912 |
| **Total, Object-of-Expense Informational Listing** | $   45,924,290,333 | $   46,151,254,586 |

Around that same time, HHSC began vacating the Broadmoor Lease premises. The GAA initially passed by the House maintained that initial lesser appropriation.[61]

---

[57] CR.270; 2 HHSC Legislative Appropriation Request 4.A at 57–58 (2022).

[58] Budget 101 at 27.

[59] 2 HHSC Legislative Appropriation Request 4.A at 58.

[60] *See* Tex. H.B. 1, 88th Leg., R.S., art. II, § 1 at II-43 (as introduced Jan. 18, 2023).

[61] *Id.* art. II, § 1 at II-37 (as passed in the House Apr. 6, 2023).

But the next version of the GAA, reported by the Senate Finance Committee and passed by the Senate, dramatically increased HHSC's appropriation for the "Rent – Building" line-item by more than $25 million across the biennium.[62]

| Object-of-Expense Informational Listing: | | |
|---|---|---|
| Salaries and Wages | $ 2,126,040,694 | $ 2,244,262,996 |
| Other Personnel Costs | 66,448,066 | 66,453,482 |
| Professional Fees and Services | 1,454,866,979 | 1,486,443,735 |
| Fuels and Lubricants | 1,400,052 | 1,400,052 |
| Consumable Supplies | 11,061,844 | 11,060,093 |
| Utilities | 44,594,120 | 44,594,120 |
| Travel | 28,479,259 | 27,880,977 |
| Rent - Building | 118,826,243 | 119,751,160 |
| Rent - Machine and Other | 24,572,964 | 24,572,964 |
| Other Operating Expense | 483,869,894 | 409,300,733 |
| Client Services | 38,808,491,236 | 39,068,840,476 |
| Food for Persons - Wards of State | 21,450,451 | 21,450,451 |
| Grants | 2,241,728,607 | 2,244,621,834 |
| Capital Expenditures | 108,980,198 | 37,763,847 |
| **Total, Object-of-Expense Informational Listing** | $ 45,540,810,607 | $ 45,808,396,920 |

The GAA adopted by the Legislature on May 27 and signed by Governor Abbott in mid-June maintained that level and also added another $1 billion to HHSC's biennial total.[63]

According to HHSC's Chief Financial Officer, HHSC had a "'very successful session from a funding perspective.'"[64]

### HHSC implausibly claims poverty and the Commission attempts to terminate

When it came to the Broadmoor Lease, however, the Legislature's generosity put HHSC and the Commission in a bind. Having jumped the gun and prematurely

---

[62] *Id.* art. II, § 1 at II-37 (as passed in the Senate Apr. 17, 2023).

[63] *Id.* art. II, § 1 at II-38 (as adopted May 27, 2023); Act of May 27, 2023, 88th Leg., R.S., ch. 1170 § 1, art. II sec. 1 at II-38.

[64] CR.272–73 (citation omitted).

13

vacated the Broadmoor Lease premises, they faced the prospect of explaining to the Legislature and the public why HHSC was paying rent for an empty building. The solution: HHSC would claim lack of appropriation to get out of the Lease, which the Commission—equally culpable for the fiasco given its supervisory role over leased property—obliged, despite the obvious impossibility of HHSC's claimed poverty.

On May 31, an HHSC staffer filled out an online space request form that "directed the Texas Facilities Commission to terminate the [Broadmoor] Lease due to the non-availability of money, either appropriated by the legislature or funded by grants, to pay for the leased premises located at 11501 Burnet Road, Austin, Texas."[65] But HHSC's claimed "non-availability of money" was unbelievable on its face. The space request represented that HHSC had money to pay the lease's rent for the remaining three months of the then-current biennium.[66] And the May 31 request came both *before* anyone knew the final form of the forthcoming biennium's GAA (because Governor Abbott had yet to sign the law) and *after* the Legislature adopted a GAA that appropriated HHSC hundreds of millions for rent.

Even so, less than 24 hours later, Commission Executive Director Mike Novak sent Broadmoor notice purporting to the terminate the Broadmoor Lease effective at the end of the 2022–23 biennium. CR.320. In that notice, Novak repeated the space request form's direction "that rent will not be certified for the biennium beginning

---

[65] CR.317.
[66] CR.308.

September 1, 2023."[67] Yet six days *later*, the Commission requested that HHSC "certify[] that funds will be available for" the Broadmoor Lease during the next (2024–25) biennium.[68]

On July 27, 2023, HHSC's Deputy Executive Commissioner Rolland Niles responded.[69] Niles refused the Commission's request to certify the availability of funds for the Broadmoor Lease.[70] But Niles was careful not to falsely certify that funding was *un*available. To avoid falsely certifying deficient funding, Niles instead misleadingly created a list of leases that omitted the Broadmoor Lease, and certified only that funds *were available* for that incomplete list.[71] Confirming that HHSC's earlier, premature assertion that it lacked funds was false, Niles acknowledged that HHSC's other annual lease obligations amounted to only $93,767,377.36—$20 million *less* than what the GAA appropriated for "Rent – Building."[72] That same day, and despite Niles's letter proving that HHSC never lacked funds, the Commission's general counsel papered an internal memo to Novak purporting to justify Novak's premature and unjustified attempt to terminate the Broadmoor Lease.[73]

---

[67] CR.320.
[68] CR.323.
[69] CR.330.
[70] CR.330.
[71] CR.330.
[72] CR.330. Niles was almost spot on. By the end of fiscal year 2024, HHSC had spent $95 million on leases. HHSC, *Monthly Financial Report for Appropriation Year 2024* at 16 (Oct. 3, 2024), https://tinyurl.com/53j57bt2.
[73] CR.340.

## C. Procedural history

Broadmoor sued the State Entities under breach of contract and the state officials under an *ultra vires* theory.[74] Broadmoor's live petition pleads the details of the Broadmoor Lease, including its design and construction requirements.[75] The petition claims the State Entities breached the lease by attempting to terminate the lease outside the lease's terms and by failing to pay rent due.[76] The petition further pleads that all conditions precedent were satisfied.[77] The petition also pleads that the state officials' acts and refusals to act were contrary the law.[78] The petition seeks damages from the State Entities for the breach, prospective mandatory and prohibitive injunctive relief against the officials, and declaratory judgment that the 88th Texas Legislature appropriated sufficient funds to pay rent under the Broadmoor Lease for the 2024-2025 biennium.[79]

The Government answered, making a general denial, and raising jurisdictional defenses.[80] It subsequently filed a plea to the jurisdiction challenging the sufficiency of Broadmoor's pleadings but offering no evidence to negate those pleadings.[81] The

---

[74] CR.264–80.
[75] CR.268–69.
[76] CR.274–75.
[77] CR.275.
[78] CR.273–76.
[79] CR.278.
[80] CR.348–50.
[81] CR.374–412.

district court granted the plea to the jurisdiction in part.[82] The Government appealed.

## STANDARD OF REVIEW

This Court reviews a decision on a plea to the jurisdiction de novo. *State v. City of San Marcos*, 2025 WL 1142065, at *4 (Tex. App.—15th Dist. 2025, no pet. h.). A plea to the jurisdiction is decided on the pleadings unless the defendant presents evidence looking to negate a plaintiff's sufficient pleading. *Id.* To evaluate "whether the facts alleged affirmatively demonstrate the court's jurisdiction," the court construes pleadings "liberally" with an eye towards the "plaintiff's intent." *City of Hous. v. Hous. Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 575 (Tex. 2018). If the pleadings are deficient but don't negate jurisdiction, the Court will remand for repleading. *See San Marcos*, 2025 WL 1142065, at *11. And to negate sufficient pleadings with evidence, the defendant must satisfy the same burdens as with a traditional motion for summary judgment. *Id.* at *4.

---

[82] CR.611. The district court dismissed as defendants the Commissioner of HHSC and the Comptroller. *Id.*

## Summary of the Argument

Sovereign immunity is not an obstacle to Broadmoor's breach of contract claim. In Chapter 114,[83] the Legislature expressly waived sovereign immunity for breach of contract claims arising from state contracts for construction and related services. This suit meets all Chapter 114's demands. A state agency (one or more of the State Entities) entered into the Broadmoor Lease. The lease is a contract subject to Chapter 114 because it includes essential terms for providing a host of services to the State Entities. Broadmoor claims a breach of an express provision of the lease—the lease's obligation to pay rent. And among the services Broadmoor provided in exchange for rent was construction of the leased premises.

Sovereign immunity is not an obstacle to Broadmoor's other claims either. Each comes down to math, which no official has discretion to botch. HHSC has always had money to pay the lease's rent. That means Novak had no authority to attempt to terminate the lease for lack of rent money and Niles shirked his ministerial duty to certify that rent money was available. And the prospective injunctive and declaratory relief Broadmoor requests are the standard means to bring officials like Novak and Niles back into compliance with state law.

The Government's attacks all miss their mark because each jumbles up statutory text, ignores the lease's terms and governing statutes, or conflates important legal concepts. A faithful application of the law shows the district court got it right.

---

[83] Throughout this brief, "Chapter 114" refers to Civil Practice & Remedies Code Chapter 114.

# ARGUMENT

The Court should affirm because Broadmoor's allegations show that sovereign immunity is waived for its breach claim and does not apply to its *ultra vires* and declaratory judgment claims.

## I. Chapter 114's Waiver of Sovereign Immunity Encompasses Broadmoor's Breach Claim.

Sovereign immunity waivers must be clear and express. Tex. Gov't Code § 311.034. Chapter 114 fits that bill:

> ### § 114.003. Waiver of Immunity to Suit for Certain Claims
> A state agency that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this chapter *waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of an express provision of the contract*, subject to the terms and conditions of this chapter.

With the clear-statement rule satisfied, this Court discerns the waiver's scope like it would any other statute. *See Pepper Lawson Horizon Int'l Grp. v. Tex. S. Univ.*, 669 S.W.3d 205, 210–11 (Tex. 2023); *contra* Br.23 ("Any ambiguity in language should be resolved in favor of retaining immunity for the State of Texas, as well as its agencies and officials."). Just as "this Court must not promote profligacy by careless construction," "[n]either should it as a self-constituted guardian of the Treasury import [sovereign] immunity back into a statute designed to limit it." *Indian Towing v. United States*, 350 U.S. 61, 69 (1955).

Evaluating whether Broadmoor's "breach-of-contract allegations . . . fall within the scope of the express statutory waiver," *Pepper Lawson*, 669 S.W.3d at 210–11, requires answering four questions posed by Section 114.003's text:

1. Did a state agency enter into the Broadmoor Lease as authorized by statute?
2. Is the Broadmoor Lease a contract subject to Chapter 114?
3. Does Broadmoor allege a breach of an express provision of the Broadmoor Lease?
4. Do any of Chapter 114's terms and conditions take Broadmoor's claim outside the waiver?

The answers are *yes* to each of the first three questions, and *no* to the fourth. Sovereign immunity is therefore no obstacle to Broadmoor's breach claim.

### A. A state agency entered into the Broadmoor Lease as authorized by law.

Chapter 114 defines "state agency." The Commission is a "state agency" as defined; the Commission was authorized to enter into the Broadmoor Lease; and the Commission entered into the Broadmoor Lease. The Government's contrary argument turns a blind eye to plain meaning and to the nature of relationship among the State Entities and between the State Entities and Broadmoor. However conceived, a "state agency" was authorized to and did enter into the Broadmoor Lease.

#### 1. The Commission entered into the Broadmoor Lease as authorized.

The Commission is a "state agency" as defined in Chapter 114 because it's a "commission . . . that is in any branch of state government and . . . is created by . . . a

statute of this state." Tex. Civ. Prac. & Rem. Code § 114.001(3); *see* Tex. Gov't Code § 2152.001 ("The Texas Facilities Commission is an agency of the state.").

The Government Code authorizes the Commission to enter into leases like the Broadmoor Lease. The Commission's "powers and duties" include the "lease of . . . property." Tex. Gov't Code § 2151.004(c).

And the Commission entered into the Broadmoor Lease. As HHSC observed in its appropriation request: "Lease contracts are entered into by [the] Texas Facilit[ies] Commission (TFC) with lessors on behalf of occupying agencies. . . . TFC enters into lease contracts in good faith on behalf of state agencies." 2 HHSC Legislative Appropriation Request 4.A at 58 (2022). The Commission's Deputy Executive Director for Planning and Real Estate Management executed the Broadmoor Lease. CR.289.[84] And the lease was expressly made "contingent upon the majority approval by a quorum of the Commission members of the Texas Facilities Commission." CR.282–83.

Chapter 2167[85]—which is inherently part of the lease, *see, e.g.*, *City of Hous. v. Williams*, 353 S.W.3d 128, 141 (2011)—repeatedly makes clear that it's the Commission that enters leases (all emphases added):

---

[84] *Cf., e.g.*, *DeLoach v. Lorillard Tobacco Co.*, 391 F.3d 551, 560 (4th Cir. 2004) ("'enters into' equates with 'executes'"); *NLRB. v. Int'l Bhd. of Elec. Workers AFL-CIO*, 405 F.2d 159, 164 (9th Cir. 1968) ("[T]he phrase 'to enter into' as used in the section included the reaffirmation of an existing agreement as well as its execution initially.").

[85] Throughout this brief, "Chapter 2167" refers to Texas Government Code Chapter 2167.

- "In leasing space under this chapter, ***the commission shall***, whenever possible, ***enter into a lease contract*** that allows for subleasing space to a child care provider." Tex. Gov't Code § 2167.104(f).

- "***The commission*** may not ***enter a lease contract*** under this chapter unless it complies with the architectural barriers law . . . ." *Id.* § 2167.006(a).

- ***The commission may delegate*** to a state agency, including an institution of higher education, ***the authority to enter into lease contracts*** for space . . . ." *Id.* § 2167.005(a).

*See also id.* § 2167.055(a) ("In a ***contract by the commission*** for the lease of space under this chapter . . . ." (emphasis added)); *id.* § 2167.054(a) ("***The commission may lease space*** using competitive sealed proposals." (emphasis added)).

### 2. The Government misreads the law and the lease.

The Government doesn't dispute that the Commission is a "state agency." It insists, however, that only the State was authorized to and did enter into the lease, because the lease names the State as "Lessee." Br.24–28. But the Government misses the dispositive provisions quoted in the prior section. It also misinterprets the statutory and lease provisions on which its arguments depend. And even looking only to the State as lessee, Chapter 114's first requirement is met.

### a. Government Code § 2167.055 confirms the Commission entered into the Broadmoor Lease.

The Government isolates one subsection of Chapter 2167 that supposedly supports its argument that no state agency entered into the lease. The Government points to § 2167.055, which sets forth necessary parameters for any lease of space. Br.25–26. It seizes on one parameter: that the "state . . . is the lessee." Tex. Gov't

22

Code § 2167.055(a); Br.25–26. But the State's status as lessee doesn't mean—contrary to numerous provisions—that the Commission doesn't enter into leases and didn't enter into the Broadmoor Lease.

Read in full, § 2167.055(a) removes any possible doubt that the Commission entered into the lease. It reads, "In a *contract by the commission for the lease of space* under this chapter, the state, acting through the commission, is the lessee" (emphasis added). The Broadmoor Lease—"a contract . . . for lease of space"—was "*by* the commission." The word "by" means "through the direct agency of," as in "a poem written ~ Keats." *By* (prep., sense 4.b), WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 306–07 (2002 ed.) ("WEBSTER'S THIRD"). The text makes plain that the lease is the Commission's contract.

Still more, the lessee isn't simply the State, but the State "acting through the commission." Tex. Gov't Code § 2167.055(a). "Through the commission" establishes that the Commission is the means of leasing. *See Through* (prep., sense 2.a(1)), WEBSTER'S THIRD 2385 ("by means of **:** by the help or agency of"). At a minimum, then, § 2167.055(a) makes the Commission the State's agent. And agents regularly "enter into" contracts for their principals. *See, e.g.*, RESTATEMENT (SECOND) OF AGENCY § 154 cmt. b (1958) ("determining whether the principal or the agent becomes a party to a contract *entered into by the agent* for his principal") (emphasis added)); 12 WILLISTON ON CONTRACTS § 35:39 (4th ed.) (discussing "[t]he liability of an agent that *enters into a contract*" (emphasis added)); *Lake v.*

*Premier Transp.*, 246 S.W.3d 167, 171 (Tex. App.—Tyler 2007, no pet.) ("In order for an agent to avoid personal liability on a contract *entered into by the agent* on behalf of the principal, the agent must disclose . . . ." (emphasis added)).

To be sure, an agent who enters into a contract on behalf of a disclosed principal usually isn't liable for any breach. But nothing in Chapter 114 ties the waiver of sovereign immunity to the liability or contracting status of the "state agency" that "enters into a contract subject to the chapter." Tex. Gov't Code § 114.003.

The Government gets tripped up on this last point. It repeatedly misframes Chapter 114's waiver of sovereign immunity as tied to the defendant's identity. The Government proposes, for instance, "The chapter explicitly 'waives immunity' *for a 'state agency* that is authorized by statute or the constitution to enter into a contract, and so "this Court must determine whether the specific state [Appellants]—the State, TFC, and HHSC—*are state agencies subject to the waiver*." Br.24, 26 (emphases added); *see also* Br.28 ("Here, there is . . . a question of whether a clear and unambiguous immunity waiver exists against the State, HHSC, and TFC (it does not)"). That's not what Chapter 114 says.

Chapter 114's waiver is for "adjudicating a *claim*"—"a claim for breach of an express provision of the contract"—without respect to whom the claim is made against. Tex. Civ. Prac. & Rem. Code § 114.003 (emphasis added). If Chapter 114's requirements are satisfied—including "a state agency . . . enter[ing] into a contract subject to this chapter"—there's no sovereign immunity for any government

defendant sued on that claim. *Id.* To hold otherwise would artificially and improperly narrow Chapter 114's express waiver. *See Youngkin v. Hines*, 546 S.W.3d 675, 681 (Tex. 2018) (rejecting "attempts to add a requirement to [a] statute that does not exist in its text" because "injecting such a requirement into the [statute] would be disloyal to its enacted text").

At any rate, the Commission—and HHSC—entered into the Broadmoor Lease as *lessees*.

### b.   The "State" as lessee includes the Commission and HHSC.

Even if "enters into" meant become a party, the Commission and HHSC are state agencies that meet that requirement here.

"The State" is the lessee, but "all the several agencies of government . . . collectively constitute the government of this state." Tex. Civ. Prac. & Rem. Code § 101.001(3)(A).[86] Thus, a legal instrument denoting "the State" may also include constituent parts of state government. For example, in *Monsanto Co. v. Cornerstones Municipal Utility District*, the Supreme Court found that an "'action of *this state*'" as used in a statute encompassed an action by any government "entity having statewide jurisdiction." 865 S.W.2d 937, 939–40 (Tex. 1993) (quoting Tex. Civ. Prac. & Rem. Code § 16.061(a) (emphasis added)).

---

[86] That's why we're here arguing about *sovereign* immunity at all. *See, e.g.*, *Herring v. Hous. Nat'l Exch. Bank*, 269 S.W. 1031, 1033 (Tex. 1925) ("The board of prison commissioners . . . is purely an agency of government . . . . If it can be sued without legislative consent, it being purely a governmental agency or department then the government, the sovereignty, can be so sued. There is no difference.").

Likewise, the law often requires some legal act be in the name of the State while some other legal entity is also a party in interest. *See, e.g.*, *In re Sanofi-Aventis U.S.*, 2025 WL 920111, at *2–3 (Tex. App.—15th Dist. 2025, no pet. h.) (discussing *qui tam* suits); *Bullock v. Tex. Skating Ass'n*, 583 S.W.2d 888, 894 (Tex. App.—Austin 1979, writ ref'd n.r.e.) ("[T]the Comptroller and the Treasurer are jurisdictional parties, although the State of Texas is the actual party in suit to recover taxes."); *Beaumont, Sour Lake & W. Ry. v. State*, 173 S.W. 641, 642 (Tex. App.—Galveston 1914, no writ) (where statute directed recovery to county coffers, State was a nominal party); Tex. Att'y Gen. Op. No. MW-52 (1979) ("In prosecutions involving violations of ordinances only, the state is not the real party in interest, but is only a nominal party."); Tex. Att'y Gen. Op. No. V-1147 (1951) (similar).

Just like a *qui tam* relator is also party to a suit brought on behalf of the State, *see In re Sanofi-Aventis*, 2025 WL 920111, at *2, so too may the State's constituent agencies be party to a contract for the State, depending on the governing statutes and terms of the contract.

### i. Chapter 2167 shows the Commission and HHSC may and did enter into the lease relationship.

Section 2167.055(a) contemplates that the Commission is included as lessee. That subsection does *not* say that the State *qua* State is the lessee. *Contra* Br. 25. Rather, it says, "the state, *acting through the commission*, is the lessee" (emphasis added); *see* CR.282 (The State "acting by and through the Texas Facilities Commission"). There's no reason for that italicized language—the State always acts and can only

act through its constituent parts—unless the Legislature intended to make clear that the Commission is equally a part of the State's lease.

Section 2167.055(f) confirms the Commission is a lessee as much as the "State": "The *obligation . . . of the commission* to accept the space *is binding* on the execution of the lease contract" (emphases added). The lease contract thus binds the Commission to accept the space, just like one would expect if the Commission were lessee.

Other provisions show that the tenant agency is also in the lease relationship. Sticking with § 2167.055, subsection (e) shows the importance of the agency tenant to the lease relationship—it provides: "A lease contract is contingent on the availability of money appropriated by the legislature to pay for the lease." And there's no dispute that when the legislature appropriates rent money, it does so through the agency occupying the leased space—the tenant agency pays the "Rent – Building." *See supra*, pp.11–12.

Thus, when the Commission executes a lease, it "lease[s] space *for a state agency*," who must "verif[y] it has money available to pay for the lease." Tex. Gov't Code § 2167.002(a) (emphasis added).[87] And because the leasing agency is financially responsible for space leased on its behalf, it must "certify to the commission, at least 60 days before the beginning of each fiscal biennium during the lease term, that

---

[87] "State agency" as used in Chapter 2167 includes only the State's constituent entities. *See* Tex. Gov't Code § 2151.002.

money is available to pay for the lease until the end of the next fiscal biennium." *Id.* § 2167.101.

And if the Commission bids out a lease, it "shall send to *the leasing state agency*" the bids for "*the leasing state agency*'s recommendation." *Id.* § 2167.053 (emphases added). Illustrating that the Commission and the tenant agency are in the lease together as the "State," they must both agree on the space, and if they can't, the Governor resolves the dispute. *See id.*

### ii. Landlord-tenant law and the Broadmoor Lease's terms show the same.

The Broadmoor Lease's terms parallel Chapter 2167 and make plain that HHSC and the Commission were included as "lessee."

"[I]n a lease arrangement, the lessor transfers possession and control of the leased premises to the tenant." *City of Irving v. Seppy*, 301 S.W.3d 435, 446 (Tex. App.—Dallas 2009, no pet.). Under the relevant statutes, the tenant agency has possession of the premises in a state lease and the Commission has control. *See* Tex. Gov't Code § 2167.101 (referring to "[a] state agency occupying space leased under this chapter"); *id.* § 2167.104 (referring to "the occupying agency" and the "occupying state agency"); *id.* § 2151.004(c) (providing that the Commission has "charge and control of state buildings, grounds, or property").[88]

---

[88] *Cf.* O'Connor's Texas Causes of Action Ch. 24-A § 3 (2025 ed.) ("If the agency that executed the contract was different from the one that benefited from and later breached the contract (e.g., the Texas [Facilities] Commission executes lease agreements for other agencies), the petition

The Broadmoor Lease's terms are more the same. Showing HHSC's possession, the lease provides the leased space will be "occupied by the Health and Human Services Commission – OIG." CR.282. And the lease term amendment was made "on behalf of the occupying agency, the Health and Human Services Commission," not the "State." CR.312–14. Showing the Commission's control, the lease says the "Commission" (not the "State") "may . . . sublet" the premises "in whole or in part." CR.283. Of course, "'[s]ubletting' is a demise by a *lessee* of the whole or part of the premises for a portion of the unexpired term." 49 TEX. JUR. 3D LANDLORD AND TENANT § 237 (emphasis added).

Even more, many parts of the Commission's form lease make no sense unless the tenant agency and the Commission are under the "lessee" umbrella (all italicized emphases added):

- "Lessee may bring on the leased Premises any and all furniture, fixtures and equipment reasonably necessary for the efficient *exercise of Lessee's governmental responsibilities . . . .*" CR.284.

- "Any signs necessary to indicate *Lessee's name, location and governmental purpose* shall be prepared and installed . . . ." CR.285; *see also* CR.296 ("[E]xterior sign. . . shall read, **Office of Inspector General**. . . . Interior signage will be more specific, i.e. Health and Human Services Commission, Department of Aging and Disability Services, or Department of Family and Protective Services and so on.")

- "*Lessee* may terminate this lease *without liability to the State of Texas* and seek other leased space if . . . ." CR.286.

---

should also identify the breaching agency as the defendant and name its executive director or executive board as the agent for service.").

- "This agreement . . . shall inure to the benefit of and be binding upon . . . the *successor in office of Lessee.*" CR.286.

- "Lessor acknowledges that . . . *Lessee is an agency of the State of Texas . . . .*" CR.287.

- "Lessor further acknowledges that, *as an agency of the State of Texas, Lessee has only such authority as is granted to Lessee by state law . . . .*" CR.287.

The Government recognizes that its cramped take on the scope of the landlord-tenant relationship here is irreconcilable with the lease's terms. In a footnote, it asks the Court to ignore "inconsistent . . . usage" of "Lessee." Br.25 n.3. But "[i]nstead of treating" the lease's terms "as conflicting," we must "ask[] whether they can be harmonized within the context and framework of the entire" lease, "giving effect to" all terms. *Pub. Util. Comm'n v. Luminant Energy*, 691 S.W.3d 448, 462 (Tex. 2024) (footnotes omitted)); *see, e.g.*, *NP Anderson Cotton Exch. v. Potter*, 230 S.W.3d 457, 463 (Tex. App.—Forth Worth 2007, no pet.) (same, for lease). The lease's terms may be harmonized with each other and the relevant statutes by treating the "State" as lessee as including the Commission and the tenant agency.

### c. In any event, the State as lessee is a "state agency" as defined.

The Government insists on a narrow conception of the "State" as lessee because it thinks the "State . . . is not a 'state agency' under the definition of Section 114.001(3)." Br.25. It's mistaken. Even accepting the Government' unnatural interpretation of the lease and Chapter 2167, Chapter 114's first requirement is still satisfied.

The State "*acting though the Commission*" is a state agency. If it weren't, then no constituent agency would be, because each constituent agency is the means through which the "State" acts. *See, e.g.*, Br.20 (insisting that "any argument related to [an HHSC spending] decision is Appellee's improper attempt to control the State"). The State, acting through the Commission, as lessee fits comfortably within Chapter 114's broad conception of "state agency."

So too does the State alone. The Legislature defined "state agency" broadly as including "an . . . entity that is in any branch of state government and that is created by the constitution." "In the absence of clear statutory language to the contrary, we presume that when the Legislature chooses broad language, the Legislature intended it to have equally broad applicability." *Rogers v. Bagley*, 623 S.W.3d 343, 353 (Tex. 2021) (quotation marks omitted). The State as lessee is an "entity that is in any branch of state government" and "is created by the constitution." Tex. Civ. Prac. & Rem. Code § 114.001(3).

The State alone as lessee is an entity. The Government concedes that the State as lessee is an "*entity* legally capable of entering into a lease." Br.25 (emphasis added). If the State can enter into contracts, it's a "legal entity": "A body, other than a natural person, that can function legally, sue or be sued, and make decisions through agents." *Legal Entity*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see* 5 WILLISTON ON CONTRACTS § 9:1 (4th ed.) ("The formation of contracts requires the existence of parties capable of contracting . . . .").

31

The State alone as lessee "is in any branch of state government." In the affirmative context, as here, "any" "means 'every' or 'all.'" *Any*, Garner's Modern English Usage (4th ed. 2017); *Kirby Lake Dev. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 840 (Tex. 2010) ("Texas courts defining 'any' have generally interpreted it to mean 'every.'"). The State as lessee *is* the state government,[89] which is in every branch. *See* Tex. Const. art. II, § 1 ("The powers of the Government of the State of Texas shall be divided into three distinct departments, . . . Legislative . . . , . . . Executive . . . , and . . . Judicial.").

And the State alone as lessee is created by the Constitution. *See id; see also id.* art. I, § 1 ("Texas is a free and independent State . . . and the maintenance of our free institutions . . . depend upon the preservation of the right of local self-government . . . ."), *id.* art. I, § 2 ("[T]he people of Texas . . . have at all times the inalienable right to alter, reform or abolish their government in such manner as they may think expedient.").

★ ★ ★

However conceived, with the execution of the Broadmoor Lease, a "state agency that is authorized by statute or the constitution to enter into a contract . . . enter[d] into a contract." Tex. Civ. Prac. & Rem. Code § 114.003.

---

[89] "State" has several possible meanings depending on context, including "the government under which the people live." *Texas v. White*, 74 U.S. 700, 720 (1868), *overruled on other grounds by Morgan v. United States*, 113 U.S. 476 (1885). In the context of state leases, provided for in the *Government* Code and for space occupied by *governmental* entities, the "State" is the state government.

**B. The Broadmoor Lease is "a contract subject to this chapter."**

The contract the State Entities entered into is "a contract subject to this chapter," which "means a written contract stating the essential terms of the agreement for providing goods or services to the state agency that is properly executed on behalf of the state agency." Tex. Civ. Prac. & Rem. Code § 114.001(3).

The lease is indisputably written, indisputably a contract, and indisputably states the essential terms for providing services to each of the State Entities. Indeed, it is a "full-*service* lease"—"in which the lessor agrees to pay all maintenance expenses, insurance premiums, and property taxes." *Lease*, BLACK'S LAW DICTIONARY (emphasis altered); *see* CR.284 (taxes); CR.287 (insurance); CR.293–94 (maintenance). The lease additionally obligates Broadmoor to provide design and construction services. *E.g.*, CR.288 ("Lessor shall design . . . and construct . . . ."); *see Hoppenstein Props. v. McLennan Cnty. Appraisal Dist.*, 341 S.W.3d 16, 20 (Tex. App.—Waco 2010, pet. denied) (holding lease that included construction services satisfied identical definition).

The Government offers two reasons why the services called for in the lease are insufficient; neither reason has merit.

*One*, the Government argues that "[a]ny alleged 'services' at issue here, such as . . . maintaining the building so that it remains inhabitable, are indirect and attenuated, at best, and are not the type of 'goods and services' contemplated by Chapter 114's waiver of immunity." Br.29. The Government never explains what it means by

"indirect and attenuated" services. No matter, because the "statute is . . . written expansively to cover agreements providing services, so long as services are provided 'to' the governmental entity." *Byrdson Servs. v. S. E. Tex. Reg'l Plan. Comm'n*, 516 S.W.3d 483, 488 (Tex. 2016) (interpreting an identically worded definition). Nothing in the lease suggests Broadmoor's services weren't provided to one or more of the State Entities.

*Two*, the Government bizarrely claims that the lease doesn't provide for payment of Broadmoor's services under the lease. Br.29-30. Broadmoor isn't a charity. It performs the services under the lease for the same consideration sought by all lessors: Rent. Thus, Broadmoor had no right to rent until "120 days after . . . the leasehold improvements shown on the approved construction plans . . . are substantially complete." CR.285. If Broadmoor fails to "strict[ly] perform[] *any* of the . . . obligations imposed on Lessor by this lease," the State Entities "may withhold payment of rent from Lessor, until such time as the violations have been corrected or the Lessee may correct all or any part of the violations and deduct the cost from rentals due the Lessor." CR.286 (emphasis added). And the State Entities agreed to extend the lease term to October 31, 2026 expressly in consideration for Broadmoor's additional "leasehold improvements." CR.314.

Moving on, the Government doesn't dispute that the lease was properly executed. The Commission's Director of Planning and Real Estate Management executed the lease on the Commission's behalf, and the Government admits that official

was authorized to do so as "representative of the" Commission. CR.428. In turn, the Commission executed the lease on behalf of the State, including HHSC. *See, e.g.*, CR.282; CR.314 ("for and on behalf of the occupying agency, the Health and Human Services Commission"); Tex. Gov't Code § 2167.0021 ("The commission shall lease space for the use of a state agency . . . ."); *see also* CR.320 (attempting to terminate the lease "on behalf of the occupying agency, the Health and Human Services Commission—Office of Inspector General").

## C. Broadmoor alleges the breach of an express provision of the Broadmoor Lease.

The Government itself identifies an express provision that Broadmoor claims was breached: "'The Lessee agrees to pay Lessor . . . Monthly Rent.'" Br.31 (quoting CR.283); *see* CR.274 (alleging breach "by failing [to] pay rent when due under the Broadmoor Lease."). Yet it insists Broadmoor's claim is insufficient "because the Lease explicitly permits early termination of the lease." Br.31. The Government's merits argument is premature and wrong.

### 1. Broadmoor doesn't need to prove a breach to come within Chapter 114's waiver of sovereign immunity.

The Government maintains that, because the lease provides "that the State of Texas or the executive agency may cease funding the lease, there is no explicit provision that Appellee can point to that has been breached." Br.32. The Government's argument has nothing to do with whether Broadmoor's petition includes "a claim for breach of an express provision of the" lease. Tex. Civ. Prac. & Rem. Code

35

§ 114.003.[90] That argument goes only to whether Broadmoor's claim will succeed—but asking the question concedes that Broadmoor's claim exists, which is all the statute requires. The Government correctly admits elsewhere that "a plaintiff must point to an express provision that was allegedly breached." Br.31 n.6. Broadmoor has done that.

The Government goes astray because it confuses a claim's existence with its ultimate merits. As the Supreme Court cautioned while applying the same statute, "a plea to the jurisdiction does not authorize an inquiry so far into the substance of the claims that plaintiffs would be required to put on their case to establish jurisdiction." *Pepper Lawson*, 669 S.W.3d at 211. Some waivers—like in the Tort Claims Act—are limited "to the extent of liability." Tex. Civ. Prac. & Rem. Code § 101.025(a). "In contrast, any waiver of sovereign immunity here is predicated not on the viability of the litigant's claim on the merits," *Oncor Elec. Delivery v. Wilbarger Cnty. Appraisal Dist.*, 691 S.W.3d 890, 906 (Tex. 2024), but the *nature* of the claim (breach of an express provision). After all, the waiver is for *adjudicating* a claim; that is, deciding its merits. So the waiver logically cannot also turn on the claim's merits.

---

[90] Their argument that, "[b]ecause Appellee has no contractual relationship with HHSC or TFC for which to assert a breach of claim, Appellee cannot assert a claim under Chapter 114 against HHSC or TFC and there is no waiver of immunity," Br.28, is misplaced for the same reason.

## 2. The State Entities breached in any event.

The Government's argument fails on its own terms too—Broadmoor's breach claim is solid. The Government relies on the clause in the lease's "Monthly Rental" section providing that the lease is subject to ongoing appropriations:

> MONTHLY RENTAL
>
> The Lessee agrees to pay Lessor a base Monthly Rent during the term of this lease . . . .
>
> This lease contract is made and entered into in accordance with and subject to the provisions of the Texas Constitution and the Texas Government Code, Title 10, Subtitle D, and is made *contingent upon the continuation of the availability of money appropriated by the legislature to pay for the lease*. *In the event the Legislature or the Executive Branch of the State of Texas cease to fund the lease*, or the agency ceases to exist . . . , then the Texas Facilities Commission . . . *may terminate* this lease.

CR.283; Br.31–32. That clause cannot defeat Broadmoor's claim because the Government never pleaded—let alone proved—its application.

### a. The Government failed to plead any condition subsequent.

The Government's merits argument fails out of the gate because the subject-to-appropriations clause is a condition subsequent that the Government must, but did not, affirmatively plead.

A defendant must set out affirmative defenses in its answer, or else they aren't at issue. *See Luther Transfer & Storage v. Walton*, 296 S.W.2d 750, 754–55 (Tex. 1956). The subject-to-appropriations clause is in the "Monthly Rental" section, and follows the express agreement to pay rent. *See* Br.31. It thus sets forth a condition subsequent,

an event that excuses further performance. *See Cmty. Health Sys. Prof'l Servs. v. Hansen*, 525 S.W.3d 671, 682–83 (Tex. 2017). And "unlike a condition precedent," a condition subsequent "is an affirmative defense on which the defendant bears the burden of proof." *City of Lancaster v. White Rock Com.*, 2018 WL 6716932, at *9 (Tex. App.—Dallas 2018, pet. denied) (citing cases).[91]

In an analogous situation, the Supreme Court held that—even if Chapter 114's waiver turned on a claim's merits—it was error to rely on the supposed failure of a condition precedent when the plaintiff pleaded that all conditions precedent have been satisfied while the government defendant failed to specifically deny any condition precedent. *Pepper Lawson*, 669 S.W.3d at 212; *see* Tex. R. Civ. P. 54. So too here it would be error to rely on the Government's unpleaded affirmative defense.

### b. Refusing to pay isn't a lack of funding.

The Government also failed to prove the absence of continuing appropriations. Indeed, the pleadings and evidence show the opposite. For fiscal year 2024, for example, the Legislature appropriated HHSC $118 million for rent, yet HHSC spent less than $100 million. *See supra*, p.15 & n.72. That 2024 delta alone is more than enough to fund the Broadmoor Lease from fiscal year 2024 through expiration. And HHSC isn't planning to come close to the $119 million the Legislature appropriated

---

[91] Even if appropriations were a condition precedent, Broadmoor pleaded that all conditions precedent were satisfied, and the Government's answer didn't specifically deny any condition precedent, so Broadmoor has no burden prove sufficient appropriations. *See* CR.275; CR.348–50; Tex. R. Civ. P. 54.

for rent in fiscal year 2025. *See id.* The Broadmoor Lease is fully funded, so the condition subsequent hasn't occurred.

Math isn't on the Government's side, so the Government insists HHSC could trigger the subject-to-appropriations clause merely by refusing to pay:

> The lease goes on to state that the Executive Branch of the State of Texas can cease to fund the lease *at any time in its discretion . . .* Because this provision is clear that the State of Texas *or the executive agency may cease funding the lease*, there is no explicit provision that Appellee can point to that has been breached.

Br.31-32 (emphasis added). That interpretation of the lease is implausible—conflicting with text, context, and purpose.

The lease doesn't anywhere "state that the Executive Branch of the State of Texas can cease to fund the lease at any time in its discretion." But even if it did, that wouldn't affect Broadmoor's claim, because the Executive Branch hasn't ceased funding. HHSC's refusal to pay rent is an expenditure decision, not a funding decision. *See Fund* (v., sense 1.b), WEBSTER'S THIRD 921 ("to make provision for meeting (a recurrent future liability) by accumulation of a fund").

The better reading of the subject-to-appropriations clause is that (at a minimum) if the GAA appropriates the agency responsible for rent sufficient funds under the line item "Rent – Building" to cover all its lease expenses, the lease's rent obligation isn't excused. The subject-to-appropriation clause distinguishes between "pay[ing] for the lease" and "fund[ing] the lease": Funding determines "the availability of money . . . to pay for the lease"; refusing to pay logically cannot affect the

*availability* of money to pay. CR.283; *see also* Tex. Gov't Code § 2167.002(a)(2) ("The commission may lease space for a state agency . . . if . . . the agency has verified it has money available to pay for the lease."). And the clause distinguishes between the "Executive Branch" and the tenant "agency"—the Executive Branch ceasing funding allows termination, but only an "agency ceas[ing] to exist" has that effect. CR.283. The Government's interpretation ignores these distinctions.

Its interpretation also ignores the clause's structure, which highlights those distinctions. The second main predicate segment in the clause's first sentence sets forth the contingency, making the lease "*contingent* upon the continuation of the *availability of money appropriated* by the legislature to pay for the lease." CR.283 (emphases added). The next sentence—the sentence the Government relies on—explains what happens when there's no appropriated money available: "In the event the Legislature or the Executive Branch of the State of Texas cease to fund the lease . . . , then the Texas Facilities Commission . . . may terminate this lease." CR.283. The latter sentence cannot be divorced from the former. "Fund" is tied to "availability of money appropriated by the legislature to pay for lease."[92]

That structure shows "the Executive Branch of the State of Texas ceas[ing] to fund the lease" most plausibly refers to the Governor, not unelected bureaucrats. The Governor is the only part of the Executive Branch that may affect the availability

---

[92] If an "agency ceases to exist," CR.283, there's definitionally no appropriated money available for a lease to house that agency. *Cf.* Tex. Const. art. VIII, § 3 ("Taxes shall be levied and collected by general laws and for public purposes only.").

of money appropriated by the legislature, through his line-item veto or budget execution authority. *See supra*, p.5. No other "executive agency," Br.31–32, has discretion to second-guess or obstruct the results of the legislative process. *See supra*, p.4; *infra*, pp.60–61; *see also GEO Grp. v. Hegar*, 2025 WL 852414, at *3 (Tex. 2025) (adopting interpretation "that best comports with the scope of the [agency]'s authority as part of the executive branch").

That more plausible interpretation has the added benefit of avoiding the anomaly that the Government's implausible interpretation would create in the Commission's form lease. The Government says the clause's recognition that the Executive Branch may cease funding means the tenant "*executive agency* may cease funding the lease." Br.32 (emphasis added). But the Commission's form lease is for state agencies outside the executive branch too: "the supreme court, the court of criminal appeals, a court of appeals, or the Texas Judicial Council." Tex. Gov't Code § 2151.002(2) (defining "state agency"). There is no reasoned distinction between executive and judicial agencies that would justify allowing the former discretion to pay rent due but not the latter. The Government's interpretation is nonsensical.

### *Purpose*

"[I]f the language [of an instrument] is susceptible of two constructions, one of which will carry out and the other defeat its manifest object, courts should apply the former construction." *In re Dallas Cnty.*, 697 S.W.3d 142, 159 (Tex. 2024) (cleaned up). Reading "In the event . . . Executive Branch of the State of Texas

41

cease[s] to fund" to allow the State Entities to terminate based on HHSC's mere refusal to pay would violate this principle.

The aim of subject-to-appropriations clauses is to "conform . . . contracts to the requirements of Texas law" on appropriations and debt. *City of Pflugerville v. Cap. Metro. Transp. Auth.*, 123 S.W.3d 106, 110 (Tex. App.—Austin 2003, pet. denied). They don't give government entities "unbridled discretion to perform." *Id.*; *contra* Br.31–32. In fact, an agency has no power to simply refuse to pay for objects of expense for which the GAA appropriates money. *See supra*, p.4; *infra*, pp.60–61.

The clause's text tracks that purpose. *See* 1 Tex. Admin. Code § 115.20 (observing that the clause tracks legal requirements). Its first sentence consists of two main predicate segments both linked to the subject "This lease contract." The second is discussed above; the initial predicate introduces the contingency with crucial context matching its constitutional purpose: "This lease contract is made and entered into in accordance with and subject to the provisions of the Texas Constitution and the Texas Government Code, Title 10, Subtitle D." CR.283.[93] The attempted lease termination too tracks that purpose. *See* CR.320 ("In accordance with Article III, Section 49(a), of the Texas Constitution, Section 2167.055(e), Texas Government Code . . . .").

---

[93] Texas Government Code, Title 10, Subtitle D likewise makes the lease contingent on appropriations for the same constitutional reasons.

The Government, however, cannot point to any "requirements of Texas law," *Pflugerville*, 123 S.W.3d at 110, that prevented HHSC from continuing to pay rent as the lease required. Instead, the Government says, "at any time in its discretion . . . the executive agency may cease funding the lease." Br.31–32. That interpretation would take the clause far beyond its evident purpose and allow an "unbridled discretion to perform" at odds with the very purpose of contracting. *Pflugerville*, 123 S.W.3d at 110.

For these and other reasons to be set forth during the merits stage on remand, HHSC's refusal to pay rent as the lease expressly requires is a breach entitling Broadmoor to damages.

### D. None of Chapter 114's terms and conditions take Broadmoor's breach claim outside the waiver.

Finally, while Chapter 114 sets forth a handful of terms and conditions to which its waiver is subject, none ousts Broadmoor's claim. Broadmoor's requested relief doesn't go outside Chapter 114's limitations on adjudication awards. *See* Tex. Civ. Prac. & Rem. Code § 114.004. Broadmoor hasn't sued in federal court. *See id.* § 114.007. It hasn't sued on a tort claim. *See id.* § 114.008. And Broadmoor isn't an agency employee. *See id.* § 114.009.

The only term or condition the Government invokes is § 114.002. *See* Br.31–32.

> ### § 114.002. Applicability
>
> This chapter applies only to *a claim for breach of a written contract for engineering, architectural, or construction services* or for materials related to engineering, architectural, or construction services *brought by a party to the written contract* in which the amount in controversy is not less than $250,000, excluding penalties, costs, expenses, prejudgment interest, and attorney's fees.

But Broadmoor's claim is for breach of a written contract (the lease) to which Broadmoor is party.

And the lease is "a written contract for engineering, architectural, or construction services." A written contract *for* engineering, architectural, or construction services is a written contract "to obtain" those services. *For* (prep., sense 2.g), WEBSTER'S THIRD 886. Through the lease, the State Entities obtained construction services.

"A lease can include provisions addressing the parties' respective responsibilities for construction or renovation of the leased premises. These provisions are particularly common in commercial leases." O'CONNOR'S TEXAS FORMS * REAL ESTATE Ch. 2 § 4.8 (2025 ed.) (citation omitted). The lease obligates Broadmoor to provide extensive construction services:

- "Lessor shall design, in consultation with Lessee and in accordance with the schedule for the Lease Requirements outlined in Exhibit B, and construct the additional 20,277 square feet commensurate with the room schedule, specifications, and Exhibits outlined in this Lease"

- "SITE PLAN & CONCEPT FLOOR PLAN DRAWINGS ('Space Plans') shall be provided by Lessor to Lessee upon the full execution of the lease." CR.291;.

44

- "COMPLETED CONSTRUCTION PLANS ('Construction Plans') shall be provided by Lessor to Lessee 60 days from execution of the lease or earlier." CR.291.

- "Lessor shall design, in consultation with Lessee, and construct the Premises based upon all of the specifications outlined in this Lease and Exhibits as well as the following criteria." CR.307

Broadmoor spent millions complying with its obligations. CR.448 And in exchange for an extension of the lease term, Broadmoor agreed to construct an additional $560,000 in leasehold improvements described in multiple change orders. CR.314.

The Government ignores the plain meaning of the statute and the lease. It offers a false dichotomy, contending "the contract is for a rental agreement for 122,123 square feet of office space, not engineering, architectural, construction services." Br.30. But "a contractual relationship can include both the granting of a property interest and an agreement to provide goods or services." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 925 (Tex. 2013). Commercial leases like this often do, including construction services. *See Hoppenstein Props.*, 341 S.W.3d at 20. And nothing in § 114.002 requires the written contract to be for *only* the listed services.

Continuing to ignore the statute's and the lease's text, the Government complains that Broadmoor "has not identified an express provision that was breached that would fall within the limited categories (engineering, architectural, construction services) and be in excess of $250,000." Br.30–31. Broadmoor doesn't need to: Nothing in Chapter 114 limits the waiver to claims for breach of express "engineering,

45

architectural, construction services" provisions, which the Legislature could easily have done if it wanted. Satisfying § 114.003's conditions "waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of an express provision of the contract," without limitation. And "the contract" in § 114.003 is a "contract subject to this chapter." Tex. Civ. Prac. & Rem. Code § 114.003. And the definition of "contract subject to this chapter" doesn't even mention construction, etc. services. *See id.* § 114.001(2).

At any rate, as already shown, Broadmoor sues on the lease's express rent obligation, which was expressly contingent on Broadmoor performing design and construction services. *See supra*, p.34. And Broadmoor claims the State Entities breached both by trying to terminate the lease and refusing to pay rent. Even on the Government's reading, Chapter 114 waives sovereign immunity to adjudicate that claim.

★ ★ ★ ★ ★

Every requirement of Chapter 114 is satisfied. The district court may adjudicate Broadmoor's breach claim against the State Entities.

## II. Broadmoor Adequately Pleaded *Ultra Vires* Claims.

Just because a governmental entity "chooses not to honor its agreements, its obligations under the statute do not simply disappear." *City of Hous.*, 549 S.W.3d at 580. The actions that ultimately resulted in the State Entities' breach were performed by state officials acting without authority and in abdication of their ministerial duties. And if the district court prospectively requires those officials to act only

within their authority and perform their ministerial duties, much of the damage caused by the State Entities' breach hopefully will be undone. That is, if the officials act according to law, they will remove the illegal obstacles to expending the Legislature's appropriation for the purpose the Legislature directed—payment of HHSC's rental obligations.

For those reasons, Broadmoor's claims for injunctive relief against state officials Mike Novak—the Commission's Executive Director—and Rolland Niles—HHSC's Deputy Executive Commissioner for System Support Services—to prospectively comply with the law fall within the *ultra vires* exception to sovereign immunity. The Government's attacks on Broadmoor's *ultra vires* claims falter in the face of statutory plain meaning, binding Supreme Court precedent, and constitutional limits on agency power.

### A. Broadmoor pleaded *ultra vires* acts by Novak and Niles.

The "basis for the *ultra vires* rule is that a government official is not following the law, so that immunity is not implicated." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 374 (Tex. 2009). The Government says this suit attempts to control the State, Br.48, but "'*ultra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state' over . . . its officials." *Phillips v. McNeill*, 635 S.W.3d 620, 628 (Tex. 2021) (citation omitted).

So, to "fall within this *ultra vires* exception, a suit . . . must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a

purely ministerial act." *Schroeder v. Escalera Ranch Owners' Ass'n*, 646 S.W.3d 329, 332 (Tex. 2022) (quotation marks omitted). In turn, acting "without legal authority" includes acting with *no* authority as well as "an officer's exercise of judgment or *limited* discretion without reference to or in conflict with the constraints of the law authorizing the official to act." *Hous. Belt & Terminal Ry. v. City of Hous.*, 487 S.W.3d 154, 163 (Tex. 2016). And "[m]inisterial acts are those for which the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Ballantyne v. Champion Builders*, 144 S.W.3d 417, 425 (Tex. 2004) (quotation marks omitted).

Broadmoor adequately pleaded that Novak's and Niles's conduct was *ultra vires*. "An official has no discretion or authority to misinterpret the law or the rules of arithmetic." *In re Phillips*, 496 S.W.3d 769, 775 (Tex. 2016) (quotation marks omitted). Novak and Niles misinterpreted both. Broadmoor alleges that rent money for the Broadmoor Lease was always available. CR.270–73 ¶¶ 19–25. Broadmoor alleges that Novak's attempted termination exceeded his authority, which is limited to terminating a lease when the Legislature has failed to appropriate money for rent, and, even then, only in conformity with the Commission's rules. CR.276–77 ¶¶ 43, 45. And Broadmoor alleges that Niles shirked his nondiscretionary duty to certify to the Commission that rent money was in fact available for the Broadmoor Lease. CR.276 ¶ 42.

### 1. Novak had no authority to terminate the Broadmoor Lease.

There are no inherent executive powers; government agencies and officials may exercise only those powers expressly granted by the Constitution or statute "and those implied powers that are reasonably necessary to carry out [their] statutory duties." *Hartzell v. S.O.*, 672 S.W.3d 304, 311-12 (Tex. 2023); *see also, e.g.*, *Fulmore v. Lane*, 140 S.W. 405, 411–12 (1911). Acts done without or exceeding authority are *ultra vires* and "have no effect." *Jessen Assocs. v. Bullock*, 531 S.W.2d 593, 598 (Tex. 1975); *Fort Worth Cavalry Club v. Sheppard*, 83 S.W.2d 660, 665 (Tex. 1935).

Likewise, state officials lack inherent discretion to interfere with or obstruct performance of a contract executed by the State's authorized agent. *See Charles Scribner's Sons v. Marrs*, 262 S.W. 722, 727–28 (Tex. 1924). In *Marrs*, the State Board of Education entered a contract with Charles Scribner's Sons for textbooks, but Marrs—the State Superintendent of Public Instruction, and subordinate to the Board of Education—unilaterally determined that the contract was invalid and therefore he couldn't comply. *Id.* at 723. The Court found that this subordinate official "was without authority to contest [the contract's] validity." *Id.* at 727. The Court warned that if any officer could "question such contracts, on their face regular and valid, chaos in government would soon reign. . . . Under such condition no contract could be enforced, and no one would dare contract with the state." *Id.* at 728. "Fixedness of responsibility is a necessity in government." *Id.*

49

Like Marrs, Novak attempted without authority to terminate a contract executed by his superiors. Indeed, even after Novak's attempted termination, the Commission was still treating the Broadmoor Lease as continuing through the next biennium. *See* CR.323 (Commission requesting that HHSC "certify[] that funds will be available for" the Broadmoor Lease during the next biennium). Instead of respecting that superior decision, Novak took marching orders from a low-level HHSC staffer's request that the Commission terminate the Broadmoor Lease. *See* CR.316–20. But nothing in any statute or regulation empowers Novak to terminate Chapter 2167 leases at the mere request of tenant agency employees, especially requests that fly in the face of other law and the Commission's rules. Novak's attempted termination was *ultra vires*.

### a. Novak had no authority to terminate the Broadmoor Lease when money was available to pay rent.

Novak has no more authority than the Commission. *See* Tex. Gov't Code § 2152.103. Chapter 2167 Subchapter C sets forth "Commission and State Agency Powers and Duties Related to Leased Space." The Commission is tasked with supervising performance under Chapter 2167 leases, both lessor and tenant agency. Section 2167.102 provides for "remedial action" by the Commission against the lessor based on "lessor's performance under the contract," and with help from the "attorney general," if necessary. Tex. Gov't Code § 2167.102(a)–(b). And § 2167.105 directs the Commission to "report . . . noncompliance" by agency tenants "with the commission's rules or with other state law related to leasing requirements . . . to the

50

members of the state agency's governing body and to the governor, lieutenant governor, and speaker of the house of representatives."

Nothing in Subchapter C, however, expressly empowers the Commission to terminate a Chapter 2167 lease for a tenant agency's lack of money to pay rent. But, as the Government suggests, *see* Br.40–42, that power may be implied from § 2167.055(e): "A lease contract is *contingent on the **availability*** of money appropriated by the legislature to pay for the lease." (emphasis added).

But "a public officer has no discretion or authority to misinterpret the law." *Hous. Belt*, 487 S.W.3d at 163, so the Commission's authority is necessarily limited to § 2167.055(e)'s terms. The Commission may terminate leases when no appropriated money for rent is available. "Availability" is a familiar concept in all sorts of statutes, but it's especially common in law related to appropriations. And "the ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Ross v. Blake*, 578 U.S. 632, 642 (2016) (quoting Webster's Third 150 (1993 ed.) and citing various other dictionaries).

Availability of money for government expenditures turns on the amount appropriated to the agency for the purpose of the expense: "'Funds available,' as marking the bounds of the commission's contractual liability creating authority . . . can, we think, mean but one thing, namely, funds made available for that purpose by the Legislature through appropriation." *Ferguson v. Johnson*, 57 S.W.2d 372, 375 (Tex.

App.—Austin 1933, writ dism'd); *accord, e.g.*, *Cmty. Health Choice v. Hawkins*, 328 S.W.3d 10, 19 (Tex. App.—Austin 2010, pet. denied) ("[H]ere an appropriation for the payment of contract claims has been made and the necessary funding is available."); *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 133 (5th Cir. 2018) ("[A] state must appropriate funds to make them available. Without a suitable appropriation, funding is not capable of immediate use.").

Novak's attempted termination of the Broadmoor Lease on June 1 exceeded the Commission's implied authority under § 2167.055(e) because he couldn't conclude "money appropriated by the legislature to pay for the lease" was unavailable. The timeline tells the story:

| May–August 2023 | |
|---|---|
| May 27 | Legislature adopts GAA appropriating HHSC **$118 million+** annually for "Rent – Building." |
| May 31 | HHSC staffer requests termination of Broadmoor lease for unavailability of appropriation. |
| June 1 | Novak transmits notice of termination of Broadmoor Lease. |
| June 7 | Commission requests HHSC certify availability of funds for the Broadmoor Lease for next biennium. |
| June 16 | Governor Abbott signs GAA. |
| July 27 | Niles certifies **$93 million** in annual lease obligations for the next biennium; leaves out Broadmoor Lease. |
| August 31 | Last rent payment to Broadmoor. |

Novak had no discretion to get the math or the law wrong. *In re Phillips*, 496 S.W.3d at 775. On June 1, the adopted GAA was not yet law, awaiting Governor Abbot's signature and any line-item veto. *See supra*, p.13. At best, then, the controlling math result was akin to dividing by zero: undefined. Novak (and HHSC) couldn't possibly conclude that money was unavailable until the GAA became law. Even more, Novak knew the cost of HHSC's leases. *See* Tex. Gov't Code 2167.103 ("the commission shall maintain records of the amount and cost of space under lease"). And so he knew that the GAA awaiting the Governor's signature appropriated sufficient funds

Indeed, the Government doesn't even argue that Novak ever did the math and concluded money for the lease wasn't available. *See* Br.42 ("Appellee makes no allegation that Executive Director Novak was involved in the decision that funds were not appropriated for this Lease."). Instead, they argue "Novak simply carried out the actions within his authority to complete [HHSC's] action—terminating the Lease—after HHSC made the determination." Br.42; *accord* Br.45.

That argument will surprise the Legislature, to whom HHSC told a different story to get more money for rent. In asking for a higher appropriation, HHSC represented that it "has limited flexibility to manage cost increases . . . for leases," including because the Commission's "input ***is required*** *before* lease payments are withheld." 2 HHSC Legislative Appropriation Request 4.A at 58 (emphasis added).

HHSC correctly represented the Commission's role to the Legislature; the Government misstates that role here. *See* 1 Tex. Admin. Code § 115.21(b) ("[A] lease may be *considered for* cancellation by the Commission upon request by a governmental agency." (emphasis added)); *id.* § 115.22(b) (similar). Novak couldn't abdicate the Commission's duty to determine whether funds were available before terminating the lease.

The Government says Novak was just relying on HHSC's certification. Br. 41-42. But the law too forecloses that excuse. Section 2167.055(e) says, "A lease contract is contingent on the availability of money appropriated by the legislature to pay for the lease," Tex. Gov't Code § 2167.055(e), *not* on the tenant agency fulfilling its duty to "certify to the commission . . . that money is available" under § 2167.101. Considering the provisions' proximity, the Commission's duty to know lease costs, and the Commission's watch-dog role over tenant agencies, the legislative choice to omit deference to the tenant agency's math could not have been an accident.

The timeline of events also forecloses the Government's just-following-orders argument. The HHSC action the Government says Novak relied was Deputy Commissioner Niles's supposed "certif[ification] that the funds were not available" for the lease. Br. 41–42; *see* Tex. Gov't Code § 2167.101. But Niles's "certification" was made on **July 27, 2023**, CR.330, while Novak attempted to terminate the lease weeks *earlier* on **June 1, 2023**. CR.320. Novak did not rely on any certification.

Novak's notice of termination instead relied on a low-level HHSC staffer's prediction that HHSC would not certify that funds are available for the Broadmoor Lease no matter how much was appropriated. *See* CR.316–18. Novak's Notice said: "You are advised that [HHSC] *has directed that rent will not be certified* for the biennium beginning September 1, 2023, *as required* by Section 2167.101, Texas Government Code." CR.320 (emphases added). That sentence is extraordinary—Novak openly acknowledges that HHSC will refuse to comply with the law, yet goes right along with it. Rather than indulge HHSC's illegality, Novak and the Commission had a duty to "report the noncompliance . . . to the governor, lieutenant governor, and speaker of the house of representatives." Tex. Gov't Code § 2167.105.

In fact, no one from HHSC has ever "certif[ied] that the funds were not available." *Contra* Br.42. The only certification came from HHSC's Niles, but Niles certified only that funding *was* available for a list of leases that excluded that Broadmoor's. CR.330–337.[94] Niles expressly refused to certify whether funds were available for the Broadmoor Lease, despite the Commission requesting that HHSC do so. CR.330. But his certification—$93 million in annual lease expenses for the biennium, CR.330—left no question that sufficient funds remained available for the Broadmoor Lease from the Legislature's "Rent – Building" appropriation of $118 million and $119 million in fiscal years 2024 and 2025, respectively:

---

[94] As the Government recognizes, § 2167.101's directive that the tenant agency "shall certify to the commission . . . that money is available," allows for a certification that money is *not* available. Regardless, money was available here.

Easy math.

In a last-ditch effort to conjure some discretion, the Government argues Novak maintained "the discretion—required by the Legislature—through section 2167.0021, to make leasing decisions on the basis of obtaining best value for the state." Br.42. That argument fails because to "*lease* space," Tex. Gov't Code § 2167.0021(a) (emphasis added), is "to take a lease of," WEBSTER'S THIRD 1286. Section 2167.0021 does not give the Commission carte blanche to *terminate* leases— discretion that would conflict with the Commission's "binding" "obligation to accept the space … on the execution of the lease contract." Tex. Gov't Code § 2167.055(f).

### b. Novak had no authority to violate the Commission's own regulations.

Even if some statute authorized Novak's bad math, his conduct was still *ultra vires*, because he acted wholly outside the Commission's regulations governing lease terminations. As Executive Director, Novak "shall manage the commission's affairs under the commission's direction." Tex. Gov't Code § 2152.103. The Commission set forth that direction as to lease terminations in regulations. And "[w]hen a state agency adopts an administrative rule, it commits itself to follow the plain meaning of the promulgated text." *Port Arthur Cmty. Action Network v. Tex. Comm'n on Env't Quality*, 707 S.W.3d 102, 104 (Tex. 2025).

At the outset, the regulations confirm that Novak may not defer to the tenant agency's funding determination. They provide that when an agency requests "to cancel a lease due to lack of funding," that request is "considered for action by the Commission," not rubber-stamped. 1 Tex. Admin. Code § 115.22(a)–(b). When the Commission leaves a determination to the tenant agency, the Commission says so expressly. *See id.* § 115.21(a) ("the governmental agency shall determine that it occupies idle facilities or has idle capacity"). The Commission doesn't defer to the agency on funding.

The regulations also set forth two unsatisfied prerequisites before the Commission could "consider[]" HHSC's request to terminate the Broadmoor Lease. *See id.* §§ 115.21–.22. The Commission couldn't even consider HHSC's request, so Novak couldn't grant it.

First, before the Commission can consider an agency's request to terminate, "the governmental agency shall determine that it occupies idle facilities or has idle capacity due to one of" a handful of factors, and then "furnish[] a written determination that the governmental agency occupies idle facilities or has idle capacity the following factors." *Id.* § 115.21. No such determination was ever furnished to the Commission. *See* CR.316–18; CR.330.

Second, when an agency, like HHSC, that's "under the authority of an individual commissioner . . . , appointed by or directly accountable to the Governor," requests "to cancel a lease due to lack of funding," that request "*must* provide

57

evidence of notification to the Office of the Governor." 1 Tex. Admin. § 115.22(b) (emphasis added). HHSC never provided evidence that it notified the Governor that it was out of money despite the vast sums the GAA appropriated to it. For obvious reasons.

Novak's attempted termination wasn't just outside the Commission's statutory authority, it also conflicted with the Commission's rules that bound his conduct.

### 2. Niles failed to perform his ministerial duty to certify that money was available for the Broadmoor Lease.

Even after Novak's *ultra vires* attempt to terminate the Broadmoor Lease, the Commission treated the lease as not terminated. It later requested "certification of available funding for the next biennium (2024–2025)" for the Broadmoor Lease. CR.323, 327. HHSC, acting through Deputy Commissioner Niles, defied that request. *See* CR.330. That defiance was *ultra vires*.

Government Code § 2167.101 says, "A state agency occupying space leased under this chapter shall certify to the commission . . . that money is available to pay for the lease until the end of the next fiscal biennium." "The use of the word 'shall' in a statute evidences the mandatory nature of the duty imposed." *TotalEnergies E&P USA v. MP Gulf of Mex.*, 667 S.W.3d 694, 709 (Tex. 2023) (quotation marks omitted). It "leav[es] no room for discretion." *In re Durnin*, 619 S.W.3d 250, 257 n.3 (Tex. 2021). "Shall" therefore introduces a ministerial duty. *See In re City of Galveston*, 622 S.W.3d 851, 857 (Tex. 2021); *see also* 15 McQuillin Mun. Corp. § 39:45 (3d ed.) ("The duty to certify [that funds are available], being expressly imposed by law, is

ministerial and may be compelled by mandamus."); *Flora Crane Serv. v. Ross*, 390 P.2d 193, 204 (Cal. 1964) (similar); *Bradston Assocs. v. Cnty. Sheriff's Dep't*, 892 N.E.2d 732, 738 (Mass. 2008) (similar).

The Government responds with a couple of faulty arguments. The Government first goes back to the "just following orders" well: "[O]nce HHSC determined that funds were unavailable to pay rent under the Lease, . . . Niles was obligated to certify that the funds were not available." Br.41–42 (citing Tex. Gov't Code § 2167.101). Three problems. *One*, Niles never certified that fund *weren't* available for the lease. *See supra*, p.55. *Two*, the Government has no evidence that "HHSC determined that funds were unavailable." It introduced no evidence at all in support of the plea to the jurisdiction, and arguments in a brief aren't evidence.[95] *Three*, even if HHSC made that untenable and unlawful determination, an *ultra vires* claim against Niles would be an appropriate vehicle to contest it. The Government concedes that Niles's conduct is the manifestation of any availability determination by HHSC; so Niles is not just some "nominal, apex representative who has nothing to do with the allegedly *ultra vires* actions." *Hall v. McRaven*, 508 S.W.3d 232, 240 (Tex. 2017).

---

[95] Should some higher official's bad math be disclosed in discovery, Broadmoor will add that official as a defendant. *Cf. In re Panchakarla*, 602 S.W.3d 536, 539–40 (Tex. 2020) (a trial court "retains continuing control over interlocutory orders and has the power to set those orders aside any time before a final judgment." (quotation marks omitted)).

The Government next asserts (over and over) that HHSC has "discretion" to "determine whether the Legislature appropriated funds to pay the particular Lease." Br.41–47. Not so. Nothing in § 2167.101 grants a tenant agency such interpretive latitude. *See Van Boven v. Freshour*, 659 S.W.3d 396, 402 (Tex. 2022) (allowing *ultra vires* claim where no law "grants the Board unrestrained authority to interpret" applicable legal requirements). "Available" has an established meaning, which permitted HHSC to—at most—compare its biennial appropriation for "Rent – Building" to its biennial rent obligations. *See supra*, pp.51–52. HHSC is devoting tens of millions less than the GAA appropriates for that item. *See supra*, pp.55–56. The law's clear and the math's easy, and no one at HHSC has discretion to get either wrong. *In re Phillips*, 496 S.W.3d at 775.

HHSC's claim to discretion isn't just wrong; it discloses a troubling misconception of agencies' role in carrying out legislative appropriations. When an agency official "cancels an item of . . . direct spending" or redirects it, "he is rejecting the policy judgment made by [the Legislature] and relying on his own policy judgment." *Clinton v. City of New York*, 524 U.S. 417, 444 (1998). The Constitution forbids that result and confirms that Niles (and Novak) acted *ultra vires*. *See supra*, pp.4–5. Appropriations are not slush funds left to bureaucratic whim. No law may give "a blank check to the Executive Department to make an appropriation or reappropriation." Tex. Att'y Gen. Op. No. M-1191 (1972). And outside the limited budget-execution authority granted the Governor, appropriations *may not* turn "upon any exercise of

60

[executive] discretion." Tex. Att'y Gen. Op. No. H-207 (1974). Rather, "[o]nce the Legislature has appropriated funds for a particular purpose or use, it is the duty of the responsible executive authority to accomplish (not frustrate) that purpose by using such funds as necessary." Tex. Att'y Gen. LA-2 (1974); *accord, e.g.*, Tex. Att'y Gen. Op. No. O-5545 (1943) ("[A]n appropriation of public money for a specific purpose may not be used—drawn from the treasury—for any purpose other than that specified."). Availability is a function of math, not discretion.

## B. Broadmoor seeks prospective relief bringing Novak's and Niles's conduct back in line with state law.

*Ultra vires* claims are limited to prospective relief, which is all Broadmoor asks for. Broadmoor's petition requests

- "an injunction mandating that . . . Novak retract the wrongful termination of the Broadmoor Lease, and comply with his non-discretionary statutory obligations" going forward, including "tak[ing] all steps necessary to ensure that his organization complies with . . . lease termination requirements," if necessary; and

- "an injunction mandating that . . . Niles comply with [his] non-discretionary statutory obligations to certify the availability of funds to pay rent under the Broadmoor Lease for the 2024–2025 fiscal years."

CR.276. That relief is forward-looking.

The Government fails to recast Broadmoor's relief as retrospective. It suggests that because Broadmoor challenges Novak's and Niles's "prior actions" as *ultra vires*, any relief "is by its very nature retrospective relief." Br.50. Wrong. In nearly every *ultra vires* claim there's an eye toward the past: "the officer *acted* without legal authority or *failed* to perform a purely ministerial act." *Schroeder*, 646 S.W.3d at 332

61

(emphases added). Thus, a court may order *corrective* relief prospectively. *See, e.g.*, *Van Boven*, 659 S.W.3d at 401 (approving injunctive relief "directing [officials] to file a Void Report . . . , which would remove the Initial Report and the Revision-to-Action Report from disclosure"); *Hartzell*, 672 S.W.3d at 319 (approving "restoration of [plaintiff's] degree on a forward-looking basis"); *Bracey v. City of Killeen*, 417 S.W.3d 94, 114 (Tex. App.—Austin 2013, no pet.) (Field, J., sitting) (observing that sovereign "immunity would not bar [a] claim for prospective reinstatement").[96]

Broadmoor's claims don't "require the Court to 'undue' [*sic*] past decisions, such as the termination of the Lease and certification of funds." Br.50. Novak issued his notice of termination without authority and therefore his attempted termination had no effect. *See, e.g.*, *Jessen Assocs.*, 531 S.W.2d at 598; *see also Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 76 (Tex. 2015) ("[U]nlawful acts of officials are not acts of the State."). And he may be enjoined to follow the law and refrain from treating the lease as terminated going forward. *See, e.g.*, *Hartzell*, 672 S.W.3d at 319. Niles has never made any certification about the availability of funds for the lease. And he may be prospectively enjoined to accurately certify the fact that money has always been available. *See, e.g.*, *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622 n.2 (Tex. 2011) ("[C]ompel[ing] a government official . . . to perform some act . . . falls within the ultra vires rationale.").

---

[96] That payment to Broadmoor may eventually result doesn't change the nature of the relief. *See, e.g.*, *Sw. Bell Tel. v. Emmett*, 459 S.W.3d 578, 588–89 (Tex. 2015).

## III. Broadmoor's UDJA Claim Is Proper.

Finally, sovereign immunity doesn't bar Broadmoor's claim seeking "a declaration that the 88th Texas Legislature did in fact appropriate sufficient funds to pay for the Broadmoor Lease for the 2024-2025 biennium." CR.278. As the Government's attempts to pass the buck (Novak to Niles, Niles to unnamed HHSC officials) show, this relief is necessary to correct the bad math at the heart of this case, whatever its origin. And it's well established that "[p]rivate parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority." *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002); *accord, e.g.*, *Sw. Bell Tel. v. Emmett*, 459 S.W.3d 578, 589 (Tex. 2015) ("AT&T is entitled to declaratory relief that payment of its relocation expenses by the District is required by § 49.223."); *contra* Br.36, 38.

## Conclusion and Prayer

The Court should affirm the district court's order denying the Government's plea to the jurisdiction. Alternatively, if the Court finds that Broadmoor's allegations are insufficient, it should remand for repleading.

63

Respectfully submitted,

**SCOTT DOUGLASS & McCONNICO LLP**

JASON R. LaFOND
State Bar No. 24103136
jlafond@scottdoug.com
CASEY DOBSON
State Bar No. 05927600
cdobson@scottdoug.com
SARA CLARK
sclark@scottdoug.com
State Bar No. 00794847
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300

*Counsel for Appellee Broadmoor Austin Associates, a Texas Joint Venture*

## CERTIFICATE OF COMPLIANCE

Microsoft Word 2019 reports that this brief contains 14,648 words, excluding the portions of the brief exempt from the word count under Texas Rule of Appellate Procedure 9.4(i)(1).

_____

JASON R. LAFOND

No. 15-25-00013

# In the Fifteenth Court of Appeals
# Austin, Texas

STATE OF TEXAS, et al.,

*Appellants*,

*v.*

BROADMOOR AUSTIN ASSOCIATES, a Texas Joint Venture,

*Appellee.*

On Appeal from the 455th Judicial District of Travis County,
No. D-1-GN-23-007899

## APPELLEE'S APPENDIX

**Tab**

1   Broadmoor Lease

2   Texas Government Code Chapter 2167

3   Texas Civil Practice & Remedies Code Chapter 114

4   Excerpts from Act of May 27, 2023, 88th Leg., R.S., ch. 1170 § 1

5   1 Texas Administrative Code Chapter 115 Subchapter B

6   2 HHSC LEGISLATIVE APPROPRIATION REQUEST 4.A (2022)

# TAB 1



**THE STATE OF TEXAS** §

**COUNTY OF TRAVIS** §

1.  PARTIES

This Agreement is made and entered into on this ZZ ND day of AUGUST , 2014, by and between LESSOR, **BROADMOOR AUSTIN ASSOCIATES, A TEXAS JOINT VENTURE** and LESSEE, STATE OF TEXAS, acting by and through the Texas Facilities Commission (TFC).

2.  PROPERTY LEASED

**122,123** Total Square Feet (usable), occupied by the

Health and Human Services Commission – OIG , located in the

Broadmoor 902 at

11501 Burnet Road in

Austin, 78758 in

Travis County, Texas

Lessor promises, in return for the consideration described herein to be paid by the Lessee and the covenants set out herein to be kept by Lessee, to hereby lease, unto the Lessee, the Property and Premises described herein.

Lessor also promises to furnish any and all requirements related to such Property and Premises as set out in this lease, all of which are incorporated herein by reference and made a part hereof for all purposes.

3.  TERMS OF LEASE

The term shall be for a period of **120** months commencing on the **later of the 1st** day of **August, 2015** or the Rent Commencement Date (as defined hereinafter in Section 7i), and ending on the **31st** day of **July, 2025** (the Termination Date), unless sooner terminated as hereinafter provided; provided, however, if Substantial Completion (as defined in Section 7(i) below) does not occur by April 3, 2015, then the Termination Date shall be the last day of the 120th month after the Rent Commencement Date. **Subject to the next sentence, this lease is contingent upon the majority approval by a quorum of the**

Commission members of the Texas Facilities Commission. If the Commission does not approve this Lease at its meeting on August 20, 2014, this Lease shall be null and void for all purposes without further action by either party.

4.  MONTHLY RENTAL

    The Lessee agrees to pay Lessor a base Monthly Rent during the term of this lease in accordance with the Rent Schedule as detailed in Exhibit A. The rental payments provided for herein shall be due and payable by Lessee in advance on the first day of the month for which said rentals are due.

    This lease contract is made and entered into in accordance with and subject to the provisions of the Texas Constitution and the Texas Government Code, Title 10, Subtitle D, and is made contingent upon the continuation of the availability of money appropriated by the legislature to pay for the lease.  In the event the Legislature or the Executive Branch of the State of Texas cease to fund the lease, or the agency ceases to exist as a result of the Legislative sunset review process, then the Texas Facilities Commission, hereinafter referred to as Commission, may assign another state agency with comparable use (General Office/Administrative and Professional Services which do not involve on-site customer/client services) to the space, or a part thereof, covered by this lease.  Should the Commission be unable to find another State agency or agencies to fill, or partially fill the space, the Commission, upon written notice to the Lessor, either may terminate this lease, or sublet in whole or in part to a private third party.

5.  RENEWAL OPTION

    By mutual agreement between Lessee and Lessor, this lease may be renewed two (2) times for a period up to 120 months, under the same terms and conditions except the rental rate, which will be at the then current market rate for comparable space, and that no leasehold improvements other than refurbishment as mutually agreed to shall be provided by Lessor except to the extent reflected in the market rate and Lessee shall have no further renewal options. Lessee shall give Lessor written notice of intention to exercise this option at least 180 days prior to expiration of this lease.

6.  CPI ESCALATION CLAUSE

    (a)  On each anniversary date of the lease commencement, the total monthly rent of the lease shall be adjusted by changes in the Consumer Price Index (CPI) reflecting percentage increases.

    (b)  To receive the CPI adjustment, the Lessor must submit a request in writing by certified mail, return receipt requested, and received by the Texas Facilities Commission (TFC) no later than forty-five (45) days after the anniversary date for that year.  In determining whether to grant Lessor's request for a CPI increase, in whole or in part, TFC may review and consider Lessor's performance under this lease and whether any material or substantive issues with the leased premises of which Lessee has provided prior timely notice to Lessor remain unresolved, as provided in Section 7(k) below.

    (c)  The percent escalation allowable will be based on the percent change in the CPI for Urban Wage Earners and Clerical Workers, Current Series (CPI-W, U.S. City Average, All Items) published by the United States Department of Labor, Bureau of Labor Statistics. The index may be obtained from the U.S. Bureau of Labor Statistics web site at **www.bls.gov**.

    The index month three (3) months prior the anniversary month for the current year and the previous year shall be used to determine the percent increase.

    (d)  Base Factor of 50% of the monthly rent will be used in the calculation for the escalation in accordance with the following schedule:

    Base Factor Percent     Paying Utilities     Paying Janitorial

(e)   **EXAMPLE (Calculation formula with a 50% Base Factor):**

Part 1. <u>CPI Current Year</u>   <u>CPI Previous Year</u>   <u>Difference</u>   <u>Divided by Previous Year</u>   <u>% Change</u>
      (Mar 04) 182.9   -   (Mar 03) 180.3   =   2.6   /         180.3            =   1.4

Part 2. <u>Current Monthly Rent</u>   <u>% Base Factor</u>                    <u>% Change</u>   <u>Rent Increase</u>
      $2,500.00        x       50%     = $1,250.00 x      1.4      =      $17.50

Part 3. <u>Current Monthly Rent</u>   <u>CPI Increase</u>   <u>New Monthly Rent</u>
      $2,500.00        +       $17.50     =      $2,517.50

(f)   The first eligible CPI rent adjustment for this lease will be **August 1, 2016**, based upon the percent change in the CPI from **May 2015** and **May 2016** using a Base Factor of **50%.** Each succeeding year, the same procedure as outlined in paragraph (e) above will be used.

7.   GENERAL TERMS AND CONDITIONS

(a)   Lessor covenants and agrees to pay all taxes of whatever nature, levied and assessed and to be levied or assessed, on or against the leased Property and improvements during the term of the lease; and to keep the leased Premises, Property and buildings in good repair and condition during the continuance of the term of this lease, said maintenance is to include, but is not limited to, the following services: repair and patch wall, ceiling and floor surfaces; painting as needed; replacement of broken window glass; repair of window shades, blinds and/or drapes, fasteners and sash cord or chains; roof and ceiling leaks; building exterior, interior; plumbing, heating, air conditioning and ventilating equipment and filters; fire protection equipment; miscellaneous valves; woodwork, locks, floor surfaces and coverings; lighting fixtures, and the replacement of all defective or burned-out light bulbs, fluorescent tubes, ballasts and starters. If the occupying agency, or its agents, cause damage to said Property that goes beyond "normal wear and tear", the occupying agency is responsible to pay for those repairs.

(b)   Lessor hereby covenants and agrees that hereafter and during the term of this lease, it will not rent, lease or otherwise furnish space in this or any adjacent buildings under its control to any enterprise which, in the usual exercise of its business, could be expected to create noise or odors injurious or disruptive to the occupying agency's normal governmental activity. Lessor covenants and agrees it will not lease space that would locate or collocate any regulated parties which have an interest in the occupying agency/ies or whose occupation of these Premises would cause the occupying agency to be in violation of State statute.

(c)   Lessor warrants that the demised Premises is not in violation of any city, state or local ordinance or statute or any restriction imposed against the demised Premises and that said Lessor will indemnify said Lessee for any direct or indirect loss sustained by Lessee as a result of the existence of such restriction, ordinance or statute.

(d)   Lessor hereby covenants and agrees that the Lessee may bring on the leased Premises any and all furniture, fixtures and equipment reasonably necessary for the efficient exercise of Lessee's governmental responsibilities and the parties agree that all such Property shall remain the Property of the Lessee.

(e)     Any signs necessary to indicate Lessee's name, location and governmental purpose shall be prepared and installed consistent with signage for other lessees in the Property and in keeping with building decor. Any special requirements of Lessee contrary to the above must be stated in writing and made a part of this lease. Any cost of compliance with this paragraph in excess of the amount that would be required for Lessor's standard signage shall be borne by Lessee.

(f)     On termination of this lease, by lapse of time or otherwise, Lessee may, within thirty (30) days thereafter, at its option and expense, remove from said Premises any and all improvements, equipment, appliances or other Property placed or owned by it thereon. Lessee shall deliver the Premises and Property to Lessor in good order and condition, provided however, the reasonable use and ordinary wear and tear are expected.

(g)     If during the term of this lease, said Premises, or any portion thereof, shall be condemned for any public purpose, Lessee hereto shall have the option of terminating and canceling this lease upon thirty (30) days' notice to the Lessor of its election to do so.

(h)     It is mutually agreed between the Lessor and the Lessee that if said building and Premises shall, during the term of this lease, be damaged by flood, fire or (any other cause or causes), the same shall be promptly repaired by the Lessor. During the time of such repair, if the space cannot be fully utilized by Lessee, lease payments due hereunder shall be either reduced or withheld in accord with the degree of non-use. But, if said building and Premises be so damaged as to render said Premises unfit for occupancy, then, and from the date of such damage, this lease shall cease and be void; and rent and other obligations hereunder shall be due and payable only to the date of such damage. The determination as to whether the building and Premises are damaged so as to render them unfit for occupancy shall be made by Lessee. If the Lessor has available under his control space which will meet Lessee's needs and offers same to Lessee, the Lessee may at its option, occupy that space under the same terms and conditions as this lease. Lessor will be responsible for any relocation costs that may be incurred, included but not limited to, cost of the space, moving, communications equipment and computer expenses.

(i)     Lessee is not obligated to pay rent and other sums under this lease until 120 days after Substantial Completion ("Rent Commencement Date") provided, however, to the extent Substantial Completion is delayed due to Lessee Delays, the Rent Commencement Date shall be the date that is 120 days after the date Substantial Completion would have occurred but for Lessee Delays.. "Substantial Completion" shall occur, and Lessor shall "Substantially Complete" the premises, when the premises are available to Lessee for full occupancy and the leasehold improvements shown on the approved construction plans (as described in Exhibit B) are substantially complete (specifically excluding Lessee's furniture and other personal property), subject to punchlist items. If Lessor is unable to deliver the premises to Lessee Substantially Complete on April 3, 2015 other than for the reasons set forth in the second paragraph of this Section 7(i), Lessor shall give Lessee immediate written notice of the cause for the delay and the date the premises will be Substantially Complete.

Except as provided in Paragraphs 3 and 4, Lessee may not terminate the lease if the delay of occupancy is caused by Lessee (a "Lessee Delay"), or by conditions beyond Lessor's control (a "Justifiable Delay"), such as strikes, fire, unavoidable casualties or other unusual circumstances beyond Lessor's control that constitutes a justifiable delay.

In the event Substantial Completion has not occurred by April 3, 2015 (provided such date shall be pushed back on a day-for-day basis for each day of Justifiable Delay or Lessee Delay), this lease shall remain in full force and effect for a period following of no less than 180 days. During this time, or for as long as Substantial Completion does

285

not occur, the rent shall not be paid. During this period, but not to exceed 6 consecutive months, Lessor will be liable to Lessee in damages for any rent payable by Lessee in excess of its current rent paid to its current landlord for its existing location in the building commonly referred to as Braker I located at 11101 Metric Boulevard, Building I, Austin, TX 78758. Lessee shall have the right to offset such excess rent against the first Monthly Rent payment(s) due from and after the Rent Commencement Date until offset in full.

Lessee may terminate this lease without liability to the State of Texas and seek other leased space if Substantial Completion does not occur by October 1, 2015, provided such date shall be pushed back on a day-for-day basis for each day of Lessee Delay and Justifiable Delay.

(j) Lessee reserves the right to assign any agency of State government to occupy all or any part of the space described herein or to assign or sublet all or any part of the leased Premises to any private entities (persons or corporations) so long as the use is General Office/Administrative and Professional services which do not involve on-site customer/client services.

(k) In the event Lessor shall breach or be in default in the strict performance of any of the covenants or obligations imposed upon Lessor by this lease, and shall remain in default for a period of thirty (30) days after written notice of such default, Lessee shall have the right and privilege of terminating this lease and declaring the same at an end, and shall have the remedies now or hereafter provided by law for recovery of damages occasioned by such default. In lieu of a formal declaration of default and resulting termination as provided above, Lessee may withhold payment of rent from Lessor, until such time as the violations have been corrected or the Lessee may correct all or any part of the violations and deduct the cost from rentals due the Lessor.

(l) If Lessee fails to pay rentals or other charges hereunder or otherwise fails to perform its obligations hereunder and this failure is not cured within 30 days after written notice from Lessor to Lessee of such failure, then Lessee is in default, and Lessor may terminate this Lease and may enter and take possession of premises, and will have the remedies now or hereafter provided by law for recovery of rent, repossession of premises and damages occasioned by Lessee's default. No provision, covenant or agreement contained in this Lease shall be deemed a waiver of sovereign immunity of the State of Texas from tort or other liability.

(m) The failure of the Lessee or Lessor to insist in any one or more instances on a strict performance of any of the covenants of this lease shall not be construed as a waiver or relinquishment of such covenants in future instances, but the same shall continue and remain in full force and effect.

(n) This agreement and each and all of its covenants, obligations and conditions hereof shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns of Lessor, and the successor in office of Lessee.

(o) This agreement shall be governed by Texas law.

(p) Lessor understands that acceptance of funds under this contract acts as acceptance of the authority of the State Auditor's Office, or any successor agency, to conduct an audit or investigation in connection with those funds. Lessor further agrees to cooperate fully with the State Auditor's Office or its successor in the conduct of the audit or investigation, including providing all records requested. Lessor will ensure that this clause concerning the authority to audit funds received indirectly by subcontractors through Lessor and the requirement to cooperate is included in any subcontract it awards.

Rev. 11/12

286

(q)     Lessor warrants and represents that any use, storage, treatment, or transportation of Hazardous Substances that has occurred in or on the Premises prior to the execution of this Lease has been in compliance with all applicable federal, state, and local laws, regulations, and ordinances. Lessor additionally warrants and represents that no release, leak, discharge, spill, disposal, or emission of Hazardous Substances in violation of environmental laws has occurred in, on, or under the Premises, and that the Premises are free of Hazardous Substances as of the execution of this Lease.

Lessor shall indemnify Lessee from any and all claims, damages, fines, judgments, penalties, costs, liabilities, or losses (including, without limitation, any and all sums paid for settlement of claims and for fees of attorneys, consultants, and experts) arising during or after the lease term from or in connection with the presence of Hazardous Substances in or on the Premises, in violation of applicable environmental laws, unless the Hazardous Substances are present as a result of Lessee or Lessee's agents, employees, contractors, or invitees. Without limitation of the foregoing, this indemnification of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision, unless the Hazardous Substances are present as a result of the acts of Lessee, Lessee's agents, employees, contractors, or invitees. Except for Hazardous Substances on the premises caused by Lessee, its agents, employees, licensees, contractors, or invitees, this indemnification shall specifically include any and all costs due to Hazardous Substances in violation of environmental laws that flow, diffuse, migrate, or percolate into, onto, or under the Premises after the lease term commences.

As used herein, "Hazardous Substance" means any substance that is toxic, ignitable, reactive, or corrosive and that is regulated by any local government with jurisdiction over the Premises, the State of Texas, or the United States Government. "Hazardous Substance" includes any and all material or substances that are defined as "hazardous waste," extremely hazardous waste," or a "hazardous substance" pursuant to any applicable state, federal, or local governmental law. "Hazardous Substance" includes but is not restricted to asbestos, polychlorobiphenyls ("PCBs"), solvents, pesticides, and petroleum.

(r)     At all times during the lease term, Lessor must maintain a policy of all-risk property insurance, issued by and bonded upon an insurance company licensed in the State of Texas, covering the Leased Premises and leasehold improvements (exclusive of contents), in an amount equal to not less than 80% percent of the replacement cost thereof. Lessee shall have no interest in the policy or policy proceeds and Lessor shall not be obligated to insure any furnishings, equipment, trade fixtures, or other personal property that Lessee may place or cause to be placed upon the Leased Premises. Lessor must also maintain a policy or policies of comprehensive general liability insurance insuring Lessor against loss of life, bodily injury and/or property damage with respect to Common Areas, operation of the Building, parking lots and other improvements associated with the land upon which the Leased Premises are located, and any other losses caused by or related to the duties and obligations of Lessor under this Lease.

Lessor acknowledges that, because Lessee is an agency of the State of Texas, liability for the tortious conduct of the agents and employees of Lessee (other than medical liability of medical staff physicians) or for injuries caused by conditions of tangible state property is provided for solely by the provisions of the Texas Tort Claims Act (Texas Civil Practice and Remedies Code, Chapters 1010 and 104), and that Workers' Compensation Insurance coverage for employees of Lessee is provided by Lessee as mandated by the provisions of Texas Labor Code, Chapter 503. Lessor further acknowledges that, as an agency of the State of Texas, Lessee has only such authority as is granted to Lessee by state law or as may be reasonably implied from such law, and that Lessee shall have the right, at its option, to (a) obtain liability insurance protecting Lessee and its employees and property insurance protecting Lessee's buildings and the contents, to the extent authorized by Section 51.966 of the Texas Education Code or other law; or (b) self-insure against any risk that may be incurred by Lessee as a result of its operations under this lease. Any obligation by Lessee under this Lease to obtain insurance is expressly made subject to the

Lessee's authority under state law to obtain such insurance. No insurance carrier of either party shall have a right of subrogation against the other party to this lease.

8. LEASE REQUIREMENTS

Lessor and Lessee shall comply with all provisions of Exhibit B entitled Lease Requirements which is incorporated herein for all purposes.

9. OTHER TERMS AND CONDITIONS

(a) This lease shall be effective as of the date that all parties execute this lease contract. All proposals, negotiations, notices, and representations with reference to matters covered by this lease are merged in this instrument and no amendment or modification thereof shall be valid unless evidenced in writing and signed by all parties as identified below.

(b) Any statement or representation of Lessee in any Estoppel Certificate delivered pursuant to this lease which would modify the rights, privileges or duties of Lessor or Lessee hereunder shall be of no force and effect and may not be relied on by any person unless otherwise agreed to in writing.

(c) Should Lessor require Lessee to provide an Estoppel Certificate at any time during the term of this lease, Lessor will give Lessee thirty (30) days prior written notice whereupon TFC will deliver to Lessor a completed signed original of same utilizing its standard Estoppel Certificate form.

10. SPECIAL PROVISIONS:

1) Lessor shall design, in consultation with Lessee and in accordance with the schedule for the Lease Requirements outlined in Exhibit B, and construct the additional 20,277 square feet commensurate with the room schedule, specifications, and Exhibits outlined in this Lease, and the cost per square foot to complete the construction of the additional 20,277 square feet shall not exceed on a cost per square foot basis the cost to complete the work defined in Exhibit B.
2) The Lessor shall provide and maintain a key card system for after-hours access to the Building for the Lessee. Lessee shall be responsible for maintaining and programing the system.
3) Normal building hours and HVAC are from 7:00 am to 7:00 pm, Monday through Friday, and from 7:00 am to 12:00 pm on Saturdays, exclusive of official State holidays as identified by the State of Texas Comptroller's calendar. After hours HVAC will be charged at the prevailing rate for the building which is currently estimated to be $25.00 per hour per zone. Notwithstanding the foregoing, the Lessor shall provide 24 hour 365 days per year HVAC to the Lessee's Tele/data room at no charge to the Lessee.

*******************************************************************************************



Rev. 11/12

288

LESSOR:

LESSEE:

Broadmoor Austin Associates
c/o Brandywine Realty Trust
1501 South MoPac Expressway, Suite 310
Austin, TX 78746
Tel. : (512) 306-1994
Email :

STATE OF TEXAS,
Acting by and through the
TEXAS FACILITIES COMMISSION
P. O. Box 13047
Austin, TX 78711
Tel.: (512) 463-3160
Fax: (512) 236-6187
Email: jon.conant@tfc.state.tx.us

By: _Leon Shadowen_

Signature

_Leon Shadowen_

Printed Name

By: _Peter Maass_

Peter Maass, Deputy Executive
Director of Planning and Real Estate
Management Division

cc:     Tim Horn, Health and Human Services Commission
        Ginna Harris, Texas Department of Licensing and Regulation
        Regina Roberson, Texas Department of insurance – Fire Safety Inspections, State Fire
        Marshal's Office

EXHIBIT A        RENT SCHEDULE
EXHIBIT B        LEASE REQUIREMENTS
EXHIBIT B1       AGENCY SPECIFIC REQUIREMENTS & ROOM SCHEDULE
EXHIBIT C        GENERAL CONSTRUCTION NOTES
EXHIBIT C1       NEW CONSTRUCTION NOTES



## EXHIBIT A

## RENT SCHEDULE

| OCCUPYING AGENCY | SQ. FT. OCCUPIED | ANNUAL BASE RATE / SF | ANNUAL BASE RENT | MONTHLY BASE RENT |
|---|---|---|---|---|
| HHSC | 122,123 | $32.39 | $3,955,043.04 | $329,586.92 |



Rev. 11/12

290

## EXHIBIT B

## LEASE REQUIREMENTS

(a)     In signing this lease contract, the Lessor certifies that the leased Premises to be occupied shall comply with all applicable federal, state and local laws, statutes, ordinances, codes, rules and regulations, which include compliance with all applicable handicapped accessibility requirements. Acceptance of the space does not exonerate the Lessor from meeting all the requirements. No requirement may be waived by the Lessee or the occupying agency.

(b)     Lessor specifically covenants and warrants that the space will comply with the Texas Accessibility Standards (TAS) requirements during the term of the lease for persons with disabilities administered by the Texas Department of Licensing and Regulations, however any TAS requirements for any work requested by, or performed for, the Lessee in addition to work on the approved plans and specifications as set out in Exhibit B1 shall be paid for by the Lessee.

(c)     Lessor attests that it has sufficient and appropriate title to said Premises and attests that it has the financial capability to fully execute obligations in this lease contract. Lessor further covenants that it has the power and authority to execute this lease and to place Lessee in possession of the Premises in full satisfaction of and compliance with the terms and conditions herein.

(d)     Subject to Lessor's current loan, Lessor also agrees that it will not attempt to impose upon Lessee any requirements of other legal instruments related to these Premises not referred to herein or made a part hereof. Lessor warrants to Lessee the leasehold interest created hereunder and agrees to defend Lessee against the claims of all persons to the leasehold interests of the Lessee. Any person or entity executing this lease as agent for the Lessor shall attach to this lease sufficient evidence of authority to act in the capacity shown.

(e)     **SITE PLAN & CONCEPT FLOOR PLAN DRAWINGS ("Space Plans") shall be provided by Lessor to Lessee upon the full execution of the lease**; Lessor shall provide lessee dimensioned Auto Cad drawing files of the floor plans of the leased premises. Site plan shall show the building footprint and parking lot(s). **Lessee shall have five (5) business days to approve Space Plans. Any delays beyond such five (5) day period shall be deemed a Lessee Delay.**

(f)     **COMPLETED CONSTRUCTION PLANS ("Construction Plans") shall be provided by Lessor to Lessee 60 days from execution of the lease or earlier**, for Lessee approval prior to commencement of construction. Lessor shall also provide Lessee a construction schedule showing all critical dates of construction or substantial renovation 60 days from execution of the lease and prior to the commencement of construction of the Premises covered by this lease. Lessee shall have five (5) business days to approve Construction Plans. Any delays beyond such five (5) day period shall be deemed a Lessee Delay.

(g)     **SUBJECT TO LESSEE DELAYS AND JUSTIFIABLE DELAYS, ALL CONSTRUCTION, REPAIRS AND ALTERATIONS shall be substantially completed by Lessor 120 days prior to the Rent Commencement Date.** Lessee shall have access to the premises beginning 180 days prior to the Rent Commencement Date to begin cabling and fit up, at no charge to Lessee, in order to prepare the Premises for occupancy, provided such access does not interfere with Lessor's construction. Any delays caused by Lessee's access to such space shall be deemed a Lessee Delay. All non-economic terms and conditions of the Lease shall be in force upon full execution of the lease. Lessee may do whatever is necessary during said period to ensure it is able to commence normal business operations upon occupancy and commencement.

**SUBJECT TO LESSEE DELAYS AND JUSTIFIABLE DELAYS, A CERTIFICATE OF**

Rev. 11/12

291

OCCUPANCY (CO), issued by the appropriate local authority, shall be provided by Lessor to Lessee **120 days** prior to the Rent Commencement Date. Notwithstanding the above and subject to Lessee Delays and Justifiable Delays, Lessor shall allow Lessee and its contractors access to begin setting up furniture, inclusive of Lessee's modular furniture, and cabling, at Lessee's sole cost and expense, on two (2) mutually agreed upon floors (other than the first floor) 150 days prior to the Rent Commencement Date and provide a Temporary Certificate of Occupancy on such floors no later than March 27, 2015. Any delay arising out of Lessee's or Lessee's contractor's installation of the modular furniture shall be deemed a Lessee delay.

(h)     Lessee reserves the right of inspection and may reject space based on the Premises not being constructed substantially in accordance with the Construction Plans. In addition, any adverse building conditions, including but not limited to general cleanliness, appearance of carpet or tile, grounds, finished interiors or exteriors, odors, pests, insects, or other problems relating to improper extermination or any other condition that would create unsanitary, unattractive or unsafe conditions, will be addressed as part of the punch list.

(i)     As a condition of occupancy, Lessor certifies that the leased space contains the minimum usable square footage specified in the lease contract.

(j)     Lessee shall have the right to survey and inspect Property during the construction process to ensure the leased space complies with all requirements as set forth in this lease agreement.

(k)     Prior to occupancy, Lessor shall thoroughly clean the leased Premises. Cleaning operations shall include, but not be limited to, the following:

1.      Removal of non-permanent protection and labels.
2.      Polish glass of all windows and doors.
3.      Clean exposed finishes.
4.      Clean all mirrors.
5.      Remove all waste and debris.
6.      Clean light fixtures and replace dimmed or burned out light bulbs.
7.      Sweep and wash paved areas as needed.
8.      Clean yards and grounds.
9.      Vacuum all carpeted areas.
10.     Wax and polish all hard surface flooring.
11.     Clean blinds.

(l)     The Lessee may, upon written notice to the Lessor at least 90 days prior to termination of this lease or any extension, remain in possession of the leased Premises for a period specified in the notice, not to exceed 180 days. The Lessee shall pay the Lessor for each month or part of a month, a pro-rata sum equal to the Monthly Rent in effect at the termination of this lease for the space occupied by the agency during this period.

(m)     Lessor shall provide, at Lessor's expense, access to all utilities services, meters, and connections necessary for the proper and intended use of the space. These utilities include telecommunications facilities, continuous hot and cold water, wastewater, electricity and natural gas, if required for heating and or cooling.

(n)     **UTILITIES** shall be paid by **LESSOR.**

Utility bills for telephone, data transmission, and telecommunications will be paid by the Occupying Agencies. The Occupying Agencies' normal weekly hours of operation shall be 7:00 a.m. to 7:00 p.m., Monday through Friday, and 7:00 a.m. to 12:00 noon on Saturday. At Lessee's reasonable request, Lessor shall also make available all utilities at other times necessary at an hourly reimbursement rate based on Building Owners and Managers Association International

(BOMA) standards, to be provided by the Lessor to the Occupying Agencies prior to award of the Lease. (Currently estimated to be $25.00/hr for OT HVAC)

(o) **JANITORIAL SERVICES AND SUPPLIES** shall be paid by **LESSOR.**

**LESSOR shall provide JANITORIAL SERVICES AND SUPPLIES, services shall include:**

A. On a Daily Basis (Monday through Friday; no earlier than 5:00p.m. and must be completed by 7:00a.m. the next work day):
1. Vacuum, sweep and/or dust mop all floors and vestibules.
2. Detergent mop, rinse, and dry all non-carpeted floors; vacuum carpets and floor rugs; and spot clean carpet and floor rugs as necessary.
3. Spot clean around light switches and door levers.
4. Clean and disinfect all restrooms, urinals, toilets, wash basins and drinking fountains.
5. Empty and clean all restroom receptacles.
6. Clean and refill all restroom dispensers.
7. Empty and clean waste baskets and place refuse in proper container. Replace trash can and waste basket liners.
8. Thoroughly clean break room(s), with cleaning to include, but not limited to, wiping table(s), counter(s), and sink(s).
9. Remove all refuse from building and place in proper container(s).
10. Set security alarm and lock the building after last janitorial employee is out of building, if applicable.

B. On a Weekly Basis:
1. Clean all baseboards and door frames.
2. Clean and wash all entrance doors.
3. Perform dusting on desks, files, etc.

C. On a Monthly Basis:
1. Perform dusting on all partitions, doors and window ledges.
2. Brush down all walls, ceiling vents and light fixtures.
3. Clean and wax all desks, if requested by the occupying agency/ies.

D. On a Semi-Annual Basis:
1. Steam clean all carpet and floor rugs.
2. Non-carpeted floors to be waxed or buffed.
3. Clean fluorescent light lenses and diffusers when needed and/or as requested by Lessee.
4. Wash all windows, blinds, glass doors, glass partitions, etc.

E. Should the Lessee exercise its right to assume janitorial services, the Lessor will continue to provide and pay for the following services:
1. Exterior of windows washed twice yearly.
2. Daily sanitization of restrooms with germicidal detergent, and restocking of soap and paper products for restrooms that are not within the occupying agency/ies space and for their exclusive use.

(p) Lessor shall provide and install labels for all individual electrical circuits in all electrical breaker/fuse boxes.

(q) Lessor shall be responsible for furnishing appropriate outside trash and refuse receptacles and for the removal of trash and refuse from the Premises.

(r) Lessor shall maintain the exterior of the building and adjacent grounds in an appropriate manner.

Rev. 11/12

Lessor agrees to make diligent efforts to landscape with Texas flora. All grass, trees, shrubbery and other landscaping must be maintained on a regular basis. Water used by Lessor for landscaping and/or decorative purposes shall be paid for by Lessor.

(s)     The Lessor shall provide monthly interior and quarterly exterior pest extermination services. Any extermination service must be performed after normal business hours.

(t)     Lessor shall have building maintenance personnel available to respond to routine calls within twenty-four (24) hours and emergency calls within four (4) hours. "Emergency" repair or maintenance shall include, but not be limited to, situations involving the air conditioning, electrical, plumbing, roof leaks, disruption of water-delivery to or drainage from any portion of the plumbing system, access into and out of the leased space, and environmental control. Lessor shall, at a minimum, acknowledge emergency calls within two (2) hours.

(u)     Space to be occupied under this lease shall be designated a "non-smoking area".

(v)     Lessor shall provide off-street parking for **548** vehicles of which **181** shall be in the parking garage. Parking must be under the direct control of the Lessor and must be located within a reasonable distance of the entry to the lease space. See agency specific requirements for parking.

(w)     Lessor shall furnish and maintain exterior lighting for the building, connecting walkways and parking area(s) as necessary for appropriate security. The light fixtures shall be equipped with a light level-sensing device that will operate the units automatically. Lessor shall provide a minimum level of illumination to comply with normal business standards. Lessor shall pay all utility costs associated with exterior lighting.

(x)     Cost of furnishing and installing light fixtures at inception of lease and replacement light bulbs shall be at Lessor's expense.

(y)     Exit lights, shall be provided to the outside of the building in accordance with applicable codes. Electric and/or luminous directional arrows shall be strategically placed to identify the way leading to the outside.

(z)     Lessor shall provide an emergency lighting system for one and one-half (1-1/2) hours of illumination in the event of failure of normal lighting.

(aa)    Each room and area shall have a light switch.

(bb)    All lighting and electrical accessories shall comply with all Municipal, County, State and Federal ordinances, rules and regulations for any new construction. All electrical work shall conform to the standards and requirements of the latest editions and applicable sections of the National Electrical Code (NEC) Handbook. All lighting fixtures shall have light diffusing panels or elements. Fluorescent lighting fixtures shall have energy efficient ballasts.

(cc)    Lessor shall provide all life safety equipment, including but not limited to fire extinguishers and smoke alarms, in accordance with the requirements of all applicable municipal building codes. In the absence of a local municipal code, Lessor agrees to comply with minimum requirements as set forth by the International Building Code and the Life Safety Code, as published by the National Fire Protection Administration.

(dd)    Lessor shall provide access to telecommunication and automation service providers under contract to the occupying agencies at appropriate times during construction.

(ee)    Lessor shall not unreasonably withhold the right of the Lessee to install a security system in the lease space, as requested by the Lessee. The security system shall remain the Property of the

Lessee or occupying agency/ies and may be removed at the end of the lease term.

(ff)     All exterior doors shall be keyed with non-duplicating keys. Lessor shall furnish keys, individually numbered, as requested by Lessee.  All exterior exit doors shall be solid core doors (where applicable) and equipped, unless otherwise required by code, with deadbolt locks with a minimum one-inch throw bolt.  All door hardware and automatic door closers shall be of sufficiently sturdy construction to ensure security.

(gg)    All offices and work areas shall have finished ceiling surfaces, unless otherwise approved by Lessee. Broken or stained acoustical tiles shall be replaced by Lessor in a timely manner.  Ceiling tiles must be of sufficient quality and weight to not become dislodged due to the opening and closing of doors.

(hh)    All demising walls between Lessee space and other tenant space shall be extended from wall to the deck above the finished ceiling at Lessor's expense.

(i)     The location of the HVAC unit(s) shall not unduly inconvenience the occupying agency, either due to maintenance requirements or noise levels. Lessor shall furnish a cost efficient central heat and cooling system.  The heating and cooling temperatures shall be maintained in accordance to meet the goals of the Energy Management Plan Guide as set forth by the State Energy Conservation Office or TFC.  The building must have a mechanical system that provides an indoor environment that is healthful, comfortable and free of objectionable odors.  The heating, air conditioning and ventilation system shall comply with the requirements of the latest American Society of Heating, Refrigeration, and Air Conditioning (ASHRAE) Standards for Ventilation for Acceptable Indoor Air Quality (currently ASHRAE 62-1989) and the latest ASHRAE Standards for Thermal Environmental Conditions for Human Occupancy (currently ASHRAE 55-1992).  Forced air cooling and heating shall be ducted and vented throughout the space to provide the most efficient manner of operation and occupant comfort.  Conditioned air shall be vented into each room and area with the exception of closets.  Thermostats shall be provided as necessary to control conditions throughout the leased space.  Numbers and locations of thermostats and associated zones or equipment shall accommodate all internal and external loads to provide uniform temperatures throughout the space.  HVAC controls/thermostats shall have locking covers and one master key or tool shall be provided to the Occupying Agency. Lessor is responsible for balancing the HVAC system.



295

EXHIBIT B1

## AGENCY SPECIFIC REQUIREMENTS & ROOM SCHEDULE

Agency Names(s): HHSC    Current Lease # and/or Location: 20085 and 10292 *revised 02/20/14*

| | |
|---|---|
| 1. | Public bus transportation, if such service is provided within the city, is preferred to be within 450 feet of the entrance to the facility site and there must be an accessible route from the property line to the accessible entrance to the building as prescribed in TAS. Any such accessible routes shall be covered with a hard surface material such as concrete, asphalt paving, or comparable surface material. |
| 2. | *Exterior Signage:* Lessor shall be responsible for the exterior sign. For collocated offices, it shall read, **Office of Inspector General**. The Lessor will coordinate exterior signage appearance and placement on the Building eyebrow<br><br>*Interior Signage:* For multi-tenant buildings Lessor shall provide a central directory indicating the location of each occupying agency and shall update the signage within a reasonable time of request from the occupying agency. Interior signage will be more specific, i.e. Health and Human Services Commission, Department of Aging and Disability Services, or Department of Family and Protective Services and so on. Lessor shall be responsible for numbering each room or area within the leased space with TAS compliant signage as specified by the agency. |
| 3. | **Parking:** Lessor shall provide off-street parking spaces. Parking must be under the direct control of the Lessor and must be located within a reasonable distance of the employee entry to the lease space, as determined by Lessee. All parking spaces shall be in close proximity to the proposed building. Accessible parking spaces shall be located as prescribed in TAS. The size of non-handicapped parking spaces shall be in accordance with city code requirements or in the absence of a city code at least 50% of the spaces shall accommodate a full size car. The parking area shall be covered with a hard surface material that is in new or like-new condition and shall drain as to prevent water accumulation if not required by city codes. The lessor shall provide and maintain all parking lot striping. The Lessor shall provide and maintain the parking area in good condition and state of repair and parking area shall be kept clean at all times. Lessor shall furnish exterior lighting for the building and parking area necessary for security and shall keep lighting in good operating condition. The light fixtures shall be equipped with a light level sensitive device that will operate the units automatically. Lessor shall provide a minimum of five foot-candles of illumination. Lessor shall provide 12 reserved parking spaces within the north garage. |
| 4. | Agency prefers contiguous space within a single building. Other space arrangements subject to approval by TFC to ensure occupying agency needs are met. |
| 5. | Multi-story building shall be equipped with 2 automatic elevators, with automatic leveling. |
| 6. | Lessor shall provide adequate access for freight loading and receiving. |
| 7. | *Interior Doors:*<br>All doors shall have door stops.<br>Interior door(s) from the client waiting room shall have automatic door closers.<br>All restroom doors will have automatic door closers. |
| 8. | *Keyed Locks:* The following rooms/doors shall have separately keyed locks provided by the lessor:<br><br>• Exterior doors to the leased premises<br>• Supervisor/Manager office(s) as identified on the room schedule<br>• Storage rooms as identified on the room schedule<br>• Janitorial Closet(s)<br><br>2 keys shall be furnished for each separately keyed lock. Keyed system will require a Master Lock system(s) with 1 Grand Master lock system. |
| 9. | *Client Waiting Area / Reception Area:*<br>Lessor shall furnish chilled water drinking fountains. Drinking water fountains must be located in the Client Waiting Room or be accessible to the Client Waiting Room from a public corridor. |
| 10. | *Client Waiting Area / Reception Area:*<br>Interior door(s) leading from the client waiting area into the office areas shall have a keyless release button(s) mounted where directed by the agency. |
| 11. | *Client Waiting Area / Reception Area:* |

| | |
|---|---|
| | Each door leading from the waiting area to internal hallways within the office area must have a safety glass view as designated by the agency. |
| 12. | **Reception Area:**<br>A panic alarm shall be installed with **1** control switch/button(s) located at the reception area. The control switch/button shall be positioned out of sight beneath the work surface of the workstation/desk(s). A sufficient number of horns/buzzers shall be installed so that when the panic alarm is activated there will be a sound level of not less than 15 dB or more than 25 dB throughout the employee work areas. The control switch/button must have the capability to send a single short alarm or a constant alarm. |
| 13. | **Client Waiting Area Customer Service Counters:**<br>A locking sliding laminated safety glass window shall be installed in the opening at the customer service counter. The window shall be 30" wide by 48" high. All openings shall have non-corrosive trim. |
| 14. | **Electrical:**<br>The agency will designate the locations of equipment and electrical outlets.<br>Lessor shall provide:<br><br>• Electrical service to accommodate vending machines as specified in these agency specifics.<br><br>• Structural support and electrical service for the following agency-provided equipment: **3** TV(s), and **3** other audio visual equipment units as specified by the agency at locations to be determined by the agency. Installation of TVs and other audio/video equipment, including hangers, is the responsibility of the agency. |
| 15. | **Modular Electrical:**<br>Lessor shall provide electrical service for the agency's modular furniture. Unless expressly permitted by the agency, connection to the modular furniture shall be made above the ceiling, through power poles that are part of the modular furniture system. (Note: Agency's modular furniture vendor shall be responsible for installation of said power poles. Lessor shall be responsible for ceiling tile cuts for agency-provided power poles.) Electrical service shall include standard 120-volt service for small office equipment and task lighting, as well as dedicated 120-volt service for computer equipment. Generally, each modular cubicle shall have two (2) standard 120-volt duplex outlets and one (1) computer-dedicated 120-volt duplex outlet. (The outlets are part of the modular furniture system.) For planning purposes, Lessor shall assume that a power pole shall service no more than four (4) modular cubicles. Locations and distribution of modular cubicles may require that a power pole service less than four (4) cubicles. In any event, Lessor will be responsible for providing and connecting electrical service to all agency-provided power poles and/or whips. Lessor shall distribute electrical service so there will be no more than six (6) standard duplex outlets per circuit and no more than six (6) computer-dedicated outlets per dedicated circuit.<br>*(See Attachment A for modular furniture dimensions and electrical requirements.)* |
| 16. | **Conference and/or Training Room(s)**<br>Lighting: Each entrance shall have a light switch to activate the main fluorescent lighting. In addition to the main lighting, Lessor shall provide sufficient recessed lighting controlled by a dimmer switch to provide evenly distributed lighting levels up to 50 foot-candles when the primary fluorescent lights are off. All special feature lighting, etc. switches shall be located together at the front of the room and there shall be one recessed light fixture at the front center connected to a switch for control of this fixture, independent from the primary fluorescent lighting.<br>HVAC: Room(s) will have a separate HVAC thermostat control and will require cooling for the planned occupant load of 20 trainees and trainers. |
| 17. | **Conference and/or Training Room(s):**<br>A folding partition shall be provided to divide the room(s) into two sections. Partitions shall be of such type as to achieve a minimum 40 STC rating. |
| 18. | **Automation Training Room(s):** Automation training room lighting will be provided as follows. Each entrance shall have a light switch to activate the main fluorescent lighting. In addition to the main lighting, Lessor shall provide sufficient recessed lighting controlled by a dimmer switch to provide evenly distributed lighting levels up to 50 foot-candles when the primary fluorescent lights are off. All special feature lighting, etc. switches shall be located together at the front of the room and there shall be one recessed light fixture at the front center connected to a switch for control of this fixture, independent from the primary fluorescent lighting. |

297

HVAC system shall be separately zoned with its own thermostat and designed for an occupant load of 20 people, 20 computers, 0 printer(s), and 0 multi purpose device (device includes copying, printing, scanning and faxing).

**19.** *Telephone/Data Closet:*

    A. The room location should be towards the interior of the facility and as near the "core" of the building as possible with no windows. The room must be free from static, magnetic disturbances, and electrical emanations from transformers, electrical switchgear, and fluorescent lights. If IDF rooms are also required, these will be placed one per floor or as designated by the occupying agency.

    B. Lessor shall maintain an ambient room temperature between 65 and 75 degrees Fahrenheit, with relative humidity between 40% and 50%. Lessor shall provide and maintain an air conditioner that is independent of the building HVAC system. This will provide A/C for 24 hours per day, 7 days a week. *(See Attachment B for a list of agency equipment.)*

    C. The room(s) must not be located under or near water or steam pipes. If local codes require sprinklers in the room(s), heads must be high temp and cages are recommended to prevent accidental discharge. Drip pans may be advisable. HVAC units of any kind should not be mounted directly above the room(s) or on walls that also contain/share proximity to HHSC/vendor network and/or phone equipment.

    D. All Telephone/Data electrical outlets must be a dedicated circuit and include isolated grounds for the data demarcations, local area network equipment, and telephone equipment.

    E. Lessor shall provide evenly spaced electrical outlets in the LAN/Telephone room with the following specifications:

        ▪ Two "quad" 5–15/20R T-slot receptacle and two 120-v NEMA L5-30R 2P 3W receptacles (for specialized UPS Systems) on wall marked for telephone and/or LAN demarcation.
        ▪ Two "quad" 5–15/20R T-slot receptacle outlets on wall marked for LAN network equipment.
        ▪ One 2-slot 5–15/20R T-slot receptacle outlet for each identified secondary IDF room.
        ▪ Other (please specify):

    F. Lessor shall provide two conduits: a 3"diameter conduit for telephone service and a 1"diameter conduit for the data circuit both from the access point on building exterior to the facility telephone company room and on to the occupying agency(s) telephone/data closet ending at the D-marc termination noted for the agency(s) plywood designated for the extended D-marcs. Sufficiently sized conduit (each) for voice and data drops will be installed from the telephone/data closet to the occupying agency(s) telephone/data extended D-marcs.

    G. Also required are two #6 solid ground wires attached to a building ground; one is to be installed at the data demarcation point and the other at the telephone demarcation point. These must be located close to the occupying agency's voice and data equipment.

    H. Lessor shall provide and mount 2 sheet(s) of 4 ft. X 8 ft. ¾" fire retardant grade plywood in the Telephone/Data Closet and IDF room(s) if needed, at a location to be determined by the occupying agency.

**20.** *Break Room:*

*Each Break room will be equipped with the following equipment to be provided by the agency:*

Refrigerators 3 Vending Machines 3 Microwaves 1 Coffee Pots

Counters Break Room countertops should have cabinet space above and below for storage. A standard double sink with a lever handle faucet, hot and cold water and garbage disposal will be

       Rev. 11/12

298

| | |
|---|---|
| | installed in the counter sink. Countertops should include space 24" high, 18" wide and 19" deep for each coffee pot indicated above.<br><br>*Cabinets:* Bottom cabinets shall be 34" high, 24" wide, have drawers at the top with cabinet space underneath with two shelves (including bottom of cabinet). Knee space shall be provided below the sink for handicapped accessibility as prescribed in TAS. There shall be enclosed wall cabinets above the lower cabinets with three shelves (including bottom of cabinet and two adjustable shelves). Upper cabinet shall be located 20" above lower cabinet. Shelving shall be provided for the number of microwaves indicated above.<br><br>Lessor shall install 1" x 8" hardwood chair rail around the perimeter of the room. Chair rail should be at a height designated by the agency. |
| 21. | *Lactation Room: (for offices with 75 or more staff)*<br>    A. Room shall have a plastic laminate countertop with a small utility-type sink deep enough to wash bottles and pump parts, and a gooseneck faucet with hot and cold water. A 30-inch wide clear knee space shall be provided beneath the counter along with a bottom cabinet for storage of cleaning supplies and paper towels. Counter shall be a minimum of 20 inches deep and wide enough to provide an adequate work surface for a pump and bottles.<br><br>    B. 120-volt duplex outlets shall be provided on two walls and above the counter. |
| 22. | *Rest Rooms:*<br>Staff Rest Rooms shall be located within the office space. All restrooms shall have a wall mounted baby changing station. Rest room shall have lever handle faucets with hot and cold water and paper towel dispensers. Rest room fixtures will be commercial grade. |
| 23. | Janitor Closet(s) must have a commercial grade floor mounted mop sink with a minimum 24" X 24" X 10" (depth) and commercial grade mop sink faucet with hot and cold water. |
| 24. | **Flooring:**<br><br>Non-slip VCT flooring shall be provided in the following rooms/areas: Restrooms, break rooms, janitor closet<br><br>Lessor shall provide commercial grade carpet tile (24" x 24") in open areas where modular stations will be installed. If lessor does not provide carpet tiles per this requirement then lessor accepts responsibility for the costs of moving furniture and equipment during carpet replacement.<br><br>All other rooms/areas may have roll carpet. |
| 25. | Normal working hours for the occupying agency(s) are 7am to 7pm, Monday thru Friday and 7am to 12 noon on Saturday. This office is anticipated to work additional hours outside of this schedule. For full service leases the lessor will provide TFC an hourly rate for keeping the building open for business. |



Rev. 11/12

## HHS Modular Furniture Dimensions & Electrical Requirements



### 6x8 workstation
### 48 sq. ft.

### 8x8 workstation
### 64 sq. ft.

### 10x8 workstation
### 80 sq. ft.

# Attachment A



Rev. 11/12

300

# Attachment B
## Telephone/Data Closet Equipment List

| Qty | Equipment | Power Consumption | | Heat |
| --- | --- | --- | --- | --- |
| | | Watts per unit | Total Watts | BTU/Hr total watts x 3.41 |
| 7 | Dell PowerEdge R510 Servers (Dual Power Supplies) | 1,500 | 10,500 | 35,805 |
| 1 | Dell PowerEdge 830 Server | 420 | 420 | 1,432 |
| 3 | Dell PowerEdge 2900 Servers (Dual Power Supplies) | 930 | 2,790 | 9,514 |
| 3 | Dell PowerEdge T320 Servers (Dual Power Supplies) | 1,500 | 4,500 | 15,345 |
| 2 | Dell PowerEdge 2800 Servers (Dual Power Supplies) | 930 | 1,860 | 6,343 |
| 1 | Dell PowerEdge R310 Server (Dual Power Supplies) | 400 | 400 | 1,364 |
| 3 | Dell OptiPlex GX790 Workstations | 250 | 750 | 2,558 |
| 1 | HP LJ1320 Printer | 340 | 340 | 1,159 |
| 1 | Dell PowerEdge 1855 Blade Server Controller | 2,100 | 2,100 | 7,161 |
| 2 | Dell 2161DS KVMs | 13 | 25 | 85 |
| 1 | Dell PowerEdge 6400 Server (Dual Power Supplies) | 640 | 640 | 2,182 |
| 3 | Cisco ASA 5520 Security Appliances | 190 | 570 | 1,944 |
| 2 | Cisco 3750 Gigabit Switches | 84 | 168 | 573 |
| 1 | D-Link 24 port Gigabit Switch | 19 | 19 | 65 |
| 1 | APC Symmetra LX | 11,200 | 11,200 | 38,192 |
| 1 | Buffalo TS-QVH8.0TL/R6 | 86 | 86 | 293 |
| 1 | Buffalo TSH0.0TGL/R5 NAS | 86 | 86 | 293 |
| 1 | LG NAS N2B1DD2 | 44 | 44 | 150 |
| | | totals | 36,498 | 124,458 |



Rev. 11/12

301

# HHSC_OIG Austin Space Program

| | | Full Time Employees | 431 | | | Date | 1/29/14 | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | Health and Human Services Commission (HHSC) | | | | | | | |
| | Office of Inspector General (OIG) | | | | | | | |
| | **Inspector General** | | | | | | | |
| 1 | Director (Wilson) | | 1 | 180 | | 180 | office; | |
| 2 | Exec Assistant | | 1 | 120 | | 120 | office; adj. to director | |
| 3 | Dentist | | 2 | 120 | | 240 | office; | |
| 4 | Physician | | 1 | 120 | | 120 | office; | |
| 5 | Research & Statistic Techs | | 11 | 80 | | 880 | system furniture | |
| | | | | | | | | |
| | **Enforcement (ENF)** | | | | | | | |
| 6 | Director (Stick) | | 1 | 140 | | 140 | office; | |
| 7 | Specialists - Chief of Staff | | 1 | 120 | | 120 | office | |
| 8 | Admin Assist. | | 1 | 80 | | 80 | system furniture; | |
| - | Data Analytics & Fraud Detection Unit (DAFDU) | | | | | | | |
| 9 | Director (Stansbury) | | 1 | 140 | | 140 | offices; Data Analytics & Fraud Detection Unit | |
| 10 | Research Specialists | | 3 | 80 | | 240 | system furniture; | |
| 11 | Specialists | | 2 | 80 | | 160 | system furniture; | |
| - | General Investigation (GI) | | | | | | | |
| 12 | Director (Vacant) | | 1 | 140 | | 140 | office | |
| 13 | Managers (Vacant / Vacant/ Compton/Vacant | | 4 | 120 | | 480 | offices | |
| 14 | Managers (Neal / Olguin / Boozer) | | 3 | 120 | | 360 | offices | |
| 15 | Investigator (lead) | | 2 | 80 | | 160 | system furniture; | |
| 16 | Investigators | | 19 | 80 | | 1,520 | system furniture; | |
| 17 | Specialists | | 7 | 80 | | 560 | system furniture; | |
| 18 | Staff Service Officer | | 1 | 80 | | 80 | system furniture; | |
| 19 | Admin. Assist. | | 3 | 64 | | 192 | system furniture; | |
| - | Medicaid Provider Integrity (MPI) | | | | | | | |
| 20 | Director (vacant) | | 1 | 140 | | 140 | office | |
| 21 | Investigator (lead) | | 1 | 80 | | 80 | system furniture; | |
| 22 | Managers (Stevens) | | 1 | 120 | | 120 | offices | |
| 23 | Nurses | | 12 | 80 | | 960 | system furniture; | |
| 24 | Investigators (lead) | | 15 | 80 | | 1,200 | system furniture; | |
| 25 | Investigators | | 45 | 80 | | 3,600 | system furniture; | |
| 26 | Admin. Assist. | | 2 | 64 | | 128 | system furniture; | |
| 27 | Manager | | 4 | 120 | | 480 | office | |
| 28 | Attorney | | 1 | 120 | | 120 | office | |
| | | | | | | | | |
| | **Operations (OPS)** | | | | | | | |
| 29 | Director (Henry) | | 1 | 140 | | 140 | office | |
| 30 | Admin. Assist. | | 1 | 64 | | 64 | system furniture; | |
| - | Managed Care Organizations (MCO) | | | | | | | |
| 31 | Manager (Duflot) | | 1 | 120 | | 120 | office | |
| 32 | Specialists | | 5 | 80 | | 80 | system furniture; | |
| - | Business Operations (Bus OPS) | | | | | | | |
| 33 | Director (Ble) | | 1 | 140 | | 140 | office | |

Rev. 11/12

302

| 34 | Managers (Porter / Pietrzyk) | 2 | 120 | 240 | offices |
|---|---|---|---|---|---|
| 35 | Xerox Representative | 1 | 120 | 120 | office |
| 36 | Actuary (lead) | 1 | 80 | 80 | system furniture; |
| 37 | Actuaries | 4 | 80 | 320 | system furniture; |
| 38 | Accountant | 1 | 80 | 80 | system furniture; |
| 39 | Financial Analyst | 1 | 80 | 80 | system furniture; |
| 40 | Budget Analyst | 1 | 80 | 80 | system furniture; |
| 41 | Specialists | 6 | 80 | 480 | system furniture; |
| 42 | Property Manager | 1 | 80 | 80 | system furniture; |
| 43 | Admin. Assist. (Receptionist) | 1 | 0 | 0 | 8x8 system furniture; locate staff in Waiting Room |
| - | **Center for Policy and Outreach (CPO)** | | | | |
| 44 | Director (Santos) | 1 | 140 | 140 | office |
| 45 | Specialist | 1 | 80 | 80 | system furniture; |
| 46 | Government Relations Specialist | 1 | 80 | 80 | system furniture; |
| 47 | Manager (Akhtar) | 1 | 120 | 120 | office |
| 48 | Nurse | 1 | 80 | 80 | system furniture; |
| 49 | Training Specialist | 1 | 80 | 80 | system furniture; |
| 50 | Specialists | 4 | 80 | 320 | system furniture; |
| 51 | Manager (Nelson-Wernli) | 1 | 120 | 120 | office |
| 52 | Admin Assist. | 1 | 64 | 64 | system furniture; |
| | CPO - Hotline *Nelson-Wernli's Group* | | | | |
| 53 | Customer Service Rep. (Lead) | 1 | 0 | 0 | 1 - 8' x 10' sys.furn; locate in hotline room |
| 54 | Customer Service Reps | 6 | 0 | 0 | 8 - 8' x 8' system furniture; locate staff in hotline room |
| - | CPO - Provider Integrity Research (PIR) *Nelson-Wernli's Group* | | | | |
| 55 | Investigator | 1 | 80 | 80 | system furniture; |
| 56 | Specialist | 1 | 80 | 80 | system furniture; |
| 57 | Research Specialists | 7 | 80 | 560 | system furniture; |
| - | **Technology Analysis Development and Support (TADS)** | | | | |
| 58 | Director (Dekneef) | 1 | 140 | 140 | office |
| 59 | Manager (Clayton / Boardhurst) | 2 | 120 | 240 | office |
| 60 | Specialists | 7 | 80 | 560 | system furniture; |
| 61 | Research Specialist | 1 | 80 | 80 | system furniture; |
| 62 | Specialist - *Dovers Group* | 1 | 80 | 80 | system furniture; |
| 63 | Research Specialists - *Dover's Group* | 8 | 80 | 640 | system furniture; |
| - | **Business Analysis and Support Services (BASS)** *Clayton's Group* | | | | |
| 64 | System Analysts (Lead) | 2 | 80 | 160 | system furniture; |
| 65 | System Analysts | 9 | 80 | 720 | system furniture; |
| 66 | Project Manager | 1 | 120 | 120 | office |
| - | **Research Analysis and Detection (RAD)** | | | | |
| 67 | Manager (Dover) | 1 | 120 | 120 | office |
| 68 | Nurses | 9 | 80 | 720 | system furniture; |
| 69 | Research Specialists | 1 | 80 | 80 | system furniture; |
| | | | | | |
| | **Compliance (COMP)** | | | | |
| 70 | Director (McDade) | 1 | 140 | 140 | office |
| 71 | Admin. Assist. | 1 | 64 | 64 | system furniture; |
| - | **Audit (AUD)** | | | | |
| 72 | Director (Vercolen) | 1 | 140 | 140 | office |
| 73 | Admin. Assist. | 1 | 64 | 64 | system furniture; |
| 74 | Auditors (Lead) | 2 | 80 | 160 | system furniture; |
| 75 | Auditors | 4 | 80 | 320 | system furniture; |

303

| 76 | Managers (Gauntt; Lane; Rhett) | 3 | 120 | 360 | offices |
|---|---|---|---|---|---|
| 77 | Admin. Assist. (Rhett's Group) | 1 | 64 | 64 | system furniture; |
| 78 | Auditor (Lead) | 1 | 80 | 80 | system furniture; |
| 79 | Auditors | 12 | 80 | 960 | system furniture; |
| 80 | Specialists | 2 | 80 | 160 | system furniture; |
| - | **Medicaid / CHIP Audit (MEDI/CHIP)** *Lane's group* | | | | |
| 81 | Auditor (Lead) | 1 | 80 | 80 | system furniture; |
| 82 | Auditors | 9 | 80 | 720 | system furniture; |
| - | **Medical Review Audit (MED REV)** *Gauntt's group* | | | | |
| 83 | Auditors | 6 | 80 | 480 | system furniture; |
| 84 | Admin. Assist. | 1 | 80 | 80 | system furniture; |
| 85 | Nurses | 6 | 80 | 480 | system furniture; |
| - | **Hospital Audit (HOSP)** | | | | |
| 86 | Managers (Evbayiro; Oliva) | 2 | 120 | 240 | offices |
| 87 | Auditors (Lead) | 2 | 80 | 160 | system furniture; |
| 88 | Auditors | 22 | 80 | 1,760 | system furniture; |
| 89 | Admin. Assist. | 1 | 64 | 64 | system furniture; |
| - | **WIC Vendor Monitoring (WIC VEN)** | | | | |
| 90 | Director (Hoffman-Knobloch) | 1 | 140 | 140 | office |
| 91 | Auditors | 8 | 80 | 640 | system furniture; |
| 92 | Manager | 1 | 120 | 120 | office |
| - | **Quality Rev - Util Rev (UR)** | | | | |
| 93 | Manager (Carlson/Vacant) | 2 | 120 | 240 | office |
| 94 | Nurses | 8 | 80 | 640 | system furniture; |
| 95 | Specialists | 6 | 80 | 480 | system furniture; |
| 96 | IT Auditor | 1 | 80 | 80 | system furniture; |
| 97 | Nurses *Hoffman-Knoblich group* | 3 | 80 | 240 | system furniture; |
| - | **Lock-In Program (LP)** | | | | |
| 98 | Nurses | 2 | 80 | 160 | system furniture; |
| 99 | Specialist | 1 | 80 | 80 | system furniture; |
| | | | | | |
| | | | | | |
| | **Internal Affairs (IA)** | | | | |
| 100 | Director | 1 | 140 | 140 | office |
| 101 | Admin. Assist. | 1 | 64 | 64 | system furniture; |
| 102 | Managers | 6 | 120 | 720 | offices |
| 103 | Investigators (lead) | 5 | 80 | 400 | system furniture; |
| 104 | Investigators | 16 | 80 | 1,280 | system furniture; |
| 105 | Investigators (Forensic Lab) | 3 | 0 | 0 | (1-8x10) &(4-8x8) system furniture; locate staff in fore lab |
| 106 | Specialists | 1 | 80 | 80 | system furniture; |
| 107 | Admin. Assist. | 2 | 64 | 128 | system furniture; |
| 108 | Research Specialists | 4 | 80 | 320 | system furniture; |
| | | | | | |
| | | | | | |
| | **Chief Counsel (CC)** | | | | |
| 109 | Director (Sparks) | 1 | 140 | 140 | office; adj. to #2, #3 |
| 110 | Attorney | 1 | 120 | 120 | office; adj. to director |
| 111 | Specialist | 1 | 80 | 80 | system furniture; |
| | **Sanctions (SANC)** | | | | |
| 112 | Director (Pettigrew) | 1 | 140 | 140 | office; adj. to |
| 113 | Attorneys | 10 | 120 | 1,200 | offices; adj. to |
| 114 | Specialists | 6 | 80 | 480 | system furniture; |

Rev. 11/12

304

| | | | | | |
|---|---|---|---|---|---|
| 115 | Accountant (Lead) | 1 | 80 | 80 | system furniture; |
| 116 | Accountant | 1 | 80 | 80 | system furniture; |
| 117 | Investigators | 6 | 80 | 480 | system furniture; |
| 118 | Admin Assist. | 1 | 64 | 64 | system furniture; |
| 119 | Legal Assistants | 2 | 80 | 160 | system furniture |
| | | | | | |
| | **HHSC IT** | | | | |
| 120 | Contractors | 3 | 80 | 160 | system furniture |
| | | | | | |
| | **Support Areas** | | | | |
| 121 | Waiting Room | 1 | 750 | 750 | at entrance; includes (4 -8'x8' cubicles) for 3 receptic 1 guard and room for mail processing |
| 122 | Open File Area | 1 | 60 | 60 | adjacent to COMP- (LP) Staff |
| 123 | Open File Area | 1 | 100 | 100 | adjacent to COMP- (UR) Staff |
| 124 | Open File Area | 1 | 70 | 70 | adjacent to COMP- (WIC-VEN) Staff |
| 125 | Office Machine Areas | 16 | 45 | 720 | distribute equally to all staff |
| 126 | CPO Hotline Room | 1 | 1,000 | 1,000 | includes staff and workspace in hotline staff; adj. to C CPO staff |
| 127 | IA Forensic Lab | 1 | 850 | 850 | location of Forensic staff; adj. to IA staff |
| 128 | IA Law Enforcement Storage Room | 1 | 500 | 500 | adjacent near IA |
| 129 | DAFDU Room | 1 | 1,000 | 1,000 | adjacent to DAFDU staff |
| 130 | Interview Rooms | 5 | 120 | 600 | adjacent to (2 at GI & MPI staff, 2 at IA staff, 1 near I lobby) |
| 131 | Supply / Storage Room | 1 | 200 | 200 | Central to all staff |
| 132 | IT Storage Room | 1 | 120 | 120 | adjacent to IT staff |
| 133 | MPI Law Enforcement Storage Room | 1 | 500 | 500 | adjacent to MPI staff |
| 134 | Enclosed File Room | 1 | 600 | 600 | adjacent to CC - (SANC) staff |
| 135 | Enclosed File Room | 1 | 700 | 700 | adjacent to OPS - (Bus OPS) staff |
| 136 | Enclosed File Room | 1 | 120 | 120 | Secured; adjacent to OPS - (Bus OPS) staff |
| 137 | Enclosed File Room | 1 | 390 | 390 | adjacent to OPS- (RAD) staff |
| 138 | Enclosed File Room | 1 | 390 | 390 | Secured; adjacent to OPS- (CPO-PIR) staff |
| 139 | Enclosed File Room | 1 | 850 | 850 | Secured; adjacent to ENF-(GI) staff |
| 140 | Enclosed File Room | 1 | 384 | 384 | Secured; adjacent to COMP staff |
| 141 | Enclosed File Room | 1 | 230 | 230 | Secured; adjacent to COMP- (UR) staff |
| 142 | Enclosed File Room | 1 | 480 | 480 | Secured; adjacent to IA staff |
| 143 | Records Storage Room | 1 | 100 | 100 | Secured; adjacent to ENF- (MPI) staff |
| 144 | DPS / TLETS Room | 1 | 90 | 90 | Secured; adjacent to IA staff |
| 145 | Tele/Data Room | 1 | 880 | 880 | central |
| 146 | Audit Training / Lab Rooms | 2 | 150 | 300 | adjacent to Compliance Staff |
| 147 | Audit Training Lab | 1 | 150 | 150 | adjacent to Compliance Staff |
| 148 | Wellness Room | 1 | 224 | 224 | |
| 149 | Hearing Rooms | 5 | 432 | 2,160 | near Sanctions/Chief Counsel |
| 150 | Conference Room (Small) | 2 | 256 | 512 | Central to all staff |
| 151 | Conference Room (Small) | 2 | 160 | 320 | Central to all staff |
| 152 | Conference Room (medium) | 1 | 432 | 432 | Central to all staff |
| 153 | Conference Room (extra large) | 1 | 2,000 | 2,000 | Central to all staff |
| 154 | Training Storage | 1 | 90 | 90 | adjacent to conference and training room |
| 155 | Automation Training/Conference Room | 1 | 520 | 520 | Central to all staff |
| 156 | Conference Room (large) | 2 | 520 | 1,040 | Central to all staff |
| 157 | Conference Room (medium) | 2 | 400 | 800 | Central to all staff |
| 158 | Conference Room (small) | 2 | 200 | 400 | Central to all staff |
| 159 | Lactation Room | 1 | 80 | 80 | near employee restrooms |

Rev. 11/12

305

| 160 | Break Room | 4 | 600 | 2,400 | distribute equally to all staff |
|---|---|---|---|---|---|
| 161 | Janitor's Closet | 2 | 60 | 120 | |
| 162 | Vestibule | 1 | 60 | 60 | exterior; unconditioned; at entrance (No circulation included) |
| 163 | Loading Dock | 1 | 100 | 100 | exterior; unconditioned; at rear (No circulation includ |
| 164 | Evidence Storage Room | 1 | 10,000 | 10,000 | Secure; conditioned; adjacent to #163 (No circulatior included) |
| 165 | General Investigation (GI) Case Files Storage Room | 1 | 9,000 | 9,000 | Secure; conditioned; adjacent to GI staff (No circui included) |
| 166 | Employees Restroom | | | 0 | per building code |
| | | Sub-total | | 78,412 | |
| | Open Plan Circulation | 50% | | 14,235 | |
| | Built-out Circulation | 30% | | 9,199 | |
| | | Total Circulation | | 23,434 | |
| | | OIG SF | | 101,846 | |
| | | HHSC SF | | 20,277 | |
| | | Total SF | | 122,123 | |

**REST ROOMS** TO BE PROVIDED BY LESSOR IN ACCORDANCE WITH LOCAL BUILDING CODE AND ARE NOT INCLUDED IN THE USABLE SQUARE FOOTAGE OF THIS LEASE.

**Parking requirements:**

| | |
|---|---|
| **Standard Parking Spaces** | 525 |
| **Reserved** | 12 |
| **ADA/TAS** | 11 |
| | 548 |



Rev. 11/12

306

## EXHIBIT C

## GENERAL CONSTRUCTION NOTES

Lessor shall design, in consultation with Lessee, and construct the Premises based upon all of the specifications outlined in this Lease and Exhibits as well as the following criteria at no additional cost to Lessee. Lessor understands that Lessee has no provision for payment of additional construction costs. Any unforeseen costs associated with compliance herein shall be at Lessor's sole cost.

Lessee, not the Occupying Agency of the lease space, has sole authority for the initiation of any changes or modifications (Change Order) to the scope of work contained in this lease.

Should any Occupying Agency cause or request changes by the Lessor to exceed the scope of work described below, Lessor shall first obtain written and signed authorization from the Texas Facilities Commission prior to being obligated to proceed with the work.

1. The space to be occupied must comply with all applicable federal, state, and local laws, statutes, ordinances, codes, rules and regulations. In lieu of applicable local building codes, the International Building Code will apply. Acceptance of the space does not exonerate the Lessor from meeting all the requirements. No requirement may be waived by the Commission or the Occupying Agency.

2. The Leased space shall meet all zoning and building code requirements of the Local Government(s) in which the space is located. Lessor shall comply with all Local Government(s) rules and regulations regarding land development including, but not limited to, subdivision requirements, zoning ordinances, site reviews, plan reviews, development and building permits, inspections, and certificates of occupancy. If Lessor seeks or acquires an exemption from such rules and regulations regarding land development without TFC approval, such action shall be grounds for termination of the lease by the Texas Facilities Commission in accordance with paragraph 7(k) of the State Lease contract.

3. The Texas Accessibility Standards (TAS) requirements for persons with disabilities are administered by the Texas Department of Licensing and Regulation (TDLR), Architectural Barriers Division, P. O. Box 12157, Austin, TX 78711, Telephone: 512-463-3211; web site http//www.license.state.tx.us.

4. Lessee reserves the right to survey or inspect construction/renovation to ensure space complies with all requirements at any time.

5. Any new construction for the Premises shall be constructed by Lessor to conform to New Construction Notes in Exhibit C1 and Lease Requirements outlined in Exhibit B and B1.



## EXHIBIT C1

## NEW CONSTRUCTION NOTES

**Initial New Construction:** If requested by Lessee, Lessor agrees to construct, in accordance with the New Construction specifications outlined in this Exhibit.

1.  **WALLS**
    (a)  All new interior walls to be taped, bedded, textured and painted. Existing walls to be repainted or cleaned to a like new condition. Color to be selected by tenant.
    (b)  Provide ceramic tiles in Restrooms and Shower Room if applicable.
    (c)  New demising walls shall be full height to structural deck with insulation and fire caulking at all penetrations.

2.  **FLOORS**
    (a)  Provide new anti-static VCT, locations to be determined by Lessee.
    (b)  Provide new building standard commercial grade carpet throughout, subject to Lessee approval unless noted otherwise, color to be approved by Lessee.
    (c)  Provide new 4" rubber cover base throughout, color to be selected by Lessee.

3.  **CEILING**
    Ceiling grid to be minimum 9'-0" Above Finished Floor (A.F.F.) with new matching 2' x 4' or 2' x 2' ceiling tiles.

4.  **DOORS & HARDWARE**
    (a)  Use building standard doors, frames, and lever hardware throughout.
    (b)  Re-paint or re-finish exterior doors and touch-up to like new condition.
    (c)  All entrance, exit and interior doors to meet ADA/TAS required code.

5.  **ELECTRICAL**
    (a)  Lessor shall provide 120 volt electrical duplex wall outlets as follows: Walls in excess of twenty feet in length will require one every ten feet. A minimum of one in each hallway; hallways in excess of 50 feet in length will require one every 25 feet.
    (b)  Lessor shall provide ring and string for telecommunication and automation station wiring in walls, ceiling or power poles, as applicable. The Lessee anticipates the need for cable drops at every workstation, office and other areas per the room schedule as will be identified during the Construction Documentation preparation phase.
    (c)  Lessee will connect the furniture to the power and data drops.
    (d)  Lessee shall provide cable. Lessor shall provide all necessary raceway, conduit or pathways per code and pull strings as necessary, to accommodate all work stations, offices etc. per Room Schedule.
    (e)  Lessor shall provide conduit from access point on building exterior to the data/telecom IDF closet for telephone lines and data circuits.
    (f)  All branch circuit ground wires must be tied to a common ground at the distribution panel, to a service ground, or suitable building ground. The conduit must not be the sole means of grounding. The system neutral must be electrically isolated from the ground conductor except at the building ground



Rev. 11/12

station. All branch circuits shall be on the same primary transformer. All dedicated circuits shall be identifiable by use of orange colored plates on the outlets.

(g) Provide adequate electrical for an 8-wire cube for all work stations. Provide j-boxes in the ceiling to feed into power-poles when furniture is not adjacent to a wall or column.

(h) Lessor to provide 120-volt electrical duplex outlets: (these are approx. numbers for preliminary bidding)
1. (3) in each Office.
2. (4) in each Storage/Break Room
3. (1) in each hallway every 25"
4. (2) in Wait Room
5. (4) in Reception area
6. (1) at each ceiling mounted. J-box at each exterior door for tenant provided security system.

(i) Provide sufficient dedicated quad. outlets @ LAN room to meet Lessee's requirements.

(j) Relocate to provide normal office lighting coverage.

(k) All electrical panels are to be labeled with circuits identified to all J boxes to be used for power to furniture, equipment, etc.

(l) To the extent not covered above Lessor shall provide required electrical service to the furniture and equipment identified by the Lessee during the Construction Documentation phase.

(m) Wiring covered by molding carried across open floor will not be permitted.

(n) Building to have standard lighting throughout. (2x4 florescent acrylic lenses or Parabolic desired).

## 6. MECHANICAL

(a) All units will be cleaned to eliminate any debris in all ducts.

(b) Thermostats to be added or relocated shall be approved as to location by Lessee.

(c) Landlord Mechanical Contractor to balance HVAC system if new or redesign, reconfigure and re-balance the existing HVAC system as required and will provide a final report to Lessee.

## 7. PLUMBING

(a) Provide hot and cold water in Break Room(s).

(b) Provide grab bars as per ADA/TAS requirements, paper towel dispensers, soap dispensers, trash receptacles, sanitary napkin dispensers and toilet paper dispensers in all restrooms.

## 8. WINDOW TREATMENT

(a) Provide new building standard window treatment if not existing. Provide blinds if there are no building standard window treatments.

(b) If existing, clean and or replace damaged blinds and window coverings to like new condition.



9. **MILLWORK**
   (a) Provide upper and lower plastic laminate clad cabinets in break rooms.
   (b) Uppers to have (2) adjustable shelves and lowers to have (1) adjustable shelf.

10. **ADA/TAS**
    (a) Provide opening below sinks to meet ADA/TAS.
    (b) Building must meet all ADA/TAS standards and regulations.
    (c) See required specs, if applicable, indicated on lease.

11. **SECURITY**
    Lessor shall provide conduit/wire pull to boxes located by Lessee for Lessee security system.

**NOTE: Above items are subject to change if noted otherwise on TFC approved Construction Documents.**



**Chair**
Betty Reinbeck

**Commissioners**
William D. Darby
Virginia Hermosa
Brant C. Ince
Mike Novak
Jack W. Perry
Alvin Shaw



**Executive Director**
Harvey Hilderbran

*Mailing address*:
P. O. Box 13047
Austin, TX 78711-3047

(512) 463-3446
www.tfc.state.tx.us

## LEASE TERM AMENDMENT
Lease: 20392 Austin

This Lease Term Amendment is made and entered into on this date, __4.17.15__, by and between the LESSOR, Broadmoor Austin Associates, and LESSEE, STATE OF TEXAS, acting by and through the Texas Facilities Commission, for and on behalf of the occupying agency, the Health and Human Services Commission. Lessor and Lessee are parties to State Lease 20392 Austin dated August 22, 2014 (the "Lease") and hereby amend the Lease upon the terms and conditions set forth below.

The following dates in the Lease are amended as follows:

(1) In Section 3: "1st day of August, 2015" is deleted and replaced with " November 1, 2015".
(2) In Section 3: "31st day of July, 2025" is deleted and replaced with "October 31, 2025".
(3) In Sections 3 and 7(i): "April 3, 2015" is deleted and replaced with "June 12, 2015".
(4) In Section 6(f): "August 1, 2016" is deleted and replaced with "November 1, 2016".
(5) In Section 6(f): "May" is deleted and replaced with "August".
(6) In Section 7(i): "October 1, 2015" is deleted and replaced with "January 1, 2016".
(7) In Exhibit B, paragraph (g): "March 27, 2015" is deleted and replaced with "May 27, 2015".

The Lease is hereby ratified and confirmed by the parties hereto, and every provision, covenant, condition, obligation, right, term, and power contained in and under the Lease shall continue in full force and effect, affected by this Amendment only to the extent of the amendments and modifications set forth herein. In the event of any conflict between the terms and conditions of this Amendment and those of the existing Lease, the terms and conditions of this Amendment shall control.

TEXAS FACILITIES
COMMISSION APPROVED:

_____
Peter Maass, Deputy Executive
Director of Planning and Real Estate
Management Division

Approved By:
BROADMOOR AUSTIN ASSOCIATES

_____
By: _____

William D. Redd
~~Executive Vice President~~
and Senior Managing Director

Printed Name

cc:     Tim Horn, Health and Human Services Commission
        Ginna Harris, Texas Department of Licensing and Regulation
        Regina Roberson, Texas Department of Insurance – Fire Safety Inspections, State Fire
        Marshal's Office

jc

**Chair**
Betty Reinbeck

**Commissioners**
William D. Darby
Virginia Hermosa
Brant C. Ince
Mike Novak
Jack W. Perry
Alvin Shaw

**Executive Director**
Harvey Hilderbran

*Mailing address*:
P. O. Box 13047
Austin, TX 78711-3047

(512) 463-3446
www.tfc.state.tx.us



## LEASE EXTENSION AMENDMENT
Lease: 20392 Austin

This Lease Extension Amendment is made and entered into on this date, **7-2-15**, by and between the LESSOR, BROADMOOR AUSTIN ASSOCIATES, and LESSEE, STATE OF TEXAS acting by and through the Texas Facilities Commission, for and on behalf of the occupying agency, the Health and Human Services Commission (HHSC-OIG). Lessor and Lessee are parties to State Lease 20392 Austin dated August 22, 2014, as amended by a Lease Term Amendment dated April 17, 2015 (as amended, the "Lease"). The Lessee hereby elects to exercise its option pursuant to the Lease, and the parties hereby extend the Lease upon the terms and conditions set forth below by mutual agreement.

The term of the Lease is extended for 12 months, from November 1, 2025 through October 31, 2026, for the leased premises comprised of 122,123 usable square feet of space at the same annual rate per square foot pursuant to the terms and conditions of the Lease, including the CPI adjustment. Substantial Completion occurred on June 22, 2015, and the Rent Commencement Date is November 1, 2015.

The leasehold improvements shall include the work shown in change orders requested by Lessee and approved in writing by Lessor ("Approved Change Orders"). The leasehold improvements shall also include any Additional Work to the premises requested by the Lessee by October 31, 2016, and approved in writing by the Lessor at Lessor's sole discretion. Lessor shall pay for up to $560,000.00 of Approved Change Orders and Approved Additional Work. All costs of Approved Change Orders and Approved Additional Work in excess of $560,000.00 shall be paid for by Lessee.

All other terms and conditions of the Lease remain the same and continue in full force and effect. This Lease Extension Amendment is by mutual agreement between Lessee and Lessor. The Lease is hereby ratified and confirmed by the parties hereto, and every provision, covenant, condition, obligation, right, term, and power contained in and under the Lease shall continue in full force and effect, affected by this Amendment only to the extent of the amendments and modifications set forth herein. In the event of any conflict between the terms and conditions of this Amendment and those of the existing Lease, the terms and conditions of this Amendment shall control.

TEXAS FACILITIES
COMMISSION APPROVED:

Peter Maass, Deputy Executive
Director of Planning and Real Estate
Management Division

APPROVED BY:

Broadmoor Austin Associates

By: William D. Redd
Printed Name

cc:     Tim Horn, Health and Human Services Commission
        Ginna Harris, Texas Department of Licensing and Regulation
        Regina Roberson, Texas Department of Insurance – Fire Safety Inspections, State Fire Marshal's
        Office

jc

**Texas Facilities Commission**
*Physical address*: 1711 San Jacinto Blvd, Austin, Texas 78701
★ *Planning and administering facilities in service to the State of Texas* ★

314

# Tab 2

GOVERNMENT CODE

TITLE 10. GENERAL GOVERNMENT

SUBTITLE D. STATE PURCHASING AND GENERAL SERVICES

CHAPTER 2167. LEASE OF SPACE FOR STATE AGENCIES

SUBCHAPTER A. GENERAL PROVISIONS

# § 2167.001. APPLICABILITY.

(a)  This chapter applies to:

(1)  office space;

(2)  warehouse space;

(3)  laboratory space;

(4)  storage space exceeding 1,000 gross square feet;

(5)  boat storage space;

(6)  aircraft hangar space other than hangar space and adjacent space leased by the Texas Department of Transportation at Austin-Bergstrom International Airport and operated for the purpose of providing air transportation services for the State of Texas;

(7)  vehicle parking space; and

(8)  a combination of those kinds of space.

(b)  This chapter does not apply to:

(1)  radio antenna space;

(2)  residential space for a Department of State Health Services or Health and Human Services Commission program;

(3)  residential space for a Texas Juvenile Justice Department program;

(4)  space to be used for less than one month for meetings, conferences, conventions, seminars, displays, examinations, auctions, or similar purposes;

(5)  district office space for members of the legislature;

(6)  space used by the Texas Workforce Commission;

(7)  residential property acquired by the Texas Department of Housing and Community Affairs or the Texas State Affordable Housing Corporation that is

offered for sale or rental to individuals and families of low or very low income or families of moderate income;

(8)   except as provided by Section 2167.007, space for a university system or institution of higher education;

(9)   space leased by the Texas Veterans Commission to administer the veterans employment services program; or

(10)   space for the Texas Department of Motor Vehicles.

# § 2167.0011.  DEFINITION.

In this chapter, "commission" means the Texas Facilities Commission.

# § 2167.002.  PREREQUISITES FOR LEASING SPACE.

(a)  The commission may lease space for a state agency in accordance with this chapter and the agency's specifications if:

  (1)  state-owned space is not otherwise available to the agency; and

  (2)  the agency has verified it has money available to pay for the lease.

(b)  In making a determination under this section that state-owned space is not available to a state agency, the commission must consider all reasonably available state-owned space in this state, regardless of whether utilizing state-owned space would require the agency to move all or part of the agency's operations to a different geographic location in this state.

# § 2167.0021.  BEST VALUE STANDARD FOR LEASE OF SPACE.

(a)  The commission shall lease space for the use of a state agency on the basis of obtaining the best value for the state.

(b)  The commission shall adopt rules establishing guidelines for the determination of best value in a lease contract.  In determining the best value, the commission may consider:

> (1)  the cost of the lease contract;

> (2)  the condition and location of lease space;

> (3)  utility costs;

> (4)  access to public transportation;

> (5)  parking availability;

> (6)  security;

> (7)  telephone service availability;

> (8)  indicators of probable lessor performance under the contract, such as the lessor's financial resources and the lessor's experience;

> (9)  compliance with the architectural barriers law, Article 9102, Revised Statutes; and

> (10)  other relevant factors.

(c)  This section does not prohibit the commission from leasing space from the offeror that offers the space at the lowest cost if the commission determines that doing so obtains the best value for the state.

## § 2167.003.  FIRST CONSIDERATION TO HISTORIC STRUCTURE.

(a)  In leasing space for the use of a state agency, the commission or the private brokerage or real estate firm assisting the commission shall give first consideration to a building that is designated as a historic structure under Section 442.001 or to a building that has been designated a landmark by a local governing authority, if:

 (1)  the building meets requirements and specifications;  and

 (2)  the cost is not substantially higher than the cost for other available buildings that meet requirements and specifications.

(b)  When it considers leasing space for a state agency, the commission or the private brokerage or real estate firm assisting the commission shall notify each individual and organization that is:

 (1)  on a list furnished to the commission by the Texas Historical Commission under Section 442.005;  and

 (2)  in the county in which the commission is considering leasing space.

(c)  Repealed by Acts 2003, 78th Leg., ch. 309, Sec. 4.07(1).

## § 2167.004.  LEASING SPACE FOR HEALTH AND HUMAN SERVICES AGENCIES.

(a)  Notwithstanding any other provision of this chapter or of Subchapter C, Chapter 2165, the commission may not lease office space to serve the needs of any health and human services agency unless the Health and Human Services Commission has approved the office space for the agency.

(b)  Repealed by Acts 2003, 78th Leg., ch. 309, Sec. 4.07(2).

(c)  In this section, "health and human services agency" has the meaning assigned by Section 521.0001.

# § 2167.005. DELEGATION OF AUTHORITY TO STATE AGENCIES.

(a)  The commission may delegate to a state agency, including an institution of higher education, the authority to enter into lease contracts for space if the commission determines that state-owned space is not available as provided by Section 2167.002.

(b)  Any reports on the lease contracts made under this delegated authority shall be required annually.

(c)  If information to be included in the report is also included in another report to be made by the institution of higher education to another state agency, the commission, the agency receiving the other report, and the institution of higher education shall enter into a memorandum of understanding concerning the information to be reported in order to enable the institution of higher education to provide the required information in the most cost-effective manner taking into account the costs to each affected agency.

(d)  The commission may revoke a delegation of authority made under this section.

## § 2167.0051.  CLASSROOM AND INSTRUCTIONAL SPACE.

(a)  An institution of higher education may not lease classroom and instructional space unless the portion of the building to be used by the institution complies with the applicable standards and specifications under the architectural barriers law, Article 9102, Revised Statutes.

(b)  An institution of higher education may lease classroom and instructional space through competitive bidding in accordance with Section 2167.053 or through competitive sealed proposals in accordance with Section 2167.054 or may negotiate for that space on making a determination that competition is not available and shall include provisions to obtain a lease contract for classroom and instructional space in accordance with Section 2167.055.

## § 2167.006.  ELIMINATION OF BARRIERS TO PERSONS WITH DISABILITIES IN LEASED BUILDINGS.

(a)  The commission may not enter a lease contract under this chapter unless it complies with the architectural barriers law, Article 9102, Revised Statutes.

(b)  A state agency, including an institution of higher education, may not enter a lease contract under Section 2167.005 unless the agency complies with the architectural barriers law, Article 9102, Revised Statutes.

# § 2167.007.  LEASING SERVICES TO STATE AGENCIES.

(a)  This chapter does not prohibit the commission from providing leasing services to a state agency otherwise excluded from its requirements.

(b)  Services performed under Subsection (a) are not subject to the interagency cooperation law, Chapter 771.

(c)  The commission may establish a system of charges and billings to assure the recovery of the cost of providing services under Subsection (a) and may submit, after the close of each month, a purchase voucher or journal voucher to an agency for which services were provided.

## § 2167.008.  RULES.

The commission shall adopt rules necessary to administer this chapter.

## § 2167.009.  CONSIDERATION TO MILITARY INSTALLATION.

In leasing space for the use of a state agency, the commission or the private brokerage or real estate firm assisting the commission shall give consideration to a federally owned or operated military installation or facility.

GOVERNMENT CODE

TITLE 10. GENERAL GOVERNMENT

SUBTITLE D. STATE PURCHASING AND GENERAL SERVICES

CHAPTER 2167. LEASE OF SPACE FOR STATE AGENCIES

SUBCHAPTER B. PROCEDURES FOR LEASING SPACE;  LEASE CONTRACT

## § 2167.051.  LEASING SPACE FROM ANOTHER GOVERNMENTAL ENTITY.

Space may be leased:

(1)  through an interagency contract from another state agency;  or

(2)  through a negotiated contract from:

(A)  the federal government;

(B)  a political subdivision, including a county, municipality, school district, water or irrigation district, hospital district, council of governments, or regional planning commission;

(C)  a statewide Texas public retirement system in a commercial building that is completely owned, directly or indirectly, by the retirement system;  or

(D)  a children's advocacy center established under Subchapter E, Chapter 264, Family Code.

# § 2167.052.  LEASING SPACE FROM PRIVATE SOURCE.

(a)  Space may be leased from a private source through:

    (1)  competitive bidding;

    (2)  competitive sealed proposals under Section 2167.054;  or

    (3)  direct negotiation.

(b)  The commission may negotiate for space on making a written determination that competition is not available.

(c)  The commission shall use the method for leasing space that provides the best value for the state.

# § 2167.053. LEASING SPACE THROUGH COMPETITIVE BIDDING.

(a)  When space is leased through competitive bidding, the commission shall determine the bid that provides the best value for the state after considering moving costs, the cost of time lost in moving, the cost of telecommunications services, and other relevant factors.

(b)  The commission shall send to the leasing state agency:

   (1)  a copy of all bids received;  and

   (2)  the commission's recommended award.

(c)  If, after review of the bids and evaluation of all relevant factors, the leasing state agency's opinion is that the bid selected by the commission is not the bid that provides the best value for the state, it may file with the commission a written recommendation that the award be made to a bidder other than the commission's recommended bidder.  The leasing state agency's recommendation must contain the agency's justification for its recommendation and a complete explanation of all factors it considered.

(d)  The commission shall fully consider the leasing state agency's recommendation and, if it does not agree, shall notify the agency of its disagreement in writing.  The leasing state agency and the commission shall attempt to agree on the award.

(e)  If the commission and the leasing state agency do not agree within 30 days, all bids and pertinent documents shall be sent to the governor.  The governor shall designate the bidder to which the award shall be made.

## § 2167.054. LEASING SPACE THROUGH COMPETITIVE SEALED PROPOSALS.

(a)  The commission may lease space using competitive sealed proposals.

(b)  The commission shall solicit proposals by publishing a notice of request for proposals in:

>   (1)  the Texas Register;  and

>   (2)  a newspaper of general circulation in the county in which the space is to be leased.

(c)  The commission shall open each proposal in a manner that does not disclose the contents of the proposal during the process of negotiating with competing offerors.

(d)  As provided in a request for proposals and under rules adopted by the commission, the commission may discuss acceptable or potentially acceptable proposals with offerors to assess an offeror's ability to meet the solicitation requirements and to obtain the most advantageous lease contract for the state.  The commission may invite a leasing state agency to participate in discussions and negotiations conducted under this section.  After receiving a proposal but before making an award, the commission may permit the offeror to revise the proposal to obtain the best final proposal.

(e)  The commission may not disclose information derived from proposals submitted from competing offerors in conducting discussions under Subsection (d).

(f)  The commission shall provide each offeror whose proposal meets the minimum requirements in the request for proposals a reasonable opportunity to discuss and revise its proposal.

(g)  The commission shall make a written award of a lease to the offeror whose proposal provides the best value for the state, considering price and the evaluation factors in the request for proposals. The commission shall state in writing in the contract file the reasons for which an award is made.

(h)  The commission shall refuse all proposals if it determines that none of the proposals is acceptable.

(i)  If the competitive sealed proposal procedure for leasing space is used by a state agency that has been delegated leasing authority under Section 2167.005, the agency shall follow the procedures outlined by this section and any rules adopted by the commission.

## § 2167.0541.  USE OF PRIVATE FIRMS TO OBTAIN SPACE.

(a)  The commission may contract with one or more private brokerage or real estate firms to assist the commission in obtaining lease space for state agencies on behalf of the commission under this chapter.

(b)  A private brokerage or real estate firm with which the commission contracts under Subsection (a) may assist the commission in leasing facilities under this chapter.

(c)  The commission may establish a system of charges and billings to recover the costs of contracting with a private brokerage or real estate firm under Subsection (a).

# § 2167.055.  CONTRACT FOR LEASE OF SPACE.

(a)  In a contract by the commission for the lease of space under this chapter, the state, acting through the commission, is the lessee.

(b)  A lease contract entered into under Section 2167.053 or 2167.054 must reflect the provisions contained in the invitation for bids or request for proposals, the successful bid or proposal, and the award of the contract.

(c)  A lease contract may:

   (1)  provide for an original term that does not exceed 10 years;  and

   (2)  include options to renew for as many terms that do not exceed 10 years each as the commission considers to be in the state's best interest.

(d)  A lease contract that does not contain an option to renew may, on agreement of the parties, be renewed under terms to which all parties to the contract agree.

(e)  A lease contract is contingent on the availability of money appropriated by the legislature to pay for the lease.

(f)  The obligation of the lessor to provide lease space and of the commission to accept the space is binding on the execution of the lease contract.

# § 2167.056. OPTION TO PURCHASE.

(a)  If the commission considers it advisable, the commission may lease space for a state agency under a contract that contains an option for the commission to purchase the space subject to the legislature's appropriation of money for the purchase.

(b)  A lease contract containing the option must indicate:

> (1)  the amount that will accumulate and be credited toward the purchase at various times during the lease term;  and

> (2)  the purchase price of the property at the beginning of each fiscal biennium during the lease term.


Added by Acts 1995, 74th Leg., ch. 41, Sec. 1, eff. Sept. 1, 1995.

GOVERNMENT CODE

TITLE 10. GENERAL GOVERNMENT

SUBTITLE D. STATE PURCHASING AND GENERAL SERVICES

CHAPTER 2167. LEASE OF SPACE FOR STATE AGENCIES

SUBCHAPTER C. COMMISSION AND STATE AGENCY POWERS
AND DUTIES RELATED TO LEASED SPACE

## § 2167.101. CERTIFICATION OF AVAILABLE MONEY.

A state agency occupying space leased under this chapter shall certify to the commission, at least 60 days before the beginning of each fiscal biennium during the lease term, that money is available to pay for the lease until the end of the next fiscal biennium.

## § 2167.102.  REMEDIAL ACTION AGAINST LESSOR.

(a)  When a state agency occupying leased space is aware of circumstances that require remedial action against the lessor, the agency shall notify the commission.

(b)  The commission may investigate the circumstances and the lessor's performance under the contract.

(c)  The attorney general on the commission's request shall assist the commission in protecting the state's interest under a lease contract.

# § 2167.103.  RECORDS.

To efficiently maintain a space management system, the commission shall maintain records of the amount and cost of space under lease by the commission and may collect other information that it considers necessary.  A state agency shall cooperate with the commission in securing this information.

# § 2167.104.  SUBLEASE TO CHILD CARE PROVIDER.

(a)   Subject to restrictions imposed by a lease or other enforceable contract, the commission, at the request of the occupying agency, shall sublease part of a space leased under this chapter to a child care provider for the operation of a child care facility.

(b)  Chapter 663 applies to the establishment and operation of the child care facility, except as provided by this section.

(c)  This section does not affect the duties of the commission regarding child care facilities in state-owned buildings and potential child care facility sites in state-owned buildings under Chapter 663, 2165, or 2166.

(d)  The occupying agency and the commission may agree to:

> (1)  procedures relating to the selection of the child care provider;

> (2)  granting some preference in enrollment to children of officers and employees of the occupying state agency;  and

> (3)  any other matter regarding the operation of the child care facility.

(e)   The commission shall sublease space under this section to a child care provider approved by the commission under Chapter 663 at a rate set by the commission.

(f)  In leasing space under this chapter, the commission shall, whenever possible, enter into a lease contract that allows for subleasing space to a child care provider.

## § 2167.105.  REPORT ON NONCOMPLIANCE.

If the commission determines that a state agency has not complied with the commission's rules or with other state law related to leasing requirements, the commission shall report the noncompliance to the members of the state agency's governing body and to the governor, lieutenant governor, and speaker of the house of representatives.  The commission shall include in its report an estimate of the fiscal impact resulting from the noncompliance.

# TAB 3

CIVIL PRACTICE AND REMEDIES CODE

TITLE 5. GOVERNMENTAL LIABILITY

CHAPTER 114. ADJUDICATION OF CLAIMS ARISING UNDER WRITTEN

CONTRACTS WITH STATE AGENCIES

# § 114.001. DEFINITIONS.

In this chapter:

(1)  "Adjudication" of a claim means the bringing of a civil suit and prosecution to final judgment in county or state court.

(2)  "Contract subject to this chapter" means a written contract stating the essential terms of the agreement for providing goods or services to the state agency that is properly executed on behalf of the state agency. The term does not include a contract that is subject to Section 201.112, Transportation Code.

(3)  "State agency" means an agency, department, commission, bureau, board, office, council, court, or other entity that is in any branch of state government and that is created by the constitution or a statute of this state, including a university system or a system of higher education.  The term does not include a county, municipality, court of a county or municipality, special purpose district, or other political subdivision of this state.

## § 114.002.  APPLICABILITY.

This chapter applies only to a claim for breach of a written contract for engineering, architectural, or construction services or for materials related to engineering, architectural, or construction services brought by a party to the written contract, in which the amount in controversy is not less than $250,000, excluding penalties, costs, expenses, prejudgment interest, and attorney's fees.

## § 114.003.  WAIVER OF IMMUNITY TO SUIT FOR CERTAIN CLAIMS.

A state agency that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this chapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of an express provision of the contract, subject to the terms and conditions of this chapter.

# § 114.004.  LIMITATIONS ON ADJUDICATION AWARDS.

(a)  The total amount of money awarded in an adjudication brought against a state agency for breach of an express provision of a contract subject to this chapter is limited to the following:

    (1)  the balance due and owed by the state agency under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration if the contract expressly provides for that compensation;

    (2)  the amount owed for written change orders;

    (3)  reasonable and necessary attorney's fees based on an hourly rate that are equitable and just if the contract expressly provides that recovery of attorney's fees is available to all parties to the contract; and

    (4)  interest at the rate specified by the contract or, if a rate is not specified, the rate for postjudgment interest under Section 304.003(c), Finance Code, but not to exceed 10 percent.

(b)  Damages awarded in an adjudication brought against a state agency arising under a contract subject to this chapter may not include:

    (1)  consequential damages;

    (2)  exemplary damages; or

    (3)  damages for unabsorbed home office overhead.

## § 114.005.  CONTRACTUAL ADJUDICATION PROCEDURES ENFORCEABLE.

Adjudication procedures, including requirements for serving notices or engaging in alternative dispute resolution proceedings before bringing a suit or an arbitration proceeding, that are stated in the contract subject to this chapter or that are established by the state agency and expressly incorporated into the contract are enforceable, except to the extent those procedures conflict with the terms of this chapter.

## § 114.006.  NO WAIVER OF OTHER DEFENSES.

This chapter does not waive a defense or a limitation on damages available to a party to a contract, other than a bar against suit based on sovereign immunity.

## § 114.007.  NO WAIVER OF IMMUNITY TO SUIT IN FEDERAL COURT.

This chapter does not waive sovereign immunity to suit in federal court.

## § 114.008. NO WAIVER OF IMMUNITY TO SUIT FOR TORT LIABILITY.

This chapter does not waive sovereign immunity to a claim arising from a cause of action for negligence, fraud, tortious interference with a contract, or any other tort.

### § 114.009.  EMPLOYMENT CONTRACTS EXEMPT.

This chapter does not apply to an employment contract between a state agency and an employee of that agency.

## § 114.010.  VENUE.

A suit under this chapter may be brought in a district court in:

    (1)  a county in which the events or omissions giving rise to the claim occurred; or

    (2)  a county in which the principal office of the state agency is located.

## § 114.011. LIMITATION ON REMEDIES.

Satisfaction and payment of any judgment under this chapter may not be paid from funds appropriated to the state agency from general revenue unless the funds are specifically appropriated for that purpose.  Property of the state or any agency, department, or office of the state is not subject to seizure, attachment, garnishment, or any other creditors' remedy to satisfy a judgment taken under this chapter.

## § 114.012.  EXCLUSIVE REMEDY.

A claim to which this chapter applies may not be brought under Chapter 2260, Government Code, against the state or a unit of state government as defined by Section 2260.001, Government Code.

# § 114.013.  REPORT.

Before January 1 of each even-numbered year, each state agency shall report to the governor, the comptroller, and each house of the legislature the cost of defense to the state agency and the office of the attorney general in an adjudication brought against the agency under a contract subject to this chapter.  Included in the report shall be the amount claimed in any adjudication pending on the date of the report.

# TAB 4

# TEXAS SESSION LAWS
## 2023

---

## GENERAL AND SPECIAL
## Eighty–Eighth Legislature,
## Regular Session

---

### GENERAL APPROPRIATIONS BILL
#### CHAPTER 1170
#### H.B. 1

*Be it enacted by the Legislature of the State of Texas:*

**Line item Veto:** *Please see the end of this chapter for information regarding sections of the General Appropriations Bill subject to line item veto.*

The text of the General Appropriations Bill can be found on the Legislative Budget Board's Website. The URL is:

http://www.lbb.state.tx.us

*Printed below is the content of* **HB1 - Conference Committee Report (2024–25 State Budget)** *from this website as of May 25, 2023.*

## HEALTH AND HUMAN SERVICES COMMISSION

|  | For the Years Ending | |
|---|---|---|
|  | August 31, 2024 | August 31, 2025 |
| **Method of Financing:** | | |
| General Revenue Fund | | |
| General Revenue Fund | $ 2,633,580,900 | $ 2,661,834,674 |
| Medicaid Program Income Account No. 705 | 649,920,000 | 289,512,000 |
| Vendor Drug Rebates—Medicaid Account No. 706 | 849,148,706 | 807,950,799 |
| GR Match for Medicaid Account No. 758 | 12,902,084,261 | 13,003,943,096 |
| Premium Co-Payments, Low Income Children Account No. 3643 | 3,815,020 | 4,666,672 |
| GR for Maternal and Child Health Block Grant Account No. 8003 | 20,806,646 | 20,806,646 |
| GR Match for Federal Funds (Older Americans Act) Account No. 8004 | 4,256,020 | 4,256,020 |
| GR Match for Title XXI (CHIP) Account No. 8010 | 9,533,397 | 9,520,506 |
| GR Match for SNAP Administration Account No. 8014 | 166,507,690 | 166,164,013 |
| Tobacco Settlement Receipts Match for Medicaid Account No. 8024 | 148,000,000 | 148,000,000 |
| Tobacco Settlement Receipts Match for CHIP Account No. 8025 | 185,705,788 | 237,003,932 |
| GR Certified as Match for Medicaid Account No. 8032 | 282,844,381 | 283,739,902 |
| Vendor Drug Rebates—Public Health Account No. 8046 | 6,048,000 | 6,048,000 |
| Experience Rebates—CHIP Account No. 8054 | 21,272,000 | 8,442,000 |
| Vendor Drug Rebates—CHIP Account No. 8070 | 7,892,077 | 8,568,762 |
| Cost Sharing - Medicaid Clients Account No. 8075 | 135,251 | 134,476 |
| Vendor Drug Rebates—Supplemental Rebates Account No. 8081 | 56,102,166 | 53,379,765 |
| General Revenue for ECI Account No. 8086 | 51,320,902 | 54,899,550 |
| Medicare Giveback Provision Account No. 8092 | 612,017,146 | 683,877,329 |
| Subtotal, General Revenue Fund | $ 18,610,990,351 | $ 18,452,748,142 |
| **General Revenue Fund - Dedicated** | | |
| Hospital Licensing Account No. 129 | $ 2,730,218 | $ 2,745,052 |
| Texas Capital Trust Fund Account No. 543 | 289,802 | 289,802 |
| Sexual Assault Program Account No. 5010 | 5,000,000 | 5,000,000 |
| Home Health Services Account No. 5018 | 15,264,354 | 15,526,915 |
| State Owned Multicategorical Teaching Hospital Account No. 5049 | 439,443 | 439,443 |
| Quality Assurance Account No. 5080 | 60,032,000 | 60,032,000 |
| Medicaid Estate Recovery Account No. 5109 | 1,721,768 | 1,721,768 |
| Subtotal, General Revenue Fund - Dedicated | $ 85,477,585 | $ 85,754,980 |
| **Federal Funds** | | |
| Coronavirus Relief Fund | $ 339,990,966 | $ 120,216,282 |
| Federal American Recovery and Reinvestment Fund Account No. 369 | 4,154,167 | 4,154,167 |
| Federal Funds | 26,965,842,113 | 26,617,213,352 |
| Subtotal, Federal Funds | $ 27,309,987,246 | $ 26,741,583,801 |
| **Other Funds** | | |
| Freestanding Emergency Medical Care Facility Licensing Fund Account No. 373 | $ 1,183,160 | $ 1,205,459 |
| Appropriated Receipts | 142,403,458 | 67,055,309 |
| State Chest Hospital Fees and Receipts Account No. 707 | 325,610 | 325,610 |
| Public Health Medicaid Reimbursements Account No. 709 | 69,245,724 | 69,245,724 |
| Interagency Contracts | 291,960,469 | 288,642,671 |
| License Plate Trust Fund Account No. 0802, estimated | 26,500 | 26,500 |
| Interagency Contracts - Transfer from Foundation School Fund No. 193 | 16,498,102 | 16,498,102 |
| MH Collections for Patient Support and Maintenance Account No. 8031 | 1,935,722 | 1,935,722 |
| MH Appropriated Receipts Account No. 8033 | 10,906,440 | 10,906,440 |
| Medicaid Subrogation Receipts (State Share) Account No. 8044 | 100,000,000 | 100,000,000 |
| Universal Services Fund Reimbursements Account No. 8051 | 988,248 | 988,248 |
| Subrogation Receipts Account No. 8052 | 5,000 | 5,000 |
| Appropriated Receipts - Match for Medicaid Account No. 8062 | 26,346,119 | 26,632,766 |
| ID Collections for Patient Support and Maintenance Account No. 8095 | 24,031,820 | 24,031,820 |
| ID Appropriated Receipts Account No. 8096 | 634,054 | 634,054 |

## HEALTH AND HUMAN SERVICES COMMISSION
### (Continued)

| | | |
|---|---|---|
| ID Revolving Fund Receipts Account No. 8098 | 80,779 | 80,779 |
| WIC Rebates Account No. 8148 | 224,959,011 | 224,959,011 |
| Subtotal, Other Funds | $ 911,530,216 | $ 833,173,215 |
| Total, Method of Financing | $ 46,917,985,398 | $ 46,113,260,138 |
| Other Direct and Indirect Costs Appropriated Elsewhere in this Act | $ 4,866,673 | $ 4,831,755 |

This bill pattern represents an estimated 62% of this agency's estimated total available funds for the biennium.

| | | |
|---|---|---|
| Number of Full-Time-Equivalents (FTE): | 38,605.6 | 38,622.3 |

**Schedule of Exempt Positions:**

| | | |
|---|---|---|
| Executive Commissioner, Group 9 | $317,754 | $345,250 |
| Texas Civil Commitment Office Executive Director, Group 7 | 240,000 | 240,000 |

**Items of Appropriation:**
**A. Goal:** MEDICAID CLIENT SERVICES
Medicaid.

| | | |
|---|---|---|
| **A.1.1. Strategy:** AGED AND MEDICARE-RELATED | $ 6,217,596,601 | $ 6,395,277,268 |
| Aged and Medicare-related Eligibility Group. | | |
| **A.1.2. Strategy:** DISABILITY-RELATED | 8,352,955,248 | 8,355,474,654 |
| Disability-Related Eligibility Group. | | |
| **A.1.3. Strategy:** PREGNANT WOMEN | 1,238,189,738 | 1,124,111,626 |
| Pregnant Women Eligibility Group. | | |
| **A.1.4. Strategy:** OTHER ADULTS | 859,101,846 | 757,876,929 |
| Other Adults Eligibility Group. | | |
| **A.1.5. Strategy:** CHILDREN | 8,292,634,929 | 7,483,733,138 |
| Children Eligibility Group. | | |
| **A.1.6. Strategy:** MEDICAID PRESCRIPTION DRUGS | 4,241,163,622 | 4,014,215,932 |
| **A.1.7. Strategy:** HEALTH STEPS (EPSDT) DENTAL | 1,269,615,983 | 1,133,428,358 |
| **A.1.8. Strategy:** MEDICAL TRANSPORTATION | 163,863,257 | 144,944,852 |
| **A.2.1. Strategy:** COMMUNITY ATTENDANT SERVICES | 1,186,014,957 | 1,215,706,595 |
| **A.2.2. Strategy:** PRIMARY HOME CARE | 25,848,491 | 26,537,931 |
| **A.2.3. Strategy:** DAY ACTIVITY & HEALTH SERVICES | 6,803,142 | 7,568,557 |
| Day Activity and Health Services (DAHS). | | |
| **A.2.4. Strategy:** NURSING FACILITY PAYMENTS | 377,121,109 | 387,724,478 |
| **A.2.5. Strategy:** MEDICARE SKILLED NURSING FACILITY | 39,613,759 | 39,483,587 |
| **A.2.6. Strategy:** HOSPICE | 315,621,032 | 327,559,316 |
| **A.2.7. Strategy:** INTERMEDIATE CARE FACILITIES - IID | 239,243,593 | 225,617,623 |
| Intermediate Care Facilities - for Individuals w/ ID (ICF/IID). | | |
| **A.3.1. Strategy:** HOME AND COMMUNITY-BASED SERVICES | 1,315,234,551 | 1,343,608,534 |
| Home and Community-based Services (HCS). | | |
| **A.3.2. Strategy:** COMMUNITY LIVING ASSISTANCE (CLASS) | 349,722,568 | 355,944,524 |
| Community Living Assistance and Support Services (CLASS). | | |
| **A.3.3. Strategy:** DEAF-BLIND MULTIPLE DISABILITIES | 19,696,763 | 20,022,611 |
| Deaf-Blind Multiple Disabilities (DBMD). | | |
| **A.3.4. Strategy:** TEXAS HOME LIVING WAIVER | 73,161,087 | 77,563,796 |
| **A.3.5. Strategy:** ALL-INCLUSIVE CARE - ELDERLY (PACE) | 42,105,888 | 42,106,322 |
| Program of All-inclusive Care for the Elderly (PACE). | | |
| **A.4.1. Strategy:** NON-FULL BENEFIT PAYMENTS | 946,385,160 | 940,089,910 |
| **A.4.2. Strategy:** MEDICARE PAYMENTS | 2,619,414,946 | 2,822,987,069 |
| For Clients Dually Eligible for Medicare and Medicaid. | | |
| **Total, Goal A:** MEDICAID CLIENT SERVICES | $ 38,191,108,270 | $ 37,241,583,610 |

**HEALTH AND HUMAN SERVICES COMMISSION**
(Continued)

**B. Goal:** MEDICAID & CHIP SUPPORT
Medicaid and CHIP Contracts and Administration.

| | | | |
|---|---|---:|---:|
| **B.1.1. Strategy:** MEDICAID & CHIP CONTRACTS & ADMIN<br>Medicaid and CHIP Contracts and Administration. | $ | 700,906,677 | $ 775,884,860 |

**C. Goal:** CHIP CLIENT SERVICES
Children's Health Insurance Program Services.

| | | | |
|---|---|---:|---:|
| **C.1.1. Strategy:** CHIP<br>CHIP, Perinatal Services, Prescription Drugs,<br>And Dental Services. | $ | 793,281,185 | $ 934,847,927 |

**D. Goal:** ADDITIONAL HEALTH-RELATED SERVICES
Provide Additional Health-related Services.

| | | | |
|---|---|---:|---:|
| **D.1.1. Strategy:** WOMEN'S HEALTH PROGRAMS | $ | 225,628,380 | $ 221,574,070 |
| **D.1.2. Strategy:** ALTERNATIVES TO ABORTION | | 70,000,000 | 70,000,000 |
| **D.1.3. Strategy:** ECI SERVICES<br>Early Childhood Intervention Services. | | 195,440,023 | 201,166,548 |
| **D.1.4. Strategy:** ECI RESPITE<br>Ensure ECI Respite Services. | | 400,000 | 400,000 |
| **D.1.5. Strategy:** CHILDREN'S BLINDNESS SERVICES | | 5,748,136 | 5,748,136 |
| **D.1.6. Strategy:** AUTISM PROGRAM | | 6,831,542 | 6,831,542 |
| **D.1.7. Strategy:** CHILDREN WITH SPECIAL NEEDS<br>Children with Special Health Care Needs. | | 24,459,505 | 24,459,505 |
| **D.1.8. Strategy:** TITLE V DNTL & HLTH SVCS<br>Title V Dental and Health Services. | | 6,266,158 | 6,266,158 |
| **D.1.9. Strategy:** KIDNEY HEALTH CARE | | 15,342,022 | 15,342,022 |
| **D.1.10. Strategy:** ADDITIONAL SPECIALTY CARE | | 16,452,474 | 16,452,474 |
| **D.1.11. Strategy:** COMMUNITY PRIMARY CARE SERVICES | | 11,912,408 | 11,912,408 |
| **D.1.12. Strategy:** ABSTINENCE EDUCATION | | 6,376,760 | 6,376,760 |
| **D.1.13. Strategy:** PRESCRIPTION DRUG SAVINGS PROGRAM | | 14,273,041 | 14,273,041 |
| **D.1.14. Strategy:** PRIMARY HEALTH & SPECIALTY CARE ADM<br>Primary Health And Specialty Care<br>Administration. | | 26,744,411 | 26,733,704 |
| **D.2.1. Strategy:** COMMUNITY MENTAL HEALTH SVCS-ADULTS<br>Community Mental Health Services (MHS) for<br>Adults. | | 451,244,249 | 451,244,249 |
| **D.2.2. Strategy:** COMMUNITY MENTAL HLTH SVCS-CHILDREN<br>Community Mental Health Services (MHS) for<br>Children. | | 110,629,159 | 110,629,159 |
| **D.2.3. Strategy:** COMMUNITY MENTAL HEALTH CRISIS SVCS<br>Community Mental Health Crisis Services (CMHCS). | | 168,063,047 | 165,563,047 |
| **D.2.4. Strategy:** SUBSTANCE ABUSE SERVICES<br>Substance Abuse Prevention, Intervention, and<br>Treatment. | | 276,979,144 | 277,091,747 |
| **D.2.5. Strategy:** BEHAVIORAL HLTH WAIVER & AMENDMENT<br>Behavioral Health Waiver and Plan Amendment. | | 33,264,695 | 32,812,995 |
| **D.2.6. Strategy:** COMMUNITY MENTAL HEALTH GRANT PGMS<br>Community Mental Health Grant Programs. | | 106,500,000 | 106,500,000 |
| **D.2.7. Strategy:** COMMUNITY BEHAVIORAL HEALTH ADM<br>Community Behavioral Health Administration. | | 54,524,689 | 54,878,168 |
| **D.3.1. Strategy:** INDIGENT HEALTH CARE REIMBURSEMENT<br>Indigent Health Care Reimbursement (UTMB). | | 439,443 | 439,443 |
| **D.3.2. Strategy:** COUNTY INDIGENT HEALTH CARE SVCS<br>County Indigent Health Care Services. | | 676,309 | 676,309 |
| **Total, Goal D:** ADDITIONAL HEALTH-RELATED SERVICES | $ | 1,828,195,595 | $ 1,827,371,485 |

**E. Goal:** ENCOURAGE SELF-SUFFICIENCY

| | | | |
|---|---|---:|---:|
| **E.1.1. Strategy:** TANF (CASH ASSISTANCE) GRANTS<br>Temporary Assistance for Needy Families Grants. | $ | 20,384,390 | $ 21,107,345 |

## HEALTH AND HUMAN SERVICES COMMISSION
### (Continued)

| | | | |
|---|---|---|---|
| **E.1.2. Strategy:** PROVIDE WIC SERVICES<br>Provide WIC Services: Benefits, Nutrition<br>Education & Counseling. | | 829,844,577 | 829,844,577 |
| **Total, Goal E:** ENCOURAGE SELF-SUFFICIENCY | $ | 850,228,967 | $ 850,951,922 |
| **F. Goal:** COMMUNITY & IL SVCS & COORDINATION<br>Community & Independent Living Services & Coordination. | | | |
| **F.1.1. Strategy:** GUARDIANSHIP | $ | 9,302,237 | $ 9,302,237 |
| **F.1.2. Strategy:** NON-MEDICAID SERVICES | | 181,999,604 | 182,253,060 |
| **F.1.3. Strategy:** NON-MEDICAID IDD COMMUNITY SVCS<br>Non-Medicaid Developmental Disability Community<br>Services. | | 50,789,535 | 50,789,535 |
| **F.2.1. Strategy:** INDEPENDENT LIVING SERVICES<br>Independent Living Services (General, Blind,<br>and CILs). | | 14,553,046 | 14,553,046 |
| **F.2.2. Strategy:** BEST PROGRAM<br>Blindness Education, Screening and Treatment<br>(BEST) Program. | | 430,000 | 430,000 |
| **F.2.3. Strategy:** COMPREHENSIVE REHABILITATION<br>(CRS)<br>Provide Services to People with Spinal<br>Cord/Traumatic Brain Injuries. | | 23,154,456 | 23,154,456 |
| **F.2.4. Strategy:** DEAF AND HARD OF HEARING<br>SERVICES<br>Provide Services to Persons Who Are Deaf or<br>Hard of Hearing. | | 4,140,361 | 4,140,361 |
| **F.3.1. Strategy:** FAMILY VIOLENCE SERVICES | | 58,570,757 | 58,570,758 |
| **F.3.2. Strategy:** CHILD ADVOCACY PROGRAMS | | 57,739,897 | 57,739,897 |
| **F.3.3. Strategy:** ADDITIONAL ADVOCACY PROGRAMS | | 25,867,739 | 25,867,739 |
| **Total, Goal F:** COMMUNITY & IL SVCS &<br>COORDINATION | $ | 426,547,632 | $ 426,801,089 |
| **G. Goal:** FACILITIES<br>Mental Health State Hospitals, SSLCs and Other Facilities. | | | |
| **G.1.1. Strategy:** STATE SUPPORTED LIVING CENTERS | $ | 793,530,359 | $ 791,462,594 |
| **G.2.1. Strategy:** MENTAL HEALTH STATE HOSPITALS | | 583,996,279 | 583,996,279 |
| **G.2.2. Strategy:** MENTAL HEALTH COMMUNITY<br>HOSPITALS | | 312,209,485 | 311,207,368 |
| **G.3.1. Strategy:** OTHER FACILITIES<br>Other State Medical Facilities. | | 5,890,216 | 5,890,216 |
| **G.4.1. Strategy:** FACILITY PROGRAM SUPPORT | | 14,023,745 | 14,023,745 |
| **G.4.2. Strategy:** FACILITY CAPITAL REPAIRS &<br>RENOV<br>Capital Repair and Renovation at SSLCs, State<br>Hospitals, and Other. | | 91,588,373 | 20,739,918 |
| **Total, Goal G:** FACILITIES | $ | 1,801,238,457 | $ 1,727,320,120 |
| **H. Goal:** REGULATORY SERVICES<br>Regulatory, Licensing and Consumer Protection Services. | | | |
| **H.1.1. Strategy:** FACILITY/COMMUNITY-BASED<br>REGULATION<br>Health Care Facilities & Community-based<br>Regulation. | $ | 130,576,742 | $ 131,123,635 |
| **H.2.1. Strategy:** CHILD CARE REGULATION | | 59,932,381 | 58,908,159 |
| **H.3.1. Strategy:** HEALTH CARE PROFESSIONALS &<br>OTHER<br>Credentialing/Certification of Health Care<br>Professionals & Others. | | 3,427,373 | 3,201,926 |
| **H.4.1. Strategy:** TEXAS.GOV<br>Texas.gov. Estimated and Nontransferable. | | 43,711 | 43,711 |
| **Total, Goal H:** REGULATORY SERVICES | $ | 193,980,207 | $ 193,277,431 |
| **I. Goal:** PGM ELG DETERMINATION & ENROLLMENT<br>Program Eligibility Determination & Enrollment. | | | |
| **I.1.1. Strategy:** INTEGRATED ELIGIBILITY &<br>ENROLLMENT<br>Integrated Financial Eligibility and Enrollment<br>(IEE). | $ | 744,754,506 | $ 667,691,469 |

## HEALTH AND HUMAN SERVICES COMMISSION
### (Continued)

| | | |
|---|---:|---:|
| **I.2.1. Strategy:** LONG-TERM CARE INTAKE & ACCESS<br>Intake, Access, and Eligibility to Services and<br>Supports. | 261,433,228 | 262,470,425 |
| **I.3.1. Strategy:** TIERS & ELIGIBILITY SUPPORT<br>TECH<br>Texas Integrated Eligibility Redesign System &<br>Supporting Tech. | 112,593,157 | 112,459,154 |
| **I.3.2. Strategy:** TIERS CAPITAL PROJECTS<br>Texas Integrated Eligibility Redesign System<br>Capital Projects. | 69,982,214 | 69,687,423 |
| **Total, Goal I:** PGM ELG DETERMINATION &<br>ENROLLMENT | $ 1,188,763,105 | $ 1,112,308,471 |
| **J. Goal:** DISABILITY DETERMINATION<br>Provide Disability Determination Services within SSA Guidelines. | | |
| **J.1.1. Strategy:** DISABILITY DETERMINATION SVCS<br>(DDS)<br>Determine Federal SSI and SSDI Eligibility. | $ 104,811,692 | $ 104,811,692 |
| **K. Goal:** OFFICE OF INSPECTOR GENERAL | | |
| **K.1.1. Strategy:** OFFICE OF INSPECTOR GENERAL | $ 61,736,739 | $ 60,042,257 |
| **L. Goal:** SYSTEM OVERSIGHT & PROGRAM SUPPORT<br>HHS Enterprise Oversight and Policy. | | |
| **L.1.1. Strategy:** HHS SYSTEM SUPPORTS<br>Enterprise Oversight and Policy. | $ 154,711,537 | $ 145,407,246 |
| **L.1.2. Strategy:** IT OVERSIGHT & PROGRAM SUPPORT<br>Information Technology Capital Projects<br>Oversight & Program Support. | 323,004,832 | 295,754,343 |
| **L.2.1. Strategy:** CENTRAL PROGRAM SUPPORT | 45,636,329 | 45,651,840 |
| **L.2.2. Strategy:** REGIONAL PROGRAM SUPPORT | 113,036,020 | 111,069,722 |
| **Total, Goal L:** SYSTEM OVERSIGHT & PROGRAM<br>SUPPORT | $ 636,388,718 | $ 597,883,151 |
| **M. Goal:** TEXAS CIVIL COMMITMENT OFFICE | | |
| **M.1.1. Strategy:** TEXAS CIVIL COMMITMENT OFFICE | $ 18,341,985 | $ 20,005,029 |
| **M.1.2. Strategy:** TCCO ADMINISTRATION<br>Texas Civil Commitment Office Administration. | 4,617,243 | 4,653,065 |
| **Total, Goal M:** TEXAS CIVIL COMMITMENT OFFICE | $ 22,959,228 | $ 24,658,094 |
| **N. Goal:** SALARY ADJUSTMENTS | | |
| **N.1.1. Strategy:** SALARY ADJUSTMENTS | $ 117,838,926 | $ 235,518,029 |
| **Grand Total,** HEALTH AND HUMAN SERVICES<br>COMMISSION | $ 46,917,985,398 | $ 46,113,260,138 |
| **Supplemental Appropriations Made In Riders:** | $ 7,500,000 | $ 7,500,000 |

**Object-of-Expense Informational Listing:**

| | | |
|---|---:|---:|
| Salaries and Wages | $ 2,155,394,385 | $ 2,273,563,620 |
| Other Personnel Costs | 66,448,066 | 66,453,482 |
| Professional Fees and Services | 1,488,549,948 | 1,509,701,239 |
| Fuels and Lubricants | 1,400,052 | 1,400,052 |
| Consumable Supplies | 11,061,630 | 11,059,879 |
| Utilities | 44,593,400 | 44,593,400 |
| Travel | 28,476,794 | 27,878,512 |
| Rent - Building | 118,826,243 | 119,751,160 |
| Rent - Machine and Other | 24,579,765 | 24,579,765 |
| Other Operating Expense | 494,440,089 | 408,428,742 |
| Client Services | 40,082,411,166 | 39,293,451,973 |
| Food for Persons - Wards of State | 21,450,451 | 21,450,451 |
| Grants | 2,278,873,210 | 2,280,684,016 |
| Capital Expenditures | 108,980,199 | 37,763,847 |
| **Total, Object-of-Expense Informational Listing** | $ 46,925,485,398 | $ 46,120,760,138 |

*Line item Veto: Pursuant to Const Art IV, § 14, the Governor disapproved certain provisions of this Act. Vetoes appear as* ~~multiple strike-through~~ *text.*

### Governor's Veto Message

House Bill No. 1 , the General Appropriations Act, having been duly certified by the Comptroller of Public Accounts pursuant to Article III, Section 49a of the Texas Constitution, has been presented to me for action.

[This budget provides historic levels of property tax relief and does not allow government to grow in an amount greater than the increase in population and inflation. This Act also makes targeted investments in areas such as public education, higher education, mental health care, foster care, law enforcement, border security, pension solvency, state parks, and broadband access that will continue building the Texas of Tomorrow.]

[Before turning to the objectionable item of appropriation in House Bill No. 1 , I must note that Section 17.36 of Article TX is unconstitutional. Section 17.36 purports to tell the Lottery Commission that it must issue a new rule on a particular subject. This attempt to make general law in the General Appropriations Act violates Article III, Section 35 of the Texas Constitution. A similar command to the Lottery Commission was proposed in Senate Bill No. 1820, but the Legislature did not pass that bill.]

[I hereby object to and veto the following item from House Bill No. 1 , and include a statement of my objection to this item.]

### Article IX — General Provisions

Contingency and Other Provisions

**Sec. 18.76.   Contingency for Senate Joint Resolution 81.** ~~Contingent on the enactment Senate Joint Resolution 81 by the 88th Legislature, Regular Session, 2023, legislation, and after approval of the constitutional amendment by the voters:~~

~~(a) Appropriate $ 1,050,000,000 in General Revenue Funds to the Comptroller of Public Accounts, for distribution to the permanent fund on January 1, 2024; and~~

~~(b) Create a new bill pattern for the Available Instruction in Manufacturing and Technical Workforce Operations Fund and in relevant strategies, increase funding by an amount of Other Funds the Comptroller determines to be available for distribution from the Permanent Instruction in Manufacturing and Technical Workforce Operations Fund in fiscal year 2024 and fiscal year 2025, in accordance with a distribution policy to be adopted by the Comptroller. Add the following riders to the bill pattern:~~

**1.   Texas State Technical College System Share.** ~~There is appropriated to the board of regents of the Texas State Technical College System for the biennium ending August 31, 2025, upon request of the system to the Comptroller of Public Accounts, that portion of the Available Instruction in Manufacturing and Technical Workforce Operations Fund apportioned to it by Article VII, Section 23(j) of the Texas Constitution, together with interest and any balance in any account established within the available fund by the system for any previous fiscal year.~~

**2.   Texas State University System Share.** ~~There is appropriated to the board of regents of the Texas State University System for the biennium ending August 31, 2025, upon request of the system to the Comptroller of Public Accounts, that portion of the Available Instruction in Manufacturing and Technical Workforce Operations Fund apportioned to it by Article VII, Section 23(j) of the Texas Constitution, together with interest and any balance in any account established within the available fund by the system for any previous fiscal year.~~

**3. Reporting.** ~~The Texas State Technical College System and the Texas State University System shall report to the Legislature and the Governor no later than December 1 of each year, beginning December 1, 2024, the uses of the Available Instruction in Manufacturing and Technical Workforce Operations Fund for each system component for the two previous fiscal years, the current fiscal year, and two future fiscal years (projected). Each report shall contain detailed information on the following:~~

~~(1) debt service allocations, by component;~~

~~(2) bond proceeds allocations, by component;~~

~~(3) available fund allocations, by component, and their purposes;~~

~~(4) available fund income, interest, beginning and end of year balances; and~~

~~(5) the rationale used by the respective boards to distribute the available funds.~~

**4. Appropriation: Unexpended Balances.** ~~Any unobligated and unexpended balances as of August 31, 2023, in Available Instruction in Manufacturing and Technical Workforce Operations Fund appropriations apportioned to the Texas State Technical College System or Texas State University System are appropriated for the same purpose for the fiscal year beginning September 1, 2023. Any unobligated and unexpended balances as of August 31, 2024, in Available Instruction in Manufacturing and Technical Workforce Operations Fund appropriations apportioned to the Texas State Technical College System or Texas State University System are appropriated for the same purpose for the fiscal year beginning September 1, 2024.~~

*This veto deletes a contingency rider for a joint resolution that did not pass.*

**SIGNING MESSAGE**

I have signed House Bill No. 1 together with this proclamation, stating my objections in accordance with Article IV, Section 14, of the Texas Constitution.

Since the 88th Legislature, Regular Session, by its adjournment has prevented the return of this bill, I am filing this bill and this objection in the office of the Secretary of State and giving notice thereof by this public proclamation according to the aforementioned constitutional provision.

Passed the House on April 6, 2023: Yeas 136, Nays 10, 1 present not voting; passed the Senate, with amendments, on April 17, 2023: Yeas 31, Nays 0; April 20, 2023, House refused to concur in Senate amendments and requested appointment of Conference Committee; May 26, 2023, Senate appointed a conference committee and adopted the conference committee report: Yeas 29, Nays 2; May 27, 2023, House adopted Conference Committee Report: Yeas 124, Nays 22, zero present not voting; passed subject to the provisions of Article III, Section 49a, of the Constitution of Texas.

Signed by the Governor/line item veto June 18, 2023.

Effective September 1, 2023.

# TAB 5

TEXAS ADMINISTRATIVE CODE

TITLE 1. ADMINISTRATION

PART 5. TEXAS FACILITIES COMMISSION

CHAPTER 115. FACILITIES LEASING PROGRAM

SUBCHAPTER B. CANCELLATION OF LEASE DUE TO LACK OF FUNDING

# § 115.20. DEFINITIONS.

The following words and terms, when used in this subchapter, shall have the following meanings, unless the context clearly indicates otherwise.

(1) "Cost of idle facilities or idle capacity" means costs such as maintenance, repair, housing, rent, and other related costs, e.g., insurance, interest, property taxes and depreciation or use allowances.

(2) "Facilities" means land and buildings or any portion thereof, equipment individually or collectively, or any other tangible capital asset, wherever located, and whether owned or leased by the governmental agency.

(3) "Funding Out Clause" means the constitutional prohibitions on spending as set out in Sections 49 and 49a, Article III, Texas Constitution and codified in Texas Government Code §2167.055(e) (West 2008) which are incorporated into the state lease, as amended.

(4) "Governmental agency" means a board, commission, department, office, or other agency in the executive branch of state government, including an institution of higher education as defined by Section 61.003, Education Code.

(5) "Idle capacity" means the unused capacity of partially used facilities. It is the difference between: (a) that which a facility could achieve under 100 percent operating time on a one-shift basis less operating interruptions resulting from time lost for repairs, setups, unsatisfactory materials, and other normal delays; and (b) the extent to which the facility was actually used to meet demands during the accounting period. A multi-shift basis should be used if it can be shown that this amount of usage would normally be expected for the type of facility involved.

(6) "Idle facilities" means completely unused facilities that are excess to the governmental agency's current needs.

## § 115.21. DETERMINATION OF IDLE CAPACITY OR IDLE FACILITIES.

(a) Prior to requesting that the Commission cancel a lease due to lack of funding, the governmental agency shall determine that it occupies idle facilities or has idle capacity due to one of the following factors:

    (1) changes in program requirements;

    (2) the implementation of changes that result in a reduction in staff;

    (3) consolidation of office or building space to achieve cost efficiencies;

    (4) a change in client demographics resulting in the need to relocate staff to other locations; or

    (5) efforts to achieve more economical operations, reorganization, termination, or other causes which could not have been reasonably foreseen.

(b) Upon furnishing a written determination that the governmental agency occupies idle facilities or has idle capacity based upon the factors set out in subsection (a) above to the Commission, a lease may be considered for cancellation by the Commission upon request by a governmental agency.

# § 115.22. CANCELLATION OF LEASE UPON REQUEST BY A GOVERNMENTAL AGENCY DUE TO LACK OF FUNDING.

(a) Unless a governmental agency has been abolished by the Legislature, a governmental agency that elects to invoke the Funding Out Clause to cancel a lease due to lack of funding shall request the Commission to either cancel the lease or make the leased premises available to another governmental agency.

(b) A request by a governmental agency to cancel a lease due to lack of funding must have the approval of the governing body of the governmental agency making the request. Any agency under the authority of an individual commissioner or executive director, appointed by or directly accountable to the Governor, must provide evidence of notification to the Office of the Governor in order for such a request to be considered for action by the Commission.

(c) Unless the term of the lease is amended by written agreement between a lessor and the Commission, the Commission will serve written notice to the lessor of intent to cancel the lease effective on a date certain at least 180 days prior to the date of the lease cancellation. Notice to the lessor is effective upon receipt if served by electronic mail directed to the lessor's designated contact on the Commission's database. Rent shall continue to be paid through the date that the lessee vacates the facilities or through the end of the biennium, whichever is earlier, for which funds had been certified pursuant to Texas Government Code § 2167.101.

# TAB 6



# Legislative Appropriations Request
# for Fiscal Year 2024 and 2025
# Volume II

**Submitted to the**
**Office of the Governor, Budget and Policy Division,**
**and the Legislative Budget Board**
**by Health and Human Services Commission**
**September 9, 2022**

**4.A. Exceptional Item Request Schedule**
88th Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE: **9/9/2022**
TIME: **11:56:06AM**

Agency code: **529**       Agency name: **Health and Human Services Commission**

| CODE | DESCRIPTION | Excp 2024 | Excp 2025 |
|------|-------------|-----------|-----------|
| | Item Name: Maintain Public Facing Offices and Client Supports | | |
| | Item Priority: 18 | | |
| | IT Component: No | | |
| | Anticipated Out-year Costs: Yes | | |
| | Involve Contracts > $50,000: No | | |
| | Includes Funding for the Following Strategy or Strategies: 12-02-02  Regional Program Support | | |

**OBJECTS OF EXPENSE:**

| CODE | DESCRIPTION | Excp 2024 | Excp 2025 |
|------|-------------|-----------|-----------|
| 2001 | PROFESSIONAL FEES AND SERVICES | 1 | 1 |
| 2006 | RENT - BUILDING | 29,601,496 | 41,826,148 |
| | **TOTAL, OBJECT OF EXPENSE** | **$29,601,497** | **$41,826,149** |

**METHOD OF FINANCING:**

| CODE | DESCRIPTION | | Excp 2024 | Excp 2025 |
|------|-------------|--|-----------|-----------|
| 1 | General Revenue Fund | | 18,613,126 | 26,299,865 |
| 555 | Federal Funds | | | |
| 10.557.001 | | SPECIAL SUPPL FOOD WIC | 2,960 | 4,183 |
| 10.561.000 | | State Admin Match SNAP | 1,353,084 | 1,911,873 |
| 93.767.000 | | CHIP | 183,825 | 259,740 |
| 93.778.000 | | XIX FMAP | 28,417 | 40,153 |
| 93.778.003 | | XIX 50% | 3,950,024 | 5,581,281 |
| 758 | GR Match For Medicaid | | 4,045,637 | 5,716,380 |
| 8010 | GR Match For Title XXI | | 56,539 | 79,888 |
| 8014 | GR Match for Food Stamp Admin | | 1,353,084 | 1,911,873 |
| 8032 | GR Certified As Match For Medicaid | | 14,801 | 20,913 |
| | **TOTAL, METHOD OF FINANCING** | | **$29,601,497** | **$41,826,149** |

**DESCRIPTION / JUSTIFICATION:**

This EI includes funding for cost increases and inflation impacts for critical agency functions including leases and major non-client services contracts for which there is little or no flexibility to alter the pricing structure or services provided under the contract.

The first component is for leases. HHS has experienced a steady increase in lease costs from FY 2017 and costs increased significantly from $93.9 million in FY 2021 to an estimated $102.2 million in FY 2022.

The increase in lease costs has required HHSC to reduce support costs including onsite security and monitoring, custodial services, building maintenance, pest control,  HVAC and plumbing services. HHSC does not have the ability to absorb further cost increases without closing public facing offices. This item includes an assumed 9.9% year-over-year increase in the Consumer Price Index for the 2024-25 biennium.

**4.A. Exceptional Item Request Schedule**
88th Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE: **9/9/2022**

TIME: **11:56:06AM**

| Agency code: | **529** | Agency name: | **Health and Human Services Commission** |

| CODE | DESCRIPTION | Excp 2024 | Excp 2025 |
| --- | --- | --- | --- |

Although new leases result in a smaller footprint in terms of space, new leases replace older space with lower costs. As Texas continues to experience population growth, new facility costs will be higher per square foot.

The remainder of the EI request serves as a placeholder for inflation impacts on program and indirect administration costs at HHSC, including for major non-client services contracts. HHSC anticipates that additional data on inflation will be available during the legislative session, and that the 2024-25 Biennial Revenue Estimate will reflect additional revenue due to inflationary impacts on certain revenue sources. HHSC anticipates that inflation will most significantly impact the fixed costs of major non-client service contracts for which there is little or no flexibility to alter the pricing structure or services provided under the contract. As additional information becomes available, the agency will be able to more accurately assess its needs.

**EXTERNAL/INTERNAL FACTORS:**

The Health and Human Services Commission (HHSC) is experiencing significant impacts from inflation and other cost increases on several critical agency functions and support costs, including on client service programs, state-owned facility operations and construction, staffing, leases, and major contracts. The Comptroller publishes Key Economic Indicators, including measures of inflation based on year-to-year change in the Consumer Price Index (CPI) based on information provided by the US Bureau of Labor Statistics. As of August 2022?, CPI in Texas increased by 9.9% from the previous year. Historically, HHSC has absorbed inflation within existing resources, but with budget reductions to administration in the 2022-23 biennium and years of absorbing inflation within existing resources, HHSC will be unable to manage this level of inflation without disruptions to service delivery and related administration if current appropriation levels are not adjusted. HHSC has limited flexibility to manage cost increases for major contracts and for leases.

Lease contracts are entered into by Texas Facility Commission (TFC) with lessors on behalf of occupying agencies. Each lease has a Consumer Price Index (CPI) escalation clause that allows the lessor to request an increase yearly. TFC enters into lease contracts in good faith on behalf of state agencies. Their input is required before lease payments are withheld or an agency seeks to end a lease prematurely for any reason.

HHSC major non-client service contracts primarily consist of 1) contracts that impact the capacity to complete the eligibility determinations for client service programs; and 2) contracts that impact the operations and oversight of the Medicaid program. HHSC has little or no flexibility to alter the pricing structure or the services provided under the contracts.

**PCLS TRACKING KEY:**

**DESCRIPTION OF ANTICIPATED OUT-YEAR COSTS :**

Each Lease permits a Consumer Price Index (CPI) esculation clause that will allow the lessor to request an increase yearly. Texas continues to experience population growth and a competitive realestate market. Annual regional lease costs in FY2017 was $70,032,535 and has risen to $82,474,757 in FY2022. The probability of additional facility replacements occurring in the future is high as some locations are more than 20 years old and agencies' business processes change as time goes on. The rise in lease costs has also been accompanied with the rise in services required to support the leases.

Agency code: **529**  Agency name: **Health and Human Services Commission**

| CODE | DESCRIPTION | Excp 2024 | Excp 2025 |
|------|-------------|-----------|-----------|

**ESTIMATED ANTICIPATED OUT-YEAR COSTS FOR ITEM:**

| 2026 | 2027 | 2028 |
|------|------|------|
| $41,826,149 | $41,826,149 | $41,826,149 |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jason LaFond on behalf of Jason LaFond
Bar No. 24103136
jlafond@scottdoug.com
Envelope ID: 100566689
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Brief Not Requesting Oral Argument
Status as of 5/7/2025 4:40 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Michaelle Peters | | mpeters@scottdoug.com | 5/7/2025 4:14:15 PM | SENT |
| Angela Goldberg | | agoldberg@scottdoug.com | 5/7/2025 4:14:15 PM | SENT |
| Susie Smith | | ssmith@scottdoug.com | 5/7/2025 4:14:15 PM | SENT |
| Jason R.LaFond | | jlafond@scottdoug.com | 5/7/2025 4:14:15 PM | SENT |
| Kemp Kasling | | kkasling@kaslinglaw.com | 5/7/2025 4:14:15 PM | SENT |
| Angie Espinoza | | aespinoza@scottdoug.com | 5/7/2025 4:14:15 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Victoria Gomez | | victoria.gomez@oag.texas.gov | 5/7/2025 4:14:15 PM | SENT |
| Alyssa Bixby-Lawson | | alyssa.bixby-lawson@oag.texas.gov | 5/7/2025 4:14:15 PM | SENT |

Associated Case Party: Broadmoor Austin Associates, a Texas Joint Venture

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Sara W.Clark | | sclark@scottdoug.com | 5/7/2025 4:14:15 PM | SENT |
| Casey Dobson | | cdobson@scottdoug.com | 5/7/2025 4:14:15 PM | SENT |